# EXHIBIT 1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )        CDC Number D-59353
                          )
WAYNE ROSS                )
                          )
_____)

**INMATE COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 9, 2006

3:57 P.M.

PANEL PRESENT:

Mr. Tom Sawyer, Presiding Commissioner
Ms. Suzanne Rothlisberger, Deputy Commissioner

OTHERS PRESENT:

Mr. Wayne Ross, Inmate
Ms. Maryann Tardiff, Attorney for Inmate
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

**Stacy Wegner, Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 5 |
| Pre-Commitment Factors | 21 |
| Post-Commitment Factors | 39 |
| Parole Plans | 29 |
| Closing Statements | 54 |
| Recess | 57 |
| Decision | 58 |
| Adjournment | 77 |
| Transcriber Certification | 78 |

--oOo--

P R O C E E D I N G S

**DEPUTY COMMISSIONER ROTHLISBERGER:** We are on record.

**PRESIDING COMMISSIONER SAWYER:** Okay. This is a subsequent parole consideration hearing for Wayne Ross, R-O-S-S, CDC number D-59353. Today's date is June the 9th, 2006. It's 3:57 in the afternoon. We're at the Correctional Training Facility in Soledad. The date received was 6/18 of 1987 from the county of Ventura, murder in the second degree, case number CR-22128, count number one 187. The term is 25 to life. The minimum eligible parole date of 1/21 of '03. This hearing is being tape recorded, and for the purpose of voice identification, each of us is required to state our first and last name, spelling our last name. And when it comes to you, Mr. Ross, as you'll recall, we also want your CDC number. Okay. I'll start and go to my left, Tom Sawyer, S-A-W-Y-E-R, Commissioner.

**DEPUTY COMMISSIONER ROTHLISBERGER:** Suzanne Rothlisberger, R-O-T-H-L-I-S-B-E-R-G-E-R, Deputy Commissioner.

**ATTORNEY TARDIFF:** Maryann Tardiff, T-A-R-D-I-F-F, attorney for Mr. Ross.

**INMATE ROSS:** Wayne Ross, D-59353.

1       **PRESIDING COMMISSIONER SAWYER:**  Spell your

2    last name.

3       **INMATE ROSS:**  R-O-S-S.

4       **PRESIDING COMMISSIONER SAWYER:**  Thank you.

5    Okay.  We have two correctional peace officers

6    in the room for security purposes.  The record

7    reflects, Mr. Ross, you signed a BPT 1073, which

8    is a reasonable accommodation notice in request

9    and accordance with the provisions of the

10   American's with Disabilities Act today.  We did

11   not find one in your file.  You have a copy.  I

12   gave the form to your attorney.  Did she discuss

13   that with you?

14      **INMATE ROSS:**  Yes.

15      **PRESIDING COMMISSIONER SAWYER:**  Okay.  And

16   you indicated on that there was no disabilities

17   that affect you that you need for this hearing

18   today?

19      **INMATE ROSS:**  That's correct.

20      **PRESIDING COMMISSIONER SAWYER:**  That's

21   correct.  Okay.  You don't wear glasses?

22      **INMATE ROSS:**  No.

23      **PRESIDING COMMISSIONER SAWYER:**  Okay.  And

24   you can hear me all right?

25      **INMATE ROSS:**  Yes.

26      **PRESIDING COMMISSIONER SAWYER:**  You look

27   real alert.  So she talked to you about your

3

1  accommodation for disabilities.  Outline of the

2  hearing procedure as well?

3      **INMATE ROSS:**  Yes, sir.

4      **PRESIDING COMMISSIONER SAWYER:**  Your rights

5  and the confidential material?

6      **INMATE ROSS:**  Right.

7      **PRESIDING COMMISSIONER SAWYER:**  Okay.

8  Counsel, would you waive reading those scripts?

9      **ATTORNEY TARDIFF:**  I will.

10     **PRESIDING COMMISSIONER SAWYER:**  Okay.  I

11 will mark that Exhibit One and put it in the

12 package.  Okay.  Commissioner Rothlisberger, do

13 we have any confidential material?

14     **DEPUTY COMMISSIONER ROTHLISBERGER:**  There

15 is but we will not be using it.

16     **PRESIDING COMMISSIONER SAWYER:**  I passed

17 the checklist to Ms. Tardiff marked Exhibit Two

18 if you could check that against your documents.

19     **ATTORNEY TARDIFF:**  I'm marking the psych

20 report document and board report as well.

21 They're current.  I have these.  Thank you.

22     **PRESIDING COMMISSIONER SAWYER:**  I have -- I

23 didn't -- didn't I have the psych marked on

24 there?

25     **ATTORNEY TARDIFF:**  No.

26     **PRESIDING COMMISSIONER SAWYER:**  Because I

27 had it in my package.

4

1          **ATTORNEY TARDIFF:**  No.

2          **PRESIDING COMMISSIONER SAWYER:**  That's the

3    psych of 5/5 of '06?

4          **ATTORNEY TARDIFF:**  Yes.

5          **PRESIDING COMMISSIONER SAWYER:**  Okay.

6    Thank you.  Do you have any additional documents

7    to be submitted?

8          **ATTORNEY TARDIFF:**  No.

9          **PRESIDING COMMISSIONER SAWYER:**  Is there

10   anything you want to include in this hearing,

11   Mr. Ross?

12         **INMATE ROSS:**  None other than what I have.

13         **PRESIDING COMMISSIONER SAWYER:**  Okay.

14   Well, then Counsel, is there any preliminary

15   objections?

16         **ATTORNEY TARDIFF:**  There are none.  I just

17   received the District Attorney's letter.  It's

18   very lengthy.  Obviously I've had insufficient

19   amount of time to go over it and prepare for

20   this hearing, so I make a motion that it not be

21   allowed.

22         **PRESIDING COMMISSIONER SAWYER:**  Based on

23   the 10-day rule?

24         **ATTORNEY TARDIFF:**  Yes.

25         **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

26   sustained.

27         **ATTORNEY TARDIFF:**  Thank you.

5

1      **PRESIDING COMMISSIONER SAWYER:**   Will the

2   inmate be speaking with the Panel?

3      **ATTORNEY TARDIFF:**   Yes.

4      **PRESIDING COMMISSIONER SAWYER:**   Would you

5   raise your right hand, sir?   Do you solemnly

6   swear or affirm that the testimony you are about

7   to give at this hearing will be the truth, the

8   whole truth, and nothing but the truth?

9      **INMATE ROSS:**   I do.

10      **PRESIDING COMMISSIONER SAWYER:**   Thank you.

11   Would you do me a favor?

12      **INMATE ROSS:**   Yes, sir.

13      **PRESIDING COMMISSIONER SAWYER:**   Would you

14   relax.   I'm not going to lay hands on you.

15   We're just going to have a hearing here.   Take a

16   deep breath.   We all have to do that from time

17   to time.   Pretend it's a job interview, which it

18   is essentially, the hardest job interview you

19   will ever have.   Okay.   I'm going to be reading

20   -- although we have a November 2005 board

21   report, and it does have some current -- a lot

22   of current information on it, but it refers back

23   -- in the summary of the crime and the

24   prisoner's version it refers back to the

25   November 2002 calendar board report.   I'll be

26   reading from page one, summary of the crime.

27              On 12/31/1986, that's New Year's

6

```
 1          Eve, right.  At approximately 9:30
 2          -- 09:30 hours businessman Ray
 3          Tejaea, T-E-J-A-E-A, arrived at the
 4          victim, Earnest Sanchez's, S-A-N-C-
 5          H-E-Z, residence to check on tax
 6          documents that the victim had been
 7          preparing on his behalf.  Upon
 8          arrival Tejaea noticed the front
 9          door opened and unlocked and the
10          bathroom window was broken.  Tejaea
11          entered the residence and
12          repeatedly called the victim's name
13          to no avail.  Tejaea observed that
14          the lights were on and saw a
15          television set sitting on the
16          kitchen floor.  Tejaea went through
17          the house and saw the bedroom was
18          empty.  He later entered the lounge
19          office area where the victim
20          normally conducted his tax
21          accounting business.  It was there
22          that he discovered the 73 year-old
23          victim lying on his side fully
24          clothed with -- in an apparently
25          injured condition.  Tejaea
26          immediately retreated from the
27          house and went to the bank and
```

7

1   cashed a check, then went home and
2   called the police, advised them of
3   his client's discovery.  At
4   approximately 11:00 hours Oxnard
5   Police, Fire, and Medical personnel
6   arrived at the victim's residence
7   and located him lying in a pool of
8   blood.  His vital signs were
9   checked, and he was determined to
10  be dead.  During investigation a
11  set of identifiable fingerprints
12  were lifted from the inside seal of
13  the broken bathroom window, which
14  later found matched those
15  fingerprints belonging to Wayne
16  Ross.  Also found in the office
17  lounge area were a pair of scissors
18  embedded in the base board.  The
19  room itself had splatters of blood
20  and the furniture was in disarray
21  as though there had been a
22  struggle.  There were shoe prints
23  in the bloodstains on the kitchen
24  tile floor.  The telephone was
25  found off the receiver with the
26  receiver off the hook dangling on
27  to the floor.  Because Ross was the

8

1  primary suspect in a previous

2  December 16th, 1986, theft of the

3  deceased -- of the deceased

4  victim's wallet, Oxnard Police

5  investigators contacted him at his

6  residence and brought him to the

7  Oxnard Police station for

8  questioning.  Ross denied

9  involvement in the murder and

10  instead maintained that he was with

11  his brother Malcolm Webster, W-E-B-

12  S-T-E-R, and Frank Crawford

13  McCauley, M-C-C-A-U-L-E-Y, the

14  evening that the victim had been

15  murdered.  Ross also indicated that

16  the murder victim -- this doesn't

17  make sense.  Ross also indicated

18  that they and the murder victim

19  were good friends and that on

20  occasion, because the victim was

21  still actually active, he would

22  provide him with females.  Also

23  stated that the victim was in good

24  shape and very strong and that they

25  would box with each others.  Police

26  investigators interviewed McCauley

27  and Webster who both confirmed that

9

1    the three were together the

2    previous evening.  While at Ross's

3    residence investigators checked all

4    the tennis shoes in an attempt to

5    match shoe prints found on the

6    victim's floor.  Police

7    investigators were left with the

8    impression that Ross was a witness

9    and that he was not a suspect.

10   Later investigators were notified

11   that Ross's fingerprints matched

12   those lifted off the window seal.

13   Ross was again brought to the

14   police station and mirandized.

15   Ross waived his right per Miranda

16   and submitted to a polygraph test,

17   and on the second interview Ross

18   subsequently confessed to

19   inflicting injuries on the victim

20   with a pair of scissors in self

21   defense.  He claimed that he did

22   not attempt to kill the victim and

23   that when he left he thought the

24   victim was alive.  On 12/31/86 at

25   approximately 9:25 p.m. Ross was

26   interviewed -- re-interviewed by

27   detectives Tatum and Garcia

10

```
1     regarding the homicide.  Claiming
2     to have killed the victim in self
3     defense, the victim had initiated
4     the attack by striking him in the
5     face several times.  He complained
6     that the victim struck him with a
7     staple gun.  He stated that the
8     victim reported -- reportedly
9     grabbed a pair of scissors off the
10    desk and began stabbing Ross.  Ross
11    claimed to have gotten the scissors
12    away from the victim and started
13    hitting the victim back with the
14    scissors making contact with him
15    three or four times.  Ross told
16    detectives that he lied because he
17    was afraid.  He claimed that he
18    dumped his bloody clothing near K
19    Mart and later changed his story
20    saying that he dumped his clothes
21    in the area of Channel Islands
22    Boulevard and Bard Road and that he
23    had taken his shoes to McCauley's
24    motel room where they tried to wash
25    off the blood.  He also indicated
26    that McCauley and his brother had
27    gone to the area of Torrance Avenue
```

11

1       and purchased cocaine but did not

2       use any prior to the altercation.

3       At the conclusion of the interview,

4       Ross was transported to St. John's

5       Hospital where a blood sample was

6       drawn.  He was examined -- he was

7       also examined for his injuries.

8       They noted that he had a number of

9       small lacerations on his fingertips

10      of his left hand.  Also placed

11      under arrest for murder.  On

12      January 1st, 1987, Dr. Ronald

13      O'Halloran, O-'-H-A-L-L-O-R-A-N,

14      performed an autopsy on the victim.

15      The victim had approximately eight

16      wounds in his chest area, while

17      none punctured the victim's lungs

18      or the chest cavity.  The victim's

19      body also had approximately 26 to

20      28 puncture wounds in the face,

21      neck, and head area.  Many of the

22      head wounds penetrated the scalp

23      and appeared to have gouged the

24      victim's skull.  The majority of

25      the wounds were concentrated on the

26      victim's right cheek and temple

27      area.  No visible defensive wounds

12

1           were found on the victim's head.

2           Cause of death was determined to be

3           myo cardio ischemia due the blood

4           loss from the multiple stab wounds.

5           Contributing factors was sclerotic

6           heart disease and coronary

7           thrombosis.  Also Dr. O'Halloran

8           noted that all the wounds had been

9           inflicted while the victim was

10          still alive.  The wound caused

11          bleeding but not death itself.

12      Okay.  I have your version here.  Would you

13  like to talk about this, or would you like me to

14  read your version?

15      **INMATE ROSS:**  Yeah, I don't mind talking

16  about it.

17      **PRESIDING COMMISSIONER SAWYER:**  Okay.

18      **INMATE ROSS:**  It was basically, you know,

19  one of those nights where Mr. Sanchez at that

20  time had called me and I went over there.  We

21  had talked and everything about what he wanted

22  to do that night and stuff.  Prior to going over

23  there he asked me to go buy and purchase some

24  more liquor and what have you.  When I got

25  there, we went in.  We was talking and stuff,

26  and he asked me could I find him any womens to

27  be with and all that.  At that time I made

13

1    several phone calls and was unable to contact

2    anybody. We was sitting there and we was

3    laughing and talking with each other, and he

4    gets angry and he goes -- start telling me well,

5    you need to do this or -- I had prior to that

6    had got a loan from him, and he told if I get

7    these girls for him that he would scratch the

8    loan and what have you. The thing went on. He

9    gets into -- I thought at the time that he was

10   just horse playing and stuff. He called me the

11   N word and he got up, picked up the phone, swung

12   the phone at me and stuff, came around from his

13   desk at that time. That's when we started

14   boxing. Still at that time I thought we was

15   just horsing around. After he called me the N

16   word he grabbed me, we fell to the ground. I

17   noticed a pair of scissors that was in his

18   hands. I had the scissors top of my head. He

19   swung it at me a couple times. When I finally

20   got him on the bottom I took the pair of

21   scissors and just started, you know, punching at

22   him and stuff. When I got up to leave he

23   grabbed me on my leg. I turned around and kind

24   of kicked his arm up and stuff. I just left

25   there from the premises and went about my other

26   business that night. That night he was -- when

27   I left he was, you know, calling my name, come

14

1    back, let's do this, let's do that and stuff,

2    but that night I seen, you know -- I have never

3    seen him like that before.  It was just out of

4    his character to be like that and stuff.  So

5    that's when later on I was contacted and

6    notified by the DA -- I mean, excuse me, the

7    police came by, talked to me, took me down to

8    the station, questioned me about the thing.  I

9    more or less sat down and told them what

10   happened.  Come to find out he was dead.  It

11   just, you know, it's something that I didn't

12   intend to do.  There was nothing premeditated

13   and stuff.  We done this on several occasions,

14   and it was nothing out of the order, so this

15   night for some reason I wasn't able to produce.

16   This incident just unfolded, you know, just went

17   worse.  Everything just went haywire.

18        **PRESIDING COMMISSIONER SAWYER:**  Were you

19   under the influence of anything?

20        **INMATE ROSS:**  I had been drinking that

21   night.

22        **PRESIDING COMMISSIONER SAWYER:**  How much?

23        **INMATE ROSS:**  Prior to going over there I

24   might of had probably three or four beers.

25        **PRESIDING COMMISSIONER SAWYER:**  And was he

26   drinking?

27        **INMATE ROSS:**  When I got there he was

15

1  drinking some, I think it was tequila, but prior

2  to going over there he had asked me to go to the

3  store to pick up some more liquor and stuff, so

4  I think it was a couple more six packs.

5      **PRESIDING COMMISSIONER SAWYER:**  And how old

6  were you at that time?

7      **INMATE ROSS:**  28.

8      **PRESIDING COMMISSIONER SAWYER:**  28?

9      **INMATE ROSS:**  28, right.

10     **PRESIDING COMMISSIONER SAWYER:**  And you had

11 been laid off your job?

12     **INMATE ROSS:**  Yeah, I was laid off probably

13 couple a months at that time.

14     **PRESIDING COMMISSIONER SAWYER:**  So what

15 were you doing for money?

16     **INMATE ROSS:**  Well, I was drawing

17 unemployment.  I was working odd jobs for Mr.

18 Sanchez at that time, house cleaning, cutting

19 his lawn, on occasion washing his car and stuff

20 like that.

21     **PRESIDING COMMISSIONER SAWYER:**  How much

22 money did you owe him?

23     **INMATE ROSS:**  I think it was 50 bucks at

24 that time.  I think it was 50 bucks at that

25 time.

26     **PRESIDING COMMISSIONER SAWYER:**  What did

27 you need to borrow money for?

16

1    INMATE ROSS:  Just for, you know, gas and
2    stuff like that.
3    PRESIDING COMMISSIONER SAWYER:  Did you
4    charge him for any of the women that you got
5    him?
6    INMATE ROSS:  No.  Well, actually we had --
7    that was kind of a deal packet, I do this, I
8    don't have to pay him back and stuff like that.
9    PRESIDING COMMISSIONER SAWYER:  That's kind
10    of charging him.
11    INMATE ROSS:  Yeah, I guess you can say
12    that.
13    PRESIDING COMMISSIONER SAWYER:  Were these
14    prostitutes that you were bringing over to him?
15    INMATE ROSS:  No.  I wouldn't say it was
16    prostitutes because I didn't know them as
17    prostitutes.  They was actually working girls as
18    far as, you know, had jobs and stuff.  None of
19    them were prostitutes.
20    PRESIDING COMMISSIONER SAWYER:  Did he pay
21    them?
22    INMATE ROSS:  Yes, on a couple occasions he
23    did.
24    PRESIDING COMMISSIONER SAWYER:  Yeah.  Did
25    he pay you?
26    INMATE ROSS:  No.
27    PRESIDING COMMISSIONER SAWYER:  But he did

17

1  loan you 50 bucks?

2      **INMATE ROSS:**  Yeah, he did loan me.

3      **PRESIDING COMMISSIONER SAWYER:**  So you

4  didn't think -- when you left there you thought

5  he was okay?

6      **INMATE ROSS:**  Yeah.  In fact, when I left,

7  like I said, when I was leaving out he grabbed

8  one of my legs, and I turned around and kicked

9  one of his arms off me and stuff, and he was

10  telling me to come back and let's finish this or

11  let's do this, and I just left.

12      **PRESIDING COMMISSIONER SAWYER:**  How did he

13  look when you left?

14      **INMATE ROSS:**  He was --

15      **PRESIDING COMMISSIONER SAWYER:**  Was he

16  bloody?

17      **INMATE ROSS:**  No, not when I left, not when

18  I left.

19      **PRESIDING COMMISSIONER SAWYER:**  Didn't you

20  leave footprints in the kitchen?

21      **INMATE ROSS:**  Yeah, well, they said that

22  there was footprints in the kitchen and in the

23  bathroom and stuff, but as far as the window and

24  stuff like that goes, I been all through his

25  house and stuff.  There was times where he had

26  me crawl through the window because a couple of

27  times he left his house keys in there and that's

18

1    when I go through the window.

2        PRESIDING COMMISSIONER SAWYER:  Is that why

3    the window was broken in the bathroom?

4        INMATE ROSS:  I can't explain why it was

5    broken that night, but that window had been

6    broken for awhile.  The window done never got

7    fixed or he never took the time or bothered to

8    have it fixed.

9        PRESIDING COMMISSIONER SAWYER:  Okay.

10       INMATE ROSS:  But he had tape over that

11   window, kind of the keep the air from coming

12   out.

13       PRESIDING COMMISSIONER SAWYER:  It was

14   December, wasn't it?

15       INMATE ROSS:  Yes.

16       PRESIDING COMMISSIONER SAWYER:  Now, what

17   about his missing wallet?  Did you have anything

18   to do with that?

19       INMATE ROSS:  Well, you know, I -- I don't

20   know nothing about the missing wallet.  In fact,

21   what I was told that everything was intact when

22   they found him.  The wallet was on him and

23   everything.

24       PRESIDING COMMISSIONER SAWYER:  Well,

25   according to this report there was a -- police

26   were investigating a missing wallet --

27       INMATE ROSS:  Right.

19

1      **PRESIDING COMMISSIONER SAWYER:**   -- on

2  December the 16th.

3      **INMATE ROSS:**  They questioned me about it,

4  but I had nothing to do with it.  In fact, I was

5  told that when they found him everything was in

6  fact intact.

7      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Well,

8  the wallet was missing prior.

9      **PRESIDING COMMISSIONER SAWYER:**  Yes.

10     **DEPUTY COMMISSIONER ROTHLISBERGER:**  Yeah.

11  Not at the time of the commitment offense.

12     **PRESIDING COMMISSIONER SAWYER:**  Right.

13     **DEPUTY COMMISSIONER ROTHLISBERGER:**  But

14  before that, I believe, is the question, right?

15     **PRESIDING COMMISSIONER SAWYER:**  Have you

16  seen these photos?

17     **INMATE ROSS:**  Yes.

18     **PRESIDING COMMISSIONER SAWYER:**  Is this

19  what he looked like when you left him?  Kind of

20  a mess.  These are blood splatters on the floor?

21     **INMATE ROSS:**  Right.

22     **PRESIDING COMMISSIONER SAWYER:**  Is this in

23  his kitchen?

24     **INMATE ROSS:**  I would assume that was.

25     **PRESIDING COMMISSIONER SAWYER:**  It's tile.

26  Did he have carpet --

27     **ATTORNEY TARDIFF:**  There is carpet in the

20

1  other areas.

2        PRESIDING COMMISSIONER SAWYER:   -- in the

3  lounge?

4        INMATE ROSS:   Yes.

5        PRESIDING COMMISSIONER SAWYER:   Lounge,

6  office?

7        INMATE ROSS:   Right.

8        PRESIDING COMMISSIONER SAWYER:   Yeah.

9        ATTORNEY TARDIFF:   You can see the carpet.

10       PRESIDING COMMISSIONER SAWYER:   Yeah, I see

11 it.

12       INMATE ROSS:   Right.

13       PRESIDING COMMISSIONER SAWYER:   Okay.

14 There's blood on the table.

15       INMATE ROSS:   Yeah.

16       PRESIDING COMMISSIONER SAWYER:   And blood

17 on his desk, his paperwork, blood on the wall

18 next to the phone.  Did you ever think about

19 calling the -- an ambulance for him?

20       INMATE ROSS:   As I stated, when I left he

21 was still functioning.  He grabbed my leg.  He

22 was calling my name to come back.  I told him --

23 I said I'm leaving, and I just decided to leave

24 at that point.

25       PRESIDING COMMISSIONER SAWYER:   Had you

26 been doing any dope during this period in your

27 life?

1      **INMATE ROSS:** I had used cocaine and PCP,

2  what have you, but that night in particular I

3  was only drinking.

4      **PRESIDING COMMISSIONER SAWYER:** Okay. Now,

5  you don't have any juvenile record, right?

6      **INMATE ROSS:** No.

7      **PRESIDING COMMISSIONER SAWYER:** Okay.

8  Arrested by Oxnard PD for 11550, under the

9  influence of a controlled substance, and this

10  was in -- several years before, 10/28 of 1984,

11  and you were put on the diversion program. On

12  9/30 of 1986 charged with disobeying a court

13  order. What was -- was that not --

14      **INMATE ROSS:** They said that was something

15  to do with child support, but at that time my

16  daughter was staying with me, and --

17      **PRESIDING COMMISSIONER SAWYER:** What

18  happened?

19      **INMATE ROSS:** With the --

20      **PRESIDING COMMISSIONER SAWYER:** Disobeying

21  the court order? Did they put you in jail?

22      **INMATE ROSS:** I didn't do no jail time.

23      **PRESIDING COMMISSIONER SAWYER:** Okay. And

24  then on 1/1 of '87 you were arrested for the

25  present office. And then the record indicates

26  that on 3/15 of 1988 while incarcerated at

27  Folsom Prison arrested for 4502, prisoner in

1  possession of a weapon, and there was no

2  prosecution.  The District Attorney declined to

3  file.  We do notice you have a 115 in there?

4       **INMATE ROSS:**  Yeah, regarding that.

5       **PRESIDING COMMISSIONER SAWYER:**  Yeah.

6       **INMATE ROSS:**  I was at Old Folsom.  I

7  remember being on the backyard playing

8  basketball when they announced my name on the

9  PA.  I came in.  The officer told me that they

10  had discovered something up in the chase.

11       **PRESIDING COMMISSIONER SAWYER:**  Yeah.

12       **INMATE ROSS:**  And the write-up itself the

13  officer explained that whatever it was that he

14  found looked like it's been there for years, but

15  whatever it was it was -- I think he said it

16  appeared to be like a piece of broken antenna

17  that might of been sharpened, made into some

18  type of point, but it was only 3/16th of an

19  inch.

20       **PRESIDING COMMISSIONER SAWYER:**  Long?

21       **INMATE ROSS:**  Right.  That was the whole

22  thing.  And the officer said himself that it

23  seemed like it had been there for years.

24       **PRESIDING COMMISSIONER SAWYER:**  But you got

25  a 115?

26       **INMATE ROSS:**  Yeah.

27       **PRESIDING COMMISSIONER SAWYER:**  Did you

23

1  appeal it?

2      INMATE ROSS:  I appealed it, and also

3  agreed to take a polygraph test for that.  And

4  at that time when I had got off the SHU term I

5  was transferred over to New Folsom.  A guy came

6  up and interviewed me.  I signed some papers,

7  and he said he would be back to administer the

8  polygraph test, and that was the last thing I

9  heard from them.

10      PRESIDING COMMISSIONER SAWYER:  Okay.  You

11  were born in 1958?

12      INMATE ROSS:  Yeah.

13      PRESIDING COMMISSIONER SAWYER:  9/12 of

14  '58?

15      INMATE ROSS:  Right.

16      PRESIDING COMMISSIONER SAWYER:  In Ventura,

17  California, to Palmer Stedson Ross and Johnnie

18  (phonetic) Neal, N-E-A-L.  You're the fifth of

19  six children, two brothers and three sisters?

20      INMATE ROSS:  Right.

21      PRESIDING COMMISSIONER SAWYER:  Attended

22  local schools, dropping out of Oxnard High

23  School during the second semester of his senior

24  year.  Why did you drop out?

25      INMATE ROSS:  I didn't drop out.  What

26  happened was I earned enough credits where I was

27  offered summary jobs.  And I was told at the

24

1  time that my credit was good enough to venture

2  out to the job markets and stuff.  I started

3  working for the naval construction base.  I had

4  other odd jobs working for Oxnard Community

5  School as the warehouse keeper, and after that I

6  started participating in going to the different

7  trade schools and stuff like that.  That was the

8  last of high school that I participated in.

9        **PRESIDING COMMISSIONER SAWYER:**  Did you go

10  through graduation?

11        **INMATE ROSS:**  No.

12        **PRESIDING COMMISSIONER SAWYER:**  Did you get

13  a diploma?

14        **INMATE ROSS:**  No diploma.

15        **PRESIDING COMMISSIONER SAWYER:**  Why?

16        **INMATE ROSS:**  I never completed -- I went

17  as far as the 12th grade, and that was when I

18  started working.  I just --

19        **PRESIDING COMMISSIONER SAWYER:**  Why did

20  they tell you to leave?

21        **INMATE ROSS:**  Well, they said that I was

22  earning enough credits that I can go out and

23  start working and, you know, that's -- I really

24  can't explain why that happened the way it did.

25  But I was told that because of my credits at

26  that time was good enough that I can go out and

27  participate in the job markets and stuff, and I

25

1  just never -- since then I've been working ever
2  since, and I never went back to school.  I tried
3  to go -- well, I did enroll myself in Oxnard
4  College.  I did try to go continue my education
5  in black arts and music appreciation.  That
6  didn't go too well because moving here, moving
7  there.  When I started working for Bitro
8  (phonetic) I enrolled myself in, I forget the
9  name of the company, but because of where I was
10  working at they offered me -- they told me if I
11  could learn something about, I think it was
12  computer accounting, that it would help me move
13  up in the company, but that was -- I was going
14  at night, attending that and working all day.
15  That got a little bit too complex and I couldn't
16  continue that as well.  So after that I just
17  started going to different places looking for
18  employment and stuff.  I went through -- I did -
19  - I went to a lot of companies looking for a job
20  and stuff, but it looked like everywhere I went,
21  based on my resume at the time, they was telling
22  me that I was over-qualified or they would keep
23  my application on file in the event that a job
24  opened up, but I always stayed looking for a
25  job.
26          **PRESIDING COMMISSIONER SAWYER:**  Nobody
27  asked you for a high school diploma?

26

1      INMATE ROSS:  No.

2      PRESIDING COMMISSIONER SAWYER:  What did

3  you put on your -- did you put down that you had

4  a high school diploma?

5      INMATE ROSS:  No.  I put down the grade

6  that I last completed.

7      PRESIDING COMMISSIONER SAWYER:  You also --

8  at Oxnard College you also did bowling?

9      INMATE ROSS:  Right.  That was one of the

10  extracurricular them classes.

11      PRESIDING COMMISSIONER SAWYER:  Did you get

12  the units when you were at Oxnard College?

13      INMATE ROSS:  I think it was about I want

14  to say four or five.

15      PRESIDING COMMISSIONER SAWYER:  Is that

16  enough to get you out of -- to get your high

17  school diploma?

18      INMATE ROSS:  No.

19      PRESIDING COMMISSIONER SAWYER:  No?

20      INMATE ROSS:  No.

21      PRESIDING COMMISSIONER SAWYER:  Okay.  Also

22  welding, went three semesters and then dropped

23  out.  It indicates you drank alcohol moderately

24  on a social basis.  Admitted using marijuana and

25  rock cocaine on a recreational but not regular

26  basis.  Isn't rock cocaine pretty a addictive?

27      INMATE ROSS:  Yes, it is.

27

1      **PRESIDING COMMISSIONER SAWYER:**  So is that

2   minimizing the use of rock cocaine to say you

3   used it recreationally?

4      **INMATE ROSS:**  Well, you know, that was just

5   something that I did just, you know, just

6   something to be doing.  I don't want to say that

7   I was using it because of the trouble I was in

8   finding employment and stuff, but I just did it

9   mainly out of, you know, just try it, just try

10  it, you know.

11     **PRESIDING COMMISSIONER SAWYER:**  Okay.  You

12  worked for a microscope electronic assembly

13  plant called Bitro, as you mentioned, where you

14  became acquainted with Mr. Sanchez.  Is that

15  right?

16     **INMATE ROSS:**  Well, that was when I was

17  working for the Balloting Center (phonetic) at

18  Port Hueneme Naval Base.

19     **PRESIDING COMMISSIONER SAWYER:**  Uh-huh.

20     **INMATE ROSS:**  Is where I met him at.

21     **PRESIDING COMMISSIONER SAWYER:**  Oh, and you

22  worked for Bitro too?

23     **INMATE ROSS:**  Right.

24     **PRESIDING COMMISSIONER SAWYER:**  Okay.  And

25  what did you do there?

26     **INMATE ROSS:**  There I was computer data

27  entry, stuff like that.

28

1      **PRESIDING COMMISSIONER SAWYER:**  Punch

2  cards?

3      **INMATE ROSS:**  Right, exactly.

4      **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

5  you know how to type?

6      **INMATE ROSS:**  I don't know how to type, but

7  I can look at the key pad and type fast just

8  based on, you know, looking at what I'm doing

9  and stuff.

10      **PRESIDING COMMISSIONER SAWYER:**  Okay.

11      **INMATE ROSS:**  Yeah, exactly.

12      **PRESIDING COMMISSIONER SAWYER:**  With two

13  fingers?

14      **INMATE ROSS:**  Exactly, right.

15      **PRESIDING COMMISSIONER SAWYER:**  Okay.  How

16  long did you work there, Bitro?

17      **INMATE ROSS:**  I think it was -- I thought I

18  had it on me, but I would say it was

19  approximately three or four years.

20      **PRESIDING COMMISSIONER SAWYER:**  Okay.

21  According to this it was '83 to '86, laid off in

22  '86?

23      **INMATE ROSS:**  Right.

24      **PRESIDING COMMISSIONER SAWYER:**  Why did you

25  get laid off?

26      **INMATE ROSS:**  Just for -- they call it

27  contract.  It was a contract ran out and they

29

1    started laying everybody off.

2         PRESIDING COMMISSIONER SAWYER:  And then it

3    says you began seeking employment, but were

4    successful.  Since you'd worked since high

5    school felt depressed of his unemployment

6    status.  Borrowed money from the victim on more

7    than one occasion.  Is that right?

8         INMATE ROSS:  That's correct.

9         PRESIDING COMMISSIONER SAWYER:  They were

10   friends prior to Ross's lay off and became

11   closer after the lay off incident.  Ross advised

12   that he and the victim periodically got together

13   and drank alcohol together.  On one occasion --

14   and on occasion would get a girl to come over to

15   the victim's residence and provide sexual

16   favors.  On the evening of the homicide Ross

17   stated that the victim was pressuring him for a

18   girl and he was unable to come through for the

19   victim.  We talked about that.  We appreciate

20   you talking about the crime.  Okay.  In your

21   future plans, you plan to parole to your wife's

22   residence, Rosa Ross.  That's in Oxnard?

23        INMATE ROSS:  That's correct.

24        PRESIDING COMMISSIONER SAWYER:  How long

25   have you been married to Rosa?

26        INMATE ROSS:  About 15 years now.

27        PRESIDING COMMISSIONER SAWYER:  15?

30

1        INMATE ROSS:  Yes.

2        PRESIDING COMMISSIONER SAWYER:  And how did

3   you meet Rosa?

4        INMATE ROSS:  I met her on the streets

5   where she used to work at.  I met her while

6   trying to apply employment there.  At that time

7   she was working for a company that made hard

8   plastic -- heart insertions.  I don't know

9   exactly what that is, but --

10        PRESIDING COMMISSIONER SAWYER:  Heart

11   valves?

12        INMATE ROSS:  Right.  Little square like

13   type heart valves.

14        PRESIDING COMMISSIONER SAWYER:  Uh-huh.

15        INMATE ROSS:  In fact, that was one of the

16   jobs where I went to and they told me that they

17   was impressed with my resume but for them to

18   hire me I wouldn't qualify for that position

19   that I was asking for.

20        PRESIDING COMMISSIONER SAWYER:  What kind

21   of position was that?

22        INMATE ROSS:  Just assembly, whatever, you

23   know, assembly.

24        PRESIDING COMMISSIONER SAWYER:  Prisoner

25   has -- as far as employment, prisoner has no

26   firm employment plans at this time; however,

27   indicates that his wife is in the process of

31

1  becoming state certified as a medical

2  interpreter and will be self employed, so she

3  has offered him a position as an office

4  technician.  Prior to incarceration you worked

5  at Bitro Company as a shipping clerk and

6  subsequently demoted to computer operator

7  position and believed that you would be able to

8  obtain employment as a tool machine operator or

9  a shipping clerk having completed vocational

10  machine shop trade.  Okay.  This was November of

11  '05.  Did she get that certification?

12      INMATE ROSS:  No, she's currently underway

13  -- she's still currently in the process.  She

14  has to take several examinations to be an

15  orderly or get -- but she's -- she's juggling

16  between taking care of her parents and trying to

17  find the time to pursue her career and getting

18  that done and stuff.

19      PRESIDING COMMISSIONER SAWYER:  Do you have

20  any children?

21      INMATE ROSS:  I have one daughter.

22      PRESIDING COMMISSIONER SAWYER:  And is Rosa

23  the mother?

24      INMATE ROSS:  No.

25      PRESIDING COMMISSIONER SAWYER:  Who's the

26  mother?

27      INMATE ROSS:  Jackie Evans.

32

1      **PRESIDING COMMISSIONER SAWYER:**  And where -

2  - what's your child doing now?

3      **INMATE ROSS:**  She's staying with her mom in

4  Detroit, and she's currently going to school to

5  be a land lawyer.

6      **PRESIDING COMMISSIONER SAWYER:**  How old is

7  she?

8      **INMATE ROSS:**  She's 20 now.

9      **PRESIDING COMMISSIONER SAWYER:**  So she's in

10  college right now?

11      **INMATE ROSS:**  Yes.

12      **PRESIDING COMMISSIONER SAWYER:**  And so

13  she's not getting in any trouble from the sounds

14  of it?

15      **INMATE ROSS:**  No.  She's doing real well.

16      **PRESIDING COMMISSIONER SAWYER:**  Staying

17  away from drugs?

18      **INMATE ROSS:**  Yes.

19      **PRESIDING COMMISSIONER SAWYER:**  Good.

20  Great.  You correspond with her?

21      **INMATE ROSS:**  Yes.

22      **PRESIDING COMMISSIONER SAWYER:**  Who else do

23  you correspond with?

24      **INMATE ROSS:**  My immediate family, my

25  brothers, my sisters, nephews, nieces.

26      **PRESIDING COMMISSIONER SAWYER:**  Okay.

27  Let's look at your letters in your file.

33

1   There's one from Jack Underwood, Sacramento,

2   June 30th of 2005.  This is your brother-in-law?

3       INMATE ROSS:  Yes.

4       PRESIDING COMMISSIONER SAWYER:  I've known

5   Wayne over the years.  I entered the family in

6   1974.  He talks about your history, talks about

7   your working, talks about your wife having a

8   positive impact and influence on you, talks

9   about the crime.  Okay.  And he and his wife are

10  both volunteer ministers for the Jehovah's

11  Witnesses, and they visit with you?

12      INMATE ROSS:  Yes.

13      PRESIDING COMMISSIONER SAWYER:  And how

14  they grieve for the Sanchez family and ask for

15  parole for you.  March 7, 2005, from Los Angeles

16  from Carolyn R. Freeman Middlebrook, M-I-D-D-L-

17  E-B-R-O-O-K.  This is your second oldest sister?

18      INMATE ROSS:  Correct.

19      PRESIDING COMMISSIONER SAWYER:  She's kept

20  up with you and through your wife.  Done a lot

21  of time for the mistake he made.  He's reliable,

22  diligent, willing to help out where he can, can

23  be counted on, asset to the community.  Your

24  sister is a widow?

25      INMATE ROSS:  Yes.

26      PRESIDING COMMISSIONER SAWYER:  And she's

27  willing to assist Wayne and his wife Rosa and

34

```
 1   willing to provide housing for them.   I assume
 2   your wife has got a house?
 3        INMATE ROSS:   Yes.
 4        PRESIDING COMMISSIONER SAWYER:   Or
 5   apartment?
 6        INMATE ROSS:   No, she's staying with her
 7   parents.
 8        PRESIDING COMMISSIONER SAWYER:   She lives
 9   with her parents?
10        INMATE ROSS:   Right.
11        PRESIDING COMMISSIONER SAWYER:   And how old
12   is your wife?
13        INMATE ROSS:   She is 34.
14        PRESIDING COMMISSIONER SAWYER:   And then we
15   have a letter from 2005/2/26, from Larry D.
16   Foster, F-O-S-T-E-R.   A friend of yours through
17   the years.   He feels that you've learned from
18   your mistakes and you'll be a productive member
19   of society.   How do you know him?
20        INMATE ROSS:   I met him through the family.
21   My older sister knew him, works for the same
22   company up in San Diego.
23        PRESIDING COMMISSIONER SAWYER:   Okay.
24   Okay.   This is from your -- is this a niece
25   Deliaha?
26        INMATE ROSS:   Yeah, Deliaha Martin.
27        PRESIDING COMMISSIONER SAWYER:   Deliaha is
```

1   spelled, D-E-L-I-A-H-A, Martin, M-A-R-T-I-N.

2   And she talks about you serving more than 15

3   years in prison, ready to go back to society,

4   role model in our community.  He's a very good

5   uncle.  Does she visit with you?

6         INMATE ROSS:  Yes.

7         PRESIDING COMMISSIONER SAWYER:  And where

8   does she live?

9         INMATE ROSS:  San Diego.

10        PRESIDING COMMISSIONER SAWYER:  Family is

11  here to support him to transition back in the

12  community, and she says you're a good man,

13  respectable, honest human being.  You will get a

14  job and able to work in our community.  How old

15  is she?

16        INMATE ROSS:  I believe she's -- she's

17  about 35.

18        PRESIDING COMMISSIONER SAWYER:  Oh.  Then

19  we've got a letter of 2/24 of '05 from Evelyn L.

20  Allison, A-L-L-I-S-O-N.  Talks in here about

21  coming home, fast learner.  I've worked with

22  him, supportive.  He and his wife have a place

23  to go.  He's a fun loving person, and he's an

24  asset to the community.  And who is Evelyn

25  Allison?

26        INMATE ROSS:  That's my oldest sister.

27        PRESIDING COMMISSIONER SAWYER:  That's your

```
 1   oldest sister.  That's right.  She starts off by
 2   saying my brother.  Okay.  Then I have a letter
 3   from Rosa from February 4th, 2005.  Very good
 4   man.  She's known you for 21 years.  Five years
 5   before you got into this mess.  Wants to be law-
 6   abiding, support from me and my family, willing
 7   to help him in anything.  We plan on having our
 8   business of interpreting.  I will go
 9   appointments.  My husband with handle the
10   office, setting up appointments, collecting
11   payments, general office work.  I will help him
12   -- Wayne find a job if he decides to work doing
13   something else.  I can tell you we are looking
14   forward to having Wayne home, especially me.  I
15   would like to spend some time with my husband.
16   For any reason God calls me before I'm ready to
17   go due to my heart condition.  She have a heart
18   condition?
19       INMATE ROSS:  Yeah, she's (indiscernible).
20       PRESIDING COMMISSIONER SAWYER:  Yeah.
21       INMATE ROSS:  Yes.
22       PRESIDING COMMISSIONER SAWYER:  Pretty
23   young to have a heart problem?
24       INMATE ROSS:  Yeah.
25       PRESIDING COMMISSIONER SAWYER:  She getting
26   it fixed?
27       INMATE ROSS:  Yeah.  She's going through
```

37

1   the process of (indiscernible) and taking the

2   medication and what have you.

3       **PRESIDING COMMISSIONER SAWYER:**  She refers

4   to the crime, I think, here as a very

5   unfortunate accident and says send my husband

6   home to me soon.  So I assume that's the offer

7   of coming to live with you -- with her?

8       **INMATE ROSS:**  Yes.

9       **PRESIDING COMMISSIONER SAWYER:**  You'll live

10  with her mother too?

11      **INMATE ROSS:**  Yeah.

12      **PRESIDING COMMISSIONER SAWYER:**  Got enough

13  room in the house?

14      **INMATE ROSS:**  Yeah.  They got a pretty nice

15  size little house.

16      **PRESIDING COMMISSIONER SAWYER:**  And how

17  many people are there?

18      **INMATE ROSS:**  With her make it three.

19      **PRESIDING COMMISSIONER SAWYER:**  Just her

20  mother --

21      **INMATE ROSS:**  Her mother and her father.

22      **PRESIDING COMMISSIONER SAWYER:**  And her

23  father?

24      **INMATE ROSS:**  Right.

25      **PRESIDING COMMISSIONER SAWYER:**  Okay.

26      **INMATE ROSS:**  Her father just recently

27  suffered a heart attack and her mother is just

38

1   up in the age where she's mobility is coming

2   sort of turning bad.

3       **PRESIDING COMMISSIONER SAWYER:**  Yeah.  How

4   old is she?

5       **INMATE ROSS:**  I think she said her mom is

6   81, if I'm not mistaken.

7       **PRESIDING COMMISSIONER SAWYER:**  81, wow.

8       **INMATE ROSS:**  Refuses to take any

9   medications.

10      **DEPUTY COMMISSIONER ROTHLISBERGER:**

11  Commissioner, I need to turn the tape.

12      **PRESIDING COMMISSIONER SAWYER:**  Go ahead.

13      **DEPUTY COMMISSIONER ROTHLISBERGER:**  All

14  right.  We're back on record.

15      **PRESIDING COMMISSIONER SAWYER:**  I have a

16  letter from December 10th, 2002, from Shadia?

17      **INMATE ROSS:**  Right.

18      **PRESIDING COMMISSIONER SAWYER:**  S-H-A-D-I-

19  A, Edmond, E-D-M-O-N-D.  This is your niece?

20      **INMATE ROSS:**  Correct.

21      **PRESIDING COMMISSIONER SAWYER:**  And she

22  talks about you being incarcerated since she was

23  around 10 years old.  Obligated to write this

24  letter as having a non-contributive father in

25  the house, and she credits you for playing her

26  father figure for she and her brother, acted as

27  a provider.  When he actually had a job he

1   bought my brother and I truly things we needed.

2   I miss the care, the wisdom, the love he

3   provided.  Despite the mistakes he's made he's a

4   good man, hard working, law-abiding citizen if

5   you give him a chance.  He's not the same man he

6   was 17 years ago and no longer do anything to

7   jeopardize the chance to be with his family.

8   And how old is Shadia?

9       **INMATE ROSS:**  Shadia is 32 now.

10      **PRESIDING COMMISSIONER SAWYER:**  Nice

11  encouraging letter.  Any other letters?

12  Anything I might of missed?

13      **INMATE ROSS:**  Those are my letters.

14      **PRESIDING COMMISSIONER SAWYER:**  That's it?

15      **INMATE ROSS:**  Yes.

16      **PRESIDING COMMISSIONER SAWYER:**  Okay.  I

17  will turn it over to Ms. Rothlisberger.

18      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Good

19  afternoon, Mr. Ross.  I'm going to cover in your

20  post-conviction factors, and in doing so I

21  reviewed your Central File, your life prisoner

22  evaluation report prepared for the November 2005

23  hearing, the calendar rather, and that was by

24  correctional counselor one H. Staten, S-T-A-T-E-

25  N, post-conviction progress reports covering the

26  period from your last hearing on November 18th,

27  2002, to the present, and also report prepared

40

1   by the same person, and the psychological

2   evaluation prepared for the May 2006 calendar by

3   Dr. M. Macomber, M-A-C-O-M-B-E-R, Ph.D.  At the

4   time of your last parole consideration hearing

5   on November 18, 2002, you were housed here at

6   CTF, correct?

7         **INMATE ROSS:**  Correct.

8         **DEPUTY COMMISSIONER ROTHLISBERGER:**  And you

9   received a denial.  The Board took action to

10  deny parole for three years.  At that time it

11  was recommended by the Board that you become and

12  remain disciplinary free, you upgrade yourself

13  vocationally and academically, and you

14  participate in self-help programming if

15  available.  The last time you were here your

16  classification score was 15, but that was under

17  the old schedule, and your current

18  classification score now is the minimum

19  mandatory of 19.  Your prior custody level was a

20  Medium-A, and your current custody level is a

21  Medium-A.  I did not find a gang affiliation in

22  your file, and any vocational instruction during

23  this period of review I did not find.  However,

24  you do have some certificates I'm going to go

25  over in just a minute.  Your academic education,

26  I understand you're still working on your GED,

27  correct?

41

1      **INMATE ROSS:**  That's correct.

2      **DEPUTY COMMISSIONER ROTHLISBERGER:**  How is

3   that coming?

4      **INMATE ROSS:**  Slow process, but it's

5   coming.

6      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Just

7   keep chipping away at it.

8      **INMATE ROSS:**  Yes, ma'am.

9      **DEPUTY COMMISSIONER ROTHLISBERGER:**  How

10   often -- are you going to classes now or

11   studying for it now?

12      **INMATE ROSS:**  Yes, I'm participating in the

13   GED program once a week on Wednesday.

14      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Okay.

15   And then you're working the rest of the time.

16   We're going to talk about that now.  You

17   currently work in the PIA furniture factory.  Is

18   that correct?

19      **INMATE ROSS:**  That's correct.

20      **DEPUTY COMMISSIONER ROTHLISBERGER:**  And

21   you're also certified -- I did find that

22   certificate, and that's from 1994 in the machine

23   shop.  You've had over -- let's see.  Your work

24   report.  You were service factory work raise as

25   a furniture finisher, and I did see that you've

26   gotten some above average work -- your more

27   recent ones are above average work reviews at

42

1  machine shop as a wood furniture factory -- as a

2  finisher.  Boy, that's difficult to say.  That's

3  tough to say.  He's also -- where did I find

4  those?  I did see some certificates on those

5  also.

6      ATTORNEY TARDIFF:  It's in the back of the

7  packet.

8      DEPUTY COMMISSIONER ROTHLISBERGER:  Is that

9  it?

10      ATTORNEY TARDIFF:  Yeah.

11      DEPUTY COMMISSIONER ROTHLISBERGER:  That's

12  where I saw them.

13      ATTORNEY TARDIFF:  He's got five.

14      DEPUTY COMMISSIONER ROTHLISBERGER:  Yeah,

15  there's a total of five certificates, right, the

16  128(b) training certificates?

17      ATTORNEY TARDIFF:  Yes.

18      DEPUTY COMMISSIONER ROTHLISBERGER:  And I

19  wanted to ask you though, what is MSDS?  Do you

20  remember?

21      INMATE ROSS:  MSDS?

22      DEPUTY COMMISSIONER ROTHLISBERGER:  MSDS it

23  says on one of them.  I thought what the heck

24  does that mean.  Let me see.  Well, you've got

25  your finish sander, edge sander, anger

26  management, and then that's right they were

27  those.  I just had them.  Here we go, the

43

1   training certification chronos, oh, back safety,

2   air, eyes and sound equipment, general safety,

3   there's another general one, and oh, right to

4   know it says, MSDS right to know in finishing

5   one and a lock out tag out. A little too

6   technical for me.

7        **ATTORNEY TARDIFF:** It might be hazardous.

8        **DEPUTY COMMISSIONER ROTHLISBERGER:** Sounds

9   like it.

10       **ATTORNEY TARDIFF:** Hazardous materials.

11       **DEPUTY COMMISSIONER ROTHLISBERGER:** Sounds

12  it. Speaking of hazardous material, I see

13  you've also completed the Cal Osha hazardous

14  communication standards. That was on 4/6/04.

15  And also I found this interesting, although

16  you're not assigned there, on 6/23/03 you

17  received a chrono for willing participation in

18  help with the GED prep tutoring. Are you still

19  involved in that?

20       **INMATE ROSS:** No. That was prior to --

21       **DEPUTY COMMISSIONER ROTHLISBERGER:** That

22  was prior to you going into the studying?

23       **INMATE ROSS:** Right.

24       **DEPUTY COMMISSIONER ROTHLISBERGER:** Okay.

25       **INMATE ROSS:** I was taking that time to

26  help prep the students to come in to study for

27  the GED while I was taking the course myself.

44

1       **DEPUTY COMMISSIONER ROTHLISBERGER:**  Oh,

2   that's good.  That's good.  So you had some real

3   involvement.  In total I found 28 new chronos

4   since we've last seen you, and including 10 from

5   NA.  It seems like you go very regularly to NA,

6   chronos from 1/6/06, 9/21/05, 6/28/05, 3/15/05,

7   second 9/21/05, actually, that was a second one.

8   You did get two.  6/28/05, 12/22/04, 1/01/04,

9   6/28/04, and 6/7/04.  You had three from AA,

10  12/27/05, 10/6/05 and 3/15/05.  Two from family

11  effective harmony in the home and self-help

12  anger management.  You took the course one in

13  4/2/04 and then again on 3/5/05.  Did you find

14  that useful?

15      **INMATE ROSS:**  Yes, ma'am.

16      **DEPUTY COMMISSIONER ROTHLISBERGER:**  What

17  did you find most useful about it?

18      **INMATE ROSS:**  Just it gave me a lot of

19  insight on different choices I can make,

20  different ways to approach different situations.

21      **DEPUTY COMMISSIONER ROTHLISBERGER:**

22  Different way to react to things?

23      **INMATE ROSS:**  Right.

24      **DEPUTY COMMISSIONER ROTHLISBERGER:**

25  Completed course in cause, prevention, and

26  treatment and management of tuberculosis on

27  1/31/05.  On 12/6/05, a course in cause,

45

1    prevention, treatment, and management of

2    HIV/Aids, the same for hepatitis on 1/13/05.

3    And then -- let me see.  I love this title.  We

4    spoke to a gentleman earlier about this, how to

5    become a father and not get angry.

6        **INMATE ROSS:**  Right.

7        **DEPUTY COMMISSIONER ROTHLISBERGER:**  On

8    1/5/05; sexual transmissions -- sexually

9    transmitted diseases, 12/23/04; sexually

10   transmitted infections on 12/23/04; and then, of

11   course, those training certificates.  You've

12   also got some, how many was it, some 20 --

13       **PRESIDING COMMISSIONER SAWYER:**  27.

14       **DEPUTY COMMISSIONER ROTHLISBERGER:**  27, is

15   that what it was, certificates from the

16   Emergency Management Institute.

17       **ATTORNEY TARDIFF:**  I believe he did all of

18   the --

19       **DEPUTY COMMISSIONER ROTHLISBERGER:**  It

20   looks as though he did all that were available.

21       **ATTORNEY TARDIFF:**  I don't see many left.

22       **DEPUTY COMMISSIONER ROTHLISBERGER:**  No.

23   And that's to be commended.  What got you

24   involved in that?

25       **INMATE ROSS:**  You know, the fact that I

26   like -- again, I'm thinking of the job market

27   and stuff that I can do when I parole.  It's a

46

1   interesting job as far as --

2   **DEPUTY COMMISSIONER ROTHLISBERGER:**   Yeah, I

3   see radiological emergency response, hazardous

4   materials, citizen's orientation, life stock and

5   disaster.   It does, it looks very interesting

6   especially these tormented times outside.   Let's

7   see.   There's been no psychiatric treatment.

8   Your participation in self-help groups, I've

9   gone over that, all your laudatory chronos and

10   general chronos from NA and AA.   In addition,

11   let me see.   Is there anything else I missed on

12   that?   I don't think so.   You have had three

13   disciplinaries 115, 10/24/01, mutual combat.   I

14   believe the Commissioner spoke of that.

15   7/26/00, work stoppage, which you were found

16   guilty; 3/15/88, back at Folsom, dangerous

17   property, possession of an inmate manufactured

18   weapon.   You lost 180 days credit on that.

19   128s, there's been five of those, 128(a)s, 1993,

20   conduct, failure to remove light and windowing

21   covering; 3/17/92, failure to attend assignment;

22   12/7/91, cell conditions; 9/10/90, failure to

23   report to a job assignment.   Same on January

24   5th, 1990.   And 128(b) on 9/24/04, which you

25   refused a lower bunk.   The correctional

26   counselor recommended at your -- recommended you

27   to become and remain disciplinary free, upgrade

47

1  educationally by obtaining your GED, participate

2  in self-help programs and cooperate with the

3  clinicians in the completion of a clinical

4  evaluation, and you did get a new clinical

5  evaluation by Dr. Macomber.  And he states that

6  -- this was for the May 2006 calendar.  Your

7  access one is no mental disorder.  Your access

8  two is no personality disorder.  And your GAF

9  score is an 80.  Your assessment of

10  dangerousness he said -- let me see.  In talking

11  about the mutual combat, not angry, hostile

12  confrontation.  You've not been involved in

13  riots, assaults, or other acts of violence.  As

14  a result, compared to other inmates potential

15  for dangerous behavior is below average in

16  custody.  Behavior when released to the

17  community is noted that the last psychologist

18  inappropriately used the HCR-20 and the VRAG,

19  which are not appropriate for use with lifers to

20  determine level of dangerousness.  These

21  measures were normed on psychiatric patients and

22  not on life term inmates.  As a result, it

23  produces high risk levels that are not accurate.

24  A more accurate measure is the level of service

25  inventory revised that assesses criminal

26  history, substance abuse use, vocational

27  achieve, social relationships and other factors

48

1  to determine current risk level on parole.  You

2  obtained a score on this assessment of 5.1

3  cumulative frequency for prison inmates, and

4  this means that if 100 men were released on

5  parole he would do better on parole than 94.9 of

6  them.  This is a low, very low risk level, and

7  as a result does not pose any more risk to

8  society than the average citizen in the

9  community.  At this point in his life there are

10  no significant risk factors in this case.  The

11  doctor also states that there are no mental or

12  emotional problems that would interfere with

13  routine release planning.  Does have strong

14  family support, completed vocational machine

15  shop, also required skills that would enable him

16  to obtain employment in the PIA wood furniture

17  factory, developed strong work values, work

18  ethic.  Employment will not be a problem, he

19  states, and you -- because you also get work

20  reports, still working on his GED, and the

21  prognosis for successful adjustment in the

22  community is good.  And I believe that covers

23  it.  Is there anything that I may of missed,

24  Counsel?

25      **ATTORNEY TARDIFF:**  No, I don't think so.

26      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Okay.

27  Commissioner.

49

1      **PRESIDING COMMISSIONER SAWYER:**  How much of

2  your restitution, your $10,000 restitution is

3  paid off?

4      **INMATE ROSS:**  Right now I'm down to about

5  8,900 --

6      **PRESIDING COMMISSIONER SAWYER:**  You paid

7  off 8,900?

8      **INMATE ROSS:**  Right.

9      **PRESIDING COMMISSIONER SAWYER:**  Or you have

10  that left to pay?

11      **INMATE ROSS:**  That's what I have to pay

12  right now.  It was 10,000, and it's -- I think

13  it's down around 8,900.

14      **PRESIDING COMMISSIONER SAWYER:**  Okay.  Do

15  you have any questions, Ms. Tardiff?

16      **ATTORNEY TARDIFF:**  Yeah.  I saw -- getting

17  back to the self-help.  There was a chrono dated

18  1/31/05 about reading books, self-help books.

19      **INMATE ROSS:**  Right.

20      **ATTORNEY TARDIFF:**  How many of those did

21  you read?

22      **INMATE ROSS:**  I read several books on

23  different topics such as anger management.  I

24  have them all in there.

25      **ATTORNEY TARDIFF:**  You have the reports in

26  there too?

27      **INMATE ROSS:**  Yeah, let me see if I --

50

1      **PRESIDING COMMISSIONER SAWYER:**  Did they

2  give you a chrono on those?

3      **INMATE ROSS:**  Right.

4      **ATTORNEY TARDIFF:**  Yeah.

5      **INMATE ROSS:**  I also did a report with Dr.

6  Gleason.  He wrote a chrono for that as well.

7  Let me see.

8      **DEPUTY COMMISSIONER ROTHLISBERGER:**  What

9  was the date on that again?

10      **ATTORNEY TARDIFF:**  I have 1/31/05.

11      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Here it

12  is.  What I have on 1/31/05 is the tuberculosis.

13      **ATTORNEY TARDIFF:**  Here.  I think we found

14  it.

15      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Did you

16  find it?

17      **ATTORNEY TARDIFF:**  A chrono dated -- it's a

18  pink one.

19      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Okay.

20      **ATTORNEY TARDIFF:**  That's his copy, I

21  guess.

22      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Oh,

23  yeah.  What's the date?

24      **ATTORNEY TARDIFF:**  1/31/05, completed

25  requirements for self-help chrono.  "There are

26  few opportunities at CTF for self-help; however,

27  some inmates are willing to read self-help books

51

1  and write reports on them and learn from each

2  other."

3      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Okay.

4      **ATTORNEY TARDIFF:**  The book title is

5  "Understanding Your Anxiety" by Dr. Bruno.

6      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Mr.

7  Ross, I need you to make sure you get that in

8  your file.  It's not in your C file.

9      **INMATE ROSS:**  Okay.

10      **DEPUTY COMMISSIONER ROTHLISBERGER:**  I want

11  you to get credit for that.

12      **PRESIDING COMMISSIONER SAWYER:**  Is that the

13  only one you did?

14      **INMATE ROSS:**  No.  I did several of them,

15  but --

16      **ATTORNEY TARDIFF:**  Is that one too?  The

17  12-week anger management for Muslims?  He did

18  that 11/19/05.

19      **PRESIDING COMMISSIONER SAWYER:**  How many

20  book reports have you done?

21      **INMATE ROSS:**  Well, what it is you're only

22  allowed to do one.

23      **ATTORNEY TARDIFF:**  For her.

24      **INMATE ROSS:**  For her, for Dr. Gleason,

25  right.

26      **ATTORNEY TARDIFF:**  But did you do more on

27  your own?

52

1    **INMATE ROSS:**  Yes, I took it upon myself to

2  do -- like I did this one righting here.

3    **ATTORNEY TARDIFF:**  Okay.  Well, this is all

4  important stuff for --

5    **DEPUTY COMMISSIONER ROTHLISBERGER:**  Right.

6    **ATTORNEY TARDIFF:**  -- to show --

7    **DEPUTY COMMISSIONER ROTHLISBERGER:**  Oh,

8  counsel, I just another too, 6/23/03.  That was

9  the GED preparation tutoring program.

10    **ATTORNEY TARDIFF:**  Right.

11    **DEPUTY COMMISSIONER ROTHLISBERGER:**  The

12  purpose of this program is to provide small

13  group tutoring for inmates, and also the how to

14  become a father.  We mentioned that before, and

15  not get angry.

16    **ATTORNEY TARDIFF:**  And did you do the

17  Muslims?

18    **DEPUTY COMMISSIONER ROTHLISBERGER:**  Yeah,

19  that's the Muslims.

20    **ATTORNEY TARDIFF:**  Okay.  And then there's

21  a report here entitled caring enough to confront

22  and it was after reading David Augsburger's book

23  "Caring Enough to Confront."  I learned better

24  way to resolve, caring and honest approach for

25  dealing with anger, and how to own my anger and

26  keep my peace.

27    **PRESIDING COMMISSIONER SAWYER:**  So we have

53

1   two books?

2       **ATTORNEY TARDIFF:**  So far, yeah.  All this
3   stuff is important for --

4       **PRESIDING COMMISSIONER SAWYER:**  Right.

5       **ATTORNEY TARDIFF:**  -- it's actually more
6   important than structured self-help because you
7   do it on your own.

8       **INMATE ROSS:**  Yeah.  I tend to have myself
9   to continue reading the books and stuff.  Each
10  time I go to the library on Wednesday to take
11  the GED program I always pick up a book over
12  there and just read it, make personal notes and
13  stuff.

14      **DEPUTY COMMISSIONER ROTHLISBERGER:**
15  Excellent.

16      **PRESIDING COMMISSIONER SAWYER:**  Good.

17      **ATTORNEY TARDIFF:**  That's -- and did you
18  have the work supervisor's report dated 5/1/06?
19  Probably not, that's pretty new.

20      **DEPUTY COMMISSIONER ROTHLISBERGER:**  5/1/06,
21  no, I did not see that.

22      **ATTORNEY TARDIFF:**  He received all ones and
23  twos, exceptional and above average, furniture
24  finisher.

25      **DEPUTY COMMISSIONER ROTHLISBERGER:**  No.
26  The last I had was an above average, not
27  exceptional.

54

1        **ATTORNEY TARDIFF:**  And his place status is

2   55 cents, which is pretty high, so he got all

3   ones and twos.

4        **PRESIDING COMMISSIONER SAWYER:**  Any other

5   questions, Ms. Tardiff?

6        **ATTORNEY TARDIFF:**  No.

7        **PRESIDING COMMISSIONER SAWYER:**  Do you have

8   a closing statement?

9        **ATTORNEY TARDIFF:**  Thank you.  In terms of

10  Mr. Ross's pre-incarceration history, it appears

11  as if he was, even though he did not get his GED

12  or high school diploma, it appears as if he was

13  -- had steady employment and was a hard worker

14  and had a lot of initiative on his own.

15  Apparently getting the GED was not something

16  that was emphasized probably in his family.

17  Since he's been -- and also his criminal history

18  -- I'm looking for my other notes.  His criminal

19  history was fairly insignificant.  I believe it

20  just involved not paying child support and

21  vehicle violations, so that's also supportive of

22  release.  Since he's been incarcerated,

23  especially since his last hearing, he's really

24  done a lot of work to fulfill what the Board has

25  asked him to do, and a lot of that has already

26  been read into the record, but there's a lot of

27  self-help.  I believe he's been going to AA/NA

1 since '92.  He obviously is finding a lot of

2 self-help programs here that we see many inmates

3 coming and saying isn't available, and he's

4 found it.  The FEMA series, completed that whole

5 thing.  Inmate peer education.  He's continued

6 to upgrade vocationally in the PIA furniture.

7 Received 128(b)s training certificates.  He's

8 psych eval is supportive of release.  What was

9 not read into the record was that his judgment

10 was intact.  His insight and self awareness was

11 good.  Because he's been clean and sober for 19

12 years, the psychologist concluded that that is

13 no longer an issue, substance abuse.  Under the

14 crime, he accepts full responsibility, and his

15 remorse appeared sincere and genuine.  Again, no

16 risk factors, strong family ties if he were to

17 be paroled.  He has his vocational machine shop.

18 He's developed strong work ethic, gets good work

19 reports and his prognosis is good for a

20 successful adaptation to the free society.  His

21 '02 psych eval, he had a high GAF score of '75,

22 and that was the testing procedures that Dr.

23 Macomber stated should not be used, but they

24 were not bad.  Under the PCLR, which is a

25 psychopathy checklist, he did not test out to

26 have that psychopathy, I guess, personality.

27 And the other HCR-20 and the VRAG were low to

56

1   moderate.  It concluded that he was not

2   criminally oriented, and that psychologist felt

3   that the crime was motivated by material gains

4   and related to substance abuse.  He obviously

5   has strong family support.  He had numerous

6   letters and places for him to live, to help him

7   should he be released.  He has marketable skills

8   in the machine shop and furniture factory.  And

9   if Mr. Ross is not found suitable today, I

10  believe a one-year denial would be quite

11  appropriate since he has remained disciplinary

12  free.  He is trying to get his GED.  He goes

13  once a week, but because he's trying to pay his

14  restitution off, he feels that doing that is

15  more important at this point, but he continues

16  to chip away at the GED and his education.

17  Thank you.

18       **PRESIDING COMMISSIONER SAWYER:**  Thank you.

19  Mr. Ross, can you tell us why you feel you're

20  suitable for parole today?

21       **INMATE ROSS:**  Well, I made major changes in

22  my life as opposed to prior to coming in, and I

23  have a brighter outlook on life itself and

24  realized the importance of being in a free

25  society and what better chances I can have of

26  being productive.  I study now.  I'm reading a

27  lot of self-help books on how to control anger

57

1    and approach situations with a more positive

2    attitude, just basically be able to function

3    based on what I've learned and what I've read.

4    I learned a lot about myself as a person from

5    the books I read and just from generalized my

6    daily life and stuff.  I'm willing to go out and

7    do everything I can to be -- to seek successful

8    work out there.  I would like to continue my

9    education.  I have recently wrote the school

10   that I attended and received a letter that

11   confirmed the courses that's available.  In the

12   event that I was to be granted parole I would

13   suit the criteria for the adult education to

14   continue my education.

15       **PRESIDING COMMISSIONER SAWYER:**  Okay.

16   That's it?

17       **INMATE ROSS:**  Yes.

18       **PRESIDING COMMISSIONER SAWYER:**  Okay.  It's

19   seven minutes past 5:00 and we are going to

20   recess for deliberations.

21                    R E C E S S

22                    --oOo--

23

24

25

26

27

58

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                   **D E C I S I O N**

3       **DEPUTY COMMISSIONER ROTHLISBERGER:**   All

4    right.   We're back on record.

5       **PRESIDING COMMISSIONER SAWYER:**   The time is

6    18 minutes past 5:00 o'clock in the afternoon.

7    We're back in the matter of Mr. Ross.   Everyone

8    has returned to the room that was previously

9    here.   The Panel reviewed all the information

10   received from the public and relied on the

11   following circumstances in concluding the

12   prisoner is not suitable for parole and would

13   pose an unreasonable risk of danger to society

14   or a threat to public safety if released from

15   prison.   Commitment offense, you have a 73 year-

16   old man who had a considerable fight with the

17   inmate, Mr. Ross, and it appear from the photos

18   that the fight was pretty rough.   And there was

19   a pair of scissors and they were used to stab

20   Mr. Sanchez approximately 24, 25 times.

21   According to the coroner's report, he didn't die

22   of the stab wounds, he died of bleeding to

23   death, and we see that as especially cruel and

24   callous and clearly demonstrates an

25   exceptionally callous disregard for human

26   suffering, in that you left him there and left

27   **WAYNE ROSS D-59353 DECISION PAGE 1 6/9/06**

59

1    him essentially to die.  The pictures were

2    pretty telling, in that there was blood left in

3    a lot of places, probably from the attack

4    itself.  It looked pretty hideous.  There was

5    blood on your clothes, there was blood on your

6    shoes.  You attempted to disguise that.  Of

7    course, your culpability in this particular

8    crime was initially lied to police, initially,

9    and then finally coming around to the truth of

10    the matter.  I still think you have a tendency

11    to minimize a little bit.  We appreciated you

12    talked to us about the crime because some people

13    come in and don't want to talk about the

14    commitment offense, and we just read it and try

15    to figure out what kind of insight they have

16    into the offense.  And I think your insight is

17    pretty good into the offense, whether you --

18    because of your condition that evening

19    (indiscernible).  This is a big deal.  This is a

20    big deal.  You took a 73 year-old man's life

21    with a pair of scissors.  The motive for the

22    crime, as you -- again, we appreciate your

23    candidness in this case.  We talked about using

24    the N word.  He was upset that you couldn't find

25    any girls.  Next time you talk about this crime

26    I want you to look a little deeper into it.

27    **WAYNE ROSS D-59353 DECISION PAGE 2 6/9/06**

1   Okay.  We're going to deny you for two years.

2   We see a lot of positive things, no question

3   about it.  You're very positive in the direction

4   that you're going.  You need a little work.  You

5   are looking at a murder first degree here, and

6   I'd like you to think about it when it's quiet,

7   find a quiet place and think about the crime.

8   Think about what you say in terms of the crime,

9   particularly in your closing statement.  You

10  didn't mention it.  You just talked about you

11  and what you wanted to do and get out there and

12  get a job and carry on with your life.  Let's go

13  back to the root of this whole thing.  The root

14  was you were out of control.  You were wandering

15  aimlessly.  If you were a boat, you didn't have

16  a ruder, no direction during this period of time

17  in your life.  We found it interesting, and

18  again in the minimal STKAEUGS of your

19  perspective on things, we found it interesting

20  that you tried to get a job but you were over-

21  qualified without a high school education.  That

22  doesn't -- that doesn't sound right to us.  It

23  just doesn't.  It doesn't sound right to us.

24  Without a GED, without a high school education,

25  people turned you down for jobs, so that -- so

26  you were turning to alcohol and drugs to mask

27  **WAYNE ROSS D-59353 DECISION PAGE 3 6/9/06**

1   your frustrations.   I would say that it was

2   probably more like you didn't have a high school

3   education, you didn't have a GED, and they

4   turned you down for a job as opposed to being

5   over-qualified.   You didn't have any

6   qualifications.   You were just fresh out of high

7   school.   And we still find it troubling to

8   understand the story about them asking you to

9   leave high school because you've already got

10  your credits and they never handed you a diploma

11  or sent you a diploma in the mail.   I find that

12  ludicrous.   I never heard a story like that.

13  yeah, most people do have more credits than they

14  need to have, minimal credits in high school, or

15  they get over the minimum amount needed to

16  graduate, but, you know, one of the most

17  important documents in my life at that age, at

18  age 18, was get my hands on that diploma.   It

19  means I did something and I completed something

20  and I've done something with my life.   And it

21  made my parents happy, and it made me happy, and

22  it made my friends happy, and quite frankly that

23  doesn't make a lot of sense to us that you'd

24  just walk away from your high school being told

25  by someone -- was it a counselor, was it a

26  principal, was it a teacher?

27  **WAYNE ROSS D-59353 DECISION PAGE 4 6/9/06**

1      **INMATE ROSS:**  It was a counselor.

2      **PRESIDING COMMISSIONER SAWYER:**  Counselor?

3      **INMATE ROSS:**  Yeah.

4      **PRESIDING COMMISSIONER SAWYER:**  Now, quite

5      honestly, and honesty will set you free, okay,

6      you've heard that.  The truth will set you free.

7      **INMATE ROSS:**  Right.

8      **PRESIDING COMMISSIONER SAWYER:**  Okay.  Did

9      they ask you to leave high school?

10     **INMATE ROSS:**  I wasn't exactly told to

11     leave high school, but they told me because I

12     had obtained at that point enough credits that I

13     qualified to get a job.

14     **PRESIDING COMMISSIONER SAWYER:**  Were you a

15     behavior problem?

16     **INMATE ROSS:**  No.  None whatsoever.

17     **PRESIDING COMMISSIONER SAWYER:**  Did they

18     ask other people to do the same thing?

19     **INMATE ROSS:**  Yes.

20     **PRESIDING COMMISSIONER SAWYER:**  Really?

21     **INMATE ROSS:**  Yes.

22     **PRESIDING COMMISSIONER SAWYER:**

23     Unbelievable.  Okay.  I'll move on.  Previous

24     record, did not have any violence or assaultive

25     behavior, but we all know -- we all know,

26     especially sitting on this side of the table,

27     **WAYNE ROSS D-59353 DECISION PAGE 5 6/9/06**

1   and I think you know sitting on that side of the

2   table because we know a lot of stuff about human

3   behavior based on our life experiences and

4   people we run into, that drugs and alcohol

5   brings the worst out in you.  You go what was I

6   thinking, what did I do because you were under

7   the influence at the time you do something

8   stupid like violence.  Okay.  So we all know by

9   using drugs, by drink, it has different effects

10  on different people.  Some people just go sit in

11  a corner.  Some people become lovers.  Some

12  people become violent.  Some people get loud.

13  Other people get quiet.  So it has a different

14  effect on us, and a lot of it -- some of it is a

15  predisposition.  You know what that is?

16          **INMATE ROSS:**  Yes.

17          **PRESIDING COMMISSIONER SAWYER:**  You study

18  that in AA?

19          **INMATE ROSS:**  Yes.

20          **PRESIDING COMMISSIONER SAWYER:**  Yeah.

21          **INMATE ROSS:**  Some of it, yeah.

22          **PRESIDING COMMISSIONER SAWYER:**

23  Predisposition.  Some cultures has more an

24  effect.  Alcohol has more an effect on a woman

25  than it does a man.  Alcohol has a -- if you got

26  a predisposition where you have a family of

27  **WAYNE ROSS D-59353 DECISION PAGE 6 6/9/06**

64

1  alcoholics, then all of a sudden you're more

2  likely to become an alcoholic.  It's just that

3  simple.  It's proven statistically.  So you turn

4  to violence in this case against a 73 year-old

5  man, Mr. Sanchez, and stabbed him numerous

6  times.  It was a rage.  Looking at those

7  pictures you had to be enraged.  You had to be

8  awfully upset with him, whether it was the

9  alcohol that induced you to that rage or whether

10  it was a personality disorder.  According to the

11  psych reports it's not a personality disorder,

12  so let's gets back to the drugs and alcohol.

13  See what I mean?  It was just a rage.  I can't

14  think of a better word to use.  Your

15  institutional behavior has been pretty good.

16  For the period of time, it's about 20 years now?

17      **INMATE ROSS:**  Yes.

18      **PRESIDING COMMISSIONER SAWYER:**  Three 115s,

19  pretty good.  I'm not going to minimize it, I'll

20  maximize it and say it's very good, your last

21  one being five years ago with mutual combat that

22  you say that you and your cellee were just horse

23  playing.  The weapon didn't belong to you up at

24  Folsom.  See what I mean?

25      **INMATE ROSS:**  Right.

26      **PRESIDING COMMISSIONER SAWYER:**  There's a

27  **WAYNE ROSS D-59353 DECISION PAGE 7 6/9/06**

65

1       common thread here, Mr. Ross.  That common

2   thread is it's not always my fault.  You kind of

3   step back from taking responsibility for your

4   actions.

5       **INMATE ROSS:**  Right.

6       **PRESIDING COMMISSIONER SAWYER:**  You

7   understand what I'm saying?  That's what we're

8   seeing.

9       **INMATE ROSS:**  Yes.

10      **PRESIDING COMMISSIONER SAWYER:**  We're doing

11  a little mental autopsy on you here.  That's

12  what we do in hearings.  We try to get as deep

13  as we can in a very short period of time based

14  on a lot of information that's been gathered,

15  and we know more about you than a lot of people

16  do on the outside, as we should, to try to make

17  a correct judgment in the interest of public

18  safety.  So we -- you're not -- you're helping

19  in the GED.  You're assisting people in tutoring

20  for the GED, preparing people for the GED, yet

21  you don't have one yet yourself.  Tell us the

22  real reason why you don't have a GED, not that

23  you're going to pay restitution and you need to

24  work.  The GED is going to be one of your

25  tickets out of here.

26  **INMATE ROSS:**  As I was telling my counselor

27  **WAYNE ROSS D-59353 DECISION PAGE 8 6/9/06**

66

1    here, you know, I'm in -- I'm optimistic of

2    obtaining or what have you, but it seems like I

3    do well up to the time it comes to testing, and

4    every time, no matter what, it seems like -- I

5    don't know if it's the thing with the timing or

6    what, but up to that point everything just seems

7    like it falls to pieces, but it hasn't kept me

8    from continuing and trying to --

9        **PRESIDING COMMISSIONER SAWYER:** How many

10   times have you taken the test?

11       **INMATE ROSS:** About five.

12       **PRESIDING COMMISSIONER SAWYER:** Five times.

13   What are the weak spots in the test?

14       **INMATE ROSS:** I would say probably

15   comprehending and math.

16       **PRESIDING COMMISSIONER SAWYER:** What was

17   the first one?

18       **INMATE ROSS:** Comprehending.

19       **PRESIDING COMMISSIONER SAWYER:**

20   Comprehension?

21       **INMATE ROSS:** Right, comprehension, yeah.

22       **PRESIDING COMMISSIONER SAWYER:** Okay.  So

23   if you know where your weaknesses are and you

24   plan for it, you're not going to be as --

25       **ATTORNEY TARDIFF:** Anxious.

26   **PRESIDING COMMISSIONER SAWYER:** That was

27   **WAYNE ROSS D-59353 DECISION PAGE 9 6/9/06**

1       exactly the word I was using.

2          **DEPUTY COMMISSIONER ROTHLISBERGER:**  We tend

3    to study things we like that come to easy to us

4    rather than things that are hard.

5          **INMATE ROSS:**  Right, I understand.

6          **PRESIDING COMMISSIONER SAWYER:**  You're not

7    going to hink (phonetic) up.  I don't know how

8    to spell that for the transcriptionist.  And

9    people do hink up, we all hink up under

10   pressure.  We all hink up under pressure.  I

11   mean, that's normal, but the better you plan,

12   the better you prepare yourself, the less you'll

13   hink up.  And I think we're getting to the

14   bottom of it.  The bottom of it is lack of self

15   confidence on your part.  Would that be fair?

16         **INMATE ROSS:**  Perhaps, yes, I might agree

17   with that.

18         **PRESIDING COMMISSIONER SAWYER:**  So you

19   combat that with better planning and better

20   preparation for the next test, and that requires

21   work.  And Commissioner Rothlisberger was

22   absolutely right, we have a tendency, we all do,

23   it's a natural tendency, to go where we have the

24   most fun.  And a tendency if we don't have to go

25   over here where it's hard and we go over here

26   where it's easy, that's normal.  If you've ever

27   **WAYNE ROSS D-59353 DECISION PAGE 10 6/9/06**

1  of been to a time management class -- my wife,

2  I'll give you an example, my wife is a professor

3  at a university, and she's got papers to grade

4  that she doesn't like to do.  She'll come home,

5  she'll put the papers down in her office and

6  start vacuuming the floor because it's -- she

7  likes to do that.  Let's say you've got

8  something -- I can read it like a book, you've

9  got something you don't want to do, and she'll

10  say, how did you know that?  And I said because

11  you're doing trivial things around the house.

12  And if you go to a time management class they'll

13  tell you what you do, the best way to manage

14  your time is to take the hardest project first,

15  get that out of the way and the rest of it then

16  easy.  The rest of it is real easy to do, so you

17  want to think about that a little bit.  That's a

18  true story, isn't it?

19      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Yes,

20  absolutely.

21      **PRESIDING COMMISSIONER SAWYER:**  How are we

22  doing on tape?

23      **DEPUTY COMMISSIONER ROTHLISBERGER:**

24  Probably got another three minutes or four

25  minutes.

26      **PRESIDING COMMISSIONER SAWYER:**  You want to

27  **WAYNE ROSS D-59353 DECISION PAGE 11 6/9/06**

69

1   put a new tape in?

2       **DEPUTY COMMISSIONER ROTHLISBERGER:**   Sure.

3       **PRESIDING COMMISSIONER SAWYER:**   Okay.

4   Trying to give you some guidance here.   Okay.

5   You understand what I'm trying to do here?

6       **INMATE ROSS:**   Yes, sir.

7       **PRESIDING COMMISSIONER SAWYER:**   We're

8   trying to encourage you so that you'll well

9   prepared when you get out of here, and you've

10  had five 128s, the last one, I think, was '93,

11  was it?

12      **DEPUTY COMMISSIONER ROTHLISBERGER:**

13  Correct.

14      **PRESIDING COMMISSIONER SAWYER:**   Correct.

15  Those are just counseling chronos, so you're

16  doing fine in that particular area as well for

17  the time you've been down.   You've not too hard

18  on the institution and the staff.   I mean,

19  you're pretty easy to work with from the looks

20  with, and you've been very pleasant in this

21  hearing, you know, our first impressions are

22  when you walk through that door and you've been

23  -- you appear to be very receptive and you speak

24  well.   Your psychiatric factors are good.   Dr.

25  Macomber indicates in our psych report, that's

26  '06, a month old, that you have a very low risk

27  **WAYNE ROSS D-59353 DECISION PAGE 12 6/9/06**

1  level and as a result did not pose any more risk

2  to society than the average citizen in the

3  community.  I would like to see -- add a caveat

4  to that, provided you're sober, and you're

5  taking good care of that.  Your AA and your NA

6  programming has been very good and must continue

7  to be good.  That's another ticket out of here.

8  That helps us understand that you understand

9  your addiction and you can't ever of use again

10  because if you do, you find yourself in a mess

11  like you got yourself into before.  I always

12  take exception when I read letters, and it's

13  nothing personal to you, but when people write

14  letters and they talk about the mistake, they

15  talk about the accident.  Like in one of your

16  letters there was an accident, the word used was

17  accident.  There's no accident here.  ██████'t

18  fall on that scissors 24 times.  You inflicted

19  those wounds and then attempted to cover it up

20  or accept responsibility for it, so there's no

21  accident.  It's not like a car, you know,

22  looking the other way and forget to look at the

23  red light and go through the red light, you

24  know, unless you're under the influence, then

25  it's no accident either.  So we have to face

26  reality that a 73 year-old man was murdered

27  **WAYNE ROSS D-59353 DECISION PAGE 13 6/9/06**

1   first degree.  Parole plans, wife who sounds

2   like a saint, Rosa?

3       **INMATE ROSS:**  Right.

4       **PRESIDING COMMISSIONER SAWYER:**  Sticking by

5   you and offering, it sounds like she's moving

6   forward with her life and sounds like she's very

7   productive.  She lives with her mother and

8   father.  You never lived with her mother and

9   father.  You've never lived with her either,

10  right?

11      **INMATE ROSS:**  No.

12      **PRESIDING COMMISSIONER SAWYER:**  Okay.  We'd

13  like you to think of maybe an alternate plan

14  from one of your siblings or somebody out there,

15  one of your family members.  You have a good

16  package of support letters, don't get me wrong.

17  Your parole plans are adequate, but just barely.

18  If you had a secondary plan in case it doesn't

19  work out, you know, you don't get along with her

20  father, you don't get along with her mother, and

21  I'm not saying that that is true, I'm just

22  saying that --

23      **ATTORNEY TARDIFF:**  It could happen.

24      **PRESIDING COMMISSIONER SAWYER:**  Thank you,

25  Counsel.

26      **ATTORNEY TARDIFF:**  You're welcome.

27  **WAYNE ROSS D-59353 DECISION PAGE 14 6/9/06**

72

1    **PRESIDING COMMISSIONER SAWYER:**  Well, I'm

2   going to throw one of my sayings, one of my isms

3   on you.  If you want to make God laugh, tell him

4   what you're doing tomorrow.  Okay.  Because we

5   don't know exactly -- we know what we want to do

6   tomorrow, and in this case you want this to

7   work.  We want it to work.  We want you to be

8   very successful when you get a date, but

9   sometimes things just don't work out the way we

10   want them to because we don't have the power.

11   We don't have all the juice.  So try to bolster

12   those parole plans.  You'll have two years to do

13   this, and this is one of the reasons we're

14   giving you two years.  One reason is the crime,

15   clearly, and the other is to strengthen up those

16   parole plans, and the other is to get your GED.

17       **INMATE ROSS:**  Okay.

18       **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

19   keep working in that direction.  We did not have

20   a response -- or a response was not allowed in

21   this hearing because it was a late response from

22   the District Attorney's office in Ventura

23   County, but they did write a six-page letter,

24   and while we didn't give it any weight, it went

25   right in the -- it went away because your

26   counsel objected to it, and she was absolutely

27   **WAYNE ROSS D-59353 DECISION PAGE 15 6/9/06**

73

1   right.  We followed the rules, so it was not

2   given any weight at all, but -- we'll leave it

3   at that.  Okay.  I failed to mention one other

4   thing that's in your favor in terms of your

5   employment.  We do think based on your 1994

6   machine shop assignment to the furniture above

7   average work to exceptional work reports in the

8   PIA furniture that you're working in now, you do

9   have those skills in the machine shop that you

10  can take with you.  You can't ever take those

11  away from you.  Any education that you have, and

12  I think you mentioned that, is they can take

13  everything else away from you, but they can't

14  take your education away from you and that's

15  what helps you get self esteem and that's what

16  helps you challenge the world.  If you know --

17  just like you've planned and you've accomplished

18  things that nobody can ever of take away from

19  you, so the more you get of that, the better off

20  you are, but you do have employable skills.  And

21  don't -- I know your wife is busy, but you have

22  some other family out there, have them ask

23  around or see what you can do to look around the

24  Oxnard Ventura area to see where those skills

25  that you have could be utilized.  You don't have

26  to have a job offer, but there's a factory that

27  **WAYNE ROSS D-59353 DECISION PAGE 16 6/9/06**

74

1  does this, that uses the same tools that I know

2  how to use and the same machines I know how to

3  use and they hire people.  That shows us that

4  you've done your home work in terms of your

5  employment so you hit the ground running, so

6  you're out there just a few days before you're

7  dropping those applications on people that you

8  could realistically work for.  Okay.  Because

9  you know what it's like to be unemployed.  It

10  puts pressure on you, so you want to get that

11  job going as soon as you can.  You put pressure

12  on your wife, you put pressure on her mom and

13  dad, you put pressure on your family.  Even

14  they're there for you, they're there to

15  surrounded you and give you positive strokes,

16  but you know, there comes a day that hey, you

17  going to get a job.  We're tired of feeding you.

18  This is not CDC, you know, because you're going

19  to have health care and things like that are

20  very important, especially if your wife starts

21  her own business, and she's going to have to

22  have health care because you said that she has a

23  heart condition.  That's expensive, especially

24  if she's got a preexisting condition to get that

25  policy to cover her and you and the business.

26  That's a lot of money every month that goes out.

27  **WAYNE ROSS D-59353 DECISION PAGE 17 6/9/06**

1   Okay. I want to commend you for your AA, very

2   important. I want to commend you for assisting

3   the tutor program in the GED area, your FEMA

4   courses, 27 separate courses, how to become a

5   father and not get angry, the family

6   effectiveness in training and harmony, the anger

7   management 12 week course in '05, your HIV/Aids

8   and TB, your book reports. Your book reports

9   gives you good insight, and as your attorney was

10  getting a little frustrated you're starting to

11  pull that stuff out, it should of been out on

12  the table long ago. You're here to perform.

13  What I mean by that is you're here to tell us --

14  you have a very limited time to tell us what

15  you're doing that's positive that we should look

16  at, so we make sure that that stuff is either in

17  your file or you have ready to present to the

18  next Panel. You understand what I'm saying? In

19  a separate decision, the Panel finds that it's

20  not reasonable to expect that parole would be

21  granted during the following two years, so given

22  the gravity of this murder, murder one, Mr.

23  Earnest Sanchez, given the fact that you haven't

24  achieved that GED since your last hearing three

25  years ago --

26        **ATTORNEY TARDIFF:** Three years ago.

27  **WAYNE ROSS D-59353 DECISION PAGE 18 6/9/06**

76

1        **PRESIDING COMMISSIONER SAWYER:**   Three

2   years.

3        **ATTORNEY TARDIFF:**   Yeah.

4        **PRESIDING COMMISSIONER SAWYER:**   That's what

5   I said, didn't I, three.

6        **DEPUTY COMMISSIONER ROTHLISBERGER:**   You

7   said two.

8        **PRESIDING COMMISSIONER SAWYER:**   Three years

9   ago, we feel that you won't -- that it's not

10  reasonable to assume that you would have a

11  parole date in the next two years.  You're going

12  in the right direction.  We don't want to

13  discourage you one bit, but we're going to be

14  realistic here.  So we've given you some things

15  to do, work on those parole plans, bolster those

16  up as well.  Okay.  And keep those good letters

17  coming from your family and any friends you've

18  got out there that will support you.  Of do you

19  have anything you'd like to say, Commissioner?

20       **DEPUTY COMMISSIONER ROTHLISBERGER:**   I just

21  want to wish you all the best of luck.  And also

22  another thing you might want to look into when

23  you go to the library, cheek out some books on

24  meditation.  That will help center yourself when

25  you take your GED.

26       **PRESIDING COMMISSIONER SAWYER:**   Good

27  **WAYNE ROSS D-59353 DECISION PAGE 19 6/9/06**

77

1  suggestion.  Okay.  Continue your self-help,

2  stay discipline free, earn the positive chronos,

3  and get a GED.  Okay?

4      **INMATE ROSS:**  Okay.

5      **PRESIDING COMMISSIONER SAWYER:**  Okay.

6  Thank you, Mr. Ross.  You've been a real

7  gentleman.

8      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Best of

9  luck, Mr. Ross.

10     **PRESIDING COMMISSIONER SAWYER:**  Best of

11 luck to you.  That concludes this hearing.  It's

12 5:44 p.m.

13

14

15

16

17

18

19

20

21

22

23 **PAROLE DENIED TWO YEARS**

24 **THIS DECISION WILL BE FINAL ON:**___**OCT 0 7 2006**___

25 **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26 **DATE, THE DECISION IS MODIFIED.**

27 **WAYNE ROSS D-59353 DECISION PAGE 20 6/9/06**

78

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, STACY WEGNER, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 77, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF WAYNE ROSS,

D-59353, ON JUNE 9, 2006, and that the foregoing pages

constitute a true, complete, and accurate

transcription of the aforementioned tape to the best

of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated September 7, 2006, at Sacramento,

California.


STACY WEGNER

TRANSCRIBER

**PETERS SHORTHAND REPORTING**