# EXHIBIT 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF VENTURA

COURTROOM 35

| | | |
|---|---|---|
| The People of the State of California | ) | No: CR22128 |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | REPORT OF PROBATION OFFICER |
| WAYNE STEDSEN ROSS | ) | |
| Defendant | ) | |
| | ) | Hearing Date: June 3, 1987 |
| | | 8:30 a.m. |

---

LEGAL STATUS

Original Charge: Ct. 1: 187 PC; Ct. 2: 459 PC

Convicted of: Ct. 1: 187 PC, first degree; Ct. 2: 459 PC, 1st degree

Date of Offense:  12-30-86

Guilty by: Plea                Date: 5-5-87                Judge: McGrath

Time in Jail: 154 actual days        Bail: N/A                O.R.: N/A

Negotiated Plea: None

Codefendants: None                        Disposition: N/A

Attorney: Public Defender

Probation Officer: Daniel Hedrick

1

2

## PERSONAL DATA

3

Legal Name: Wayne Stedsen Ross              AKA: Wayne Steden Ross
                                            Wayne Steneon Ross

4                                           Wayne Stedson Ross

5   Address: 540 North McKinley Street, Oxnard, CA 93030

6   Phone: 486-7703

7   Age: 28        Date and Birthplace: 9-12-58; Ventura, CA

8   Race/Ethnic Origin: Black                 Citizenship: USA
                                              (Country)
9

    Date Arrived in County: Life        State: Life         U.S.: Life
10

11  Sex: M      Height: 6'0"      Weight: 180      Hair: Black    Eyes: Brown

    Driver's License No: N6168649                  SS No: 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
12

    Education: The defendant dropped out of Oxnard High School during the
13  second half of the 12th grade in 1976.  He later enrolled at Oxnard
    College, withdrew from most of the classes he enrolled in, completing only
14  bowling, "Black Experience of Fine Arts," and welding.  After three
    semesters he gave up on Oxnard College.  In 1985, he entered a micro
15  computer accounting program at Waterson College, but later dropped out.

16  Military Service: None                     Dates: N/A

17  Type of Discharge: N/A

18  Health/Handicaps: Good/None

19  Alcohol/Drug Use:  The defendant indicated that he drank moderate
    amounts of alcohol, on an infrequent, social basis.  He denied having any
20  alcohol abuse or dependency problems.  He admitted to having previously
    used marijuana and rock form cocaine on an irregular, recreational basis.
21  He denied cocaine addiction and other illicit drug use.  Refer to the
    defendant's statement for additional information.
22

23                          FAMILY INFORMATION

24  Father's Name: Palmer Stedsen Ross        Occupation: Baptist Minister

25  Address: (Presumed to be deceased)

26  Mother's Name: Johnny Neal                Occupation: Unemployed

27  Address: 540 North McKinley Street, Oxnard, CA 93030

28  Stepparent: None indicated               Occupation: N/A

-2-

Address: N/A

No. of Brothers: 2          Sisters: 3          Ages: 27, 31, 32, 40 & 41

Present/Former Spouse: The defendant has never been married.

Address: N/A

Although the defendant has never been married, he had previously been involved in a common-law relationship with Jackie Evans on an episodic, "on/off basis," with one child born out of that union.

## DEFENDANT'S CHILDREN

| Name | Age | Custody | Supported By |
|------|-----|---------|--------------|
| Nequalye A. Ross | 6 | Jackie Evans | Not noted |

The defendant had previously been on a grant of conditional release and ordered to pay $102 per month in child support on behalf of his daughter. He subsequently failed to make payments as ordered by the Court, and probation was later revoked.  Refer to body of report for further information.

## EMPLOYMENT RECORD

| From | To | Employer's Name | Type of Work | Salary |
|------|-----|-----------------|--------------|--------|
| 1-6-83<br>(Verified) | 6-20-86 | Vitro Corp.<br>2545 Statham Bl.<br>Oxnard, CA | Computer Opr. | $5.00/hr. |

The defendant was originally hired by the Vitro Corp. as a shipping clerk, but later received training and was promoted to a computer operator position.  The defendant was laid off when the company lost a government contract.

| From | To | Employer's Name | Type of Work | Salary |
|------|-----|-----------------|--------------|--------|
| 9-18-78<br>(Verified) | 9-5-80 | Western Tech. Asso.<br>721 Richmond Ave.<br>Oxnard, CA | Maintenance &<br>Shipping Clerk | $3.47 to<br>$4.32/hr. |
| 7-22-75<br><br>(Verified) | 9-8-78 | Naval Construction<br>Batallion Center<br>Pt. Hueneme<br>(Youth Opportunity<br>Program) | | Not noted |

## CRIMINAL HISTORY

Present Arresting Agency: Oxnard PD          Date: 12-31-87

BI No: 98174          CII No: A06014295          FBI No: 0692374R5

-3-

The following information was obtained from CII, DMV, FBI, Ventura SO, and Ventura Municipal Court records:

| Date | Agency | Charge | Disposition |
|---|---|---|---|
| 7-21-84 | Vta. Muni. Ct. | 4000(a) VC<br>12951(a) VC<br>40508(a) VC | 569927-1. 9-26-84: Conv. 4000(a) VC, 12951(a) VC, 40508(a) VC. Fine (amount not noted). |
| 9-30-86 | Vta. Muni. Ct. | 166.4 PC | VE10937. 9-30-86: Conv. 166.4 PC, 36 mos. FP, pay $102/mo. child support, $25/mo. arrear. begin. 11-15-86.<br>4-7-87: Prob. revoked.<br>5-8-87: Prob. reins. & mod. People motioned to convert from formal to CRR granted |
| 12-31-86 | Oxnard PD | 187 PC<br>459 PC | CR22128. 5-5-87: PG, 187 PC, 1st deg. & 459 PC, 1st deg., Refer to prob. P&S hrg. set 6-3-87.<br>PRESENT MATTER. |

CIRCUMSTANCES OF OFFENSE:

The following information was obtained from Oxnard Police Department report number 86-28521, Ventura County Medical Examiner/Coroner, Autopsy Report #1853-87, and from the transcripts of the preliminary hearing in this matter dated March 2, and 3, 1987:

On or about the afternoon of December 30, 1986, the defendant and his half brother, Melvin Webster (age 26), had occasion to go for a ride as passengers of Crawford McCauley (age 30), an acquaintance of their's who lived in a room at Angel's Hotel, located at 141 Hayes Street, in Oxnard. During the ride, McCauley drove the defendant and Webster around the Oxnard area, and made three stops to cash checks. During the first two stops, McCauley cashed a couple of checks at the Pleasant Valley branch of Bank of A. Levy for $25 and $30. Upon the third stop, McCauley left the defendant and Webster in his car and entered the Alpha Beta Market on Ventura Road to cash one more check for $25. Following that

-4-

transaction, McCauley returned to his car, gave the defendant about $50 then proceeded to the 4500 block of Terrace Avenue in Oxnard, where the defendant exited McCauley's vehicle and made a purchase of some rock cocaine from a nearby residence. After making the cocaine purchase, the defendant returned to McCauley's car and they proceeded back to McCauley's hotel room, where the defendant and Webster ingested the rock cocaine.

After consuming the cocaine, the defendant asked to be driven to the vicinity of 2200 South Ventura Road in Oxnard, the home of victim, Ernest Sanchez (age 73). As requested, McCauley complied with the defendant and drove him and Webster to the vicinity of Khala and Ventura Road, in Oxnard where he parked his car as directed by the defendant. At that point, the defendant exited McCauley's car, reported that he had to take care of some "business," then proceeded to walk away toward the victim's home, leaving McCauley and Webster waiting in the car. As instructed by the defendant, McCauley and Webster waited in the car for about 15 to 20 minutes, and when the defendant did not come back, Webster left McCauley in the car and walked away to look for his brother. After waiting for the defendant and Webster for another ten minutes, McCauley got out of his car, and walked toward the victim's home a single family residence. At about that time, the defendant and Webster met up with McCauley outside of the victim's house and accompanied him back to the car. With the defendant sitting in the back seat and Webster sitting in the front passenger seat of his car, McCauley then drove back to Terrace Avenue so that the defendant could make another cocaine purchase. During the approximate three mile journey from Ventura Road and Khala Street to Terrace Avenue, the defendant indicated to his companions that he had taken "care of business," and proceeded to borrow a jacket from McCauley

-5-

because he was cold. McCauley then stopped again on Terrace Avenue, where the defendant made another cocaine purchase from his drug connection. After the cocaine transaction, McCauley, Webster and the defendant left Terrace Avenue and proceeded back to McCauley's room at the Angel Hotel.

During that trip, McCauley noticed that the defendant had removed some of his clothing and was throwing it out the window of the car. Upon their return to McCauley's hotel room, Webster and the defendant ingested the cocaine. At about that time, the defendant also returned $50 to McCauley, stating that it was "blood money." The defendant and Webster then spent the balance of the evening with McCauley in his hotel room.

At about that time, McCauley noticed that the defendant's tennis shoes were covered with a reddish substance resembling blood. The defendant asked McCauley if he had any cleaner to clean his shoes with, and was given some bleach to use. When the defendant's shoes would not come clean, McCauley gave him a pair of boots and the defendant later discarded his discolored tennis shoes. Later that night at about 2:00 or 3:00 a.m., McCauley drove the defendant and Webster back to their home at 540 North McKinley Avenue, Oxnard, before retiring for the evening.

On the following day, December 31, 1986, Ray Tejada, a business client of the victim, had occasion to drop by at the victim's home in order to check on some tax documents that the victim had been preparing on his behalf. When Tejada arrived at the victim's house at about 9:30 a.m., he found the front door open and unlocked, and noticed that a front bathroom window was broken. Tejada then entered the house and repeatedly called out the victim's name, but there was no answer. Inside the house, Tejada noticed that the lights were on in the entry way and that a television set was sitting on the kitchen floor. He then went to the victim's bedroom,

-6-

and found that the bed was made and that no one was present. He also
looked into the bathroom and noted that a set of drapes belonging to the
broken window were in the toilet.

At that point, Tejada proceeded from the bathroom, through the
kitchen and into a lounge/office area of the house where the victim
conducted his tax accounting business from. In that room Tejada came
across the fully clothed body of the victim, which was laying on its side in
the center of the room in an apparently injured condition. Without
disturbing the victim's body or contents of the residence, Tejada retreated
from the house and went directly to his bank and cashed a check. He
then went home, advised his wife about his discovery and went to the
office of his attorney, Robert Garcia, who called the police and notified
them of Tejada's discovery.

Shortly thereafter, at about 11:00 a.m., Oxnard Police, fire, and
emergency medial personnel arrived at the victim's residence and found the
victim's body on the floor of the office area lying in a pool of blood. The
vital signs on the victim were checked, he was determined to be deceased.
He appeared to be a murder victim who had sustained multiple upper body
wounds on his face, neck and torso. In light of the discovery of the
victim's body, the Coroner and other police investigators were called to
the scene, and a homicide and burglary investigation ensued.

During the subsequent investigation, police investigators lifted a set
of identifiable fingerprints from the inside window sill of the broken
bathroom window, which were later determined to match those belonging to
the defendant. Additionally, it was noted that the television set that was
found on the floor of the victim's kitchen had been moved there from
another room, where it had been previously attached to a cable connection.
In the office/lounge area, where the victim's body had been discovered,

investigators found a pair of scissors embedded in a section of base board, which was believed to have been the murder weapon. The office lounge room, which contained a desk, a couch, coffee table, filing cabinets and chairs, was splattered with blood and showed signs of a struggle as some of the furniture was disarrayed. There were numerous blood spots on the top of the victim's desk, and a telephone was found with its receiver off the hook, dangling on to the floor. A beer can and vodka bottle were also found on the floor, in the vicinity of the office couch. Police also saw blood stains on the kitchen's tile flooring which appeared to have been left as shoe prints. Based upon the physical evidence found at the scene, investigators initially speculated that the victim had been stabbed by an assailant during the course of a burglary.

During the course of the ensuing police investigation, the defendant's name came to the attention of law enforcement as it was discovered that the victim had previously reported to the police that his wallet and its contents had been stolen by the defendant on or about December 16, 1986, while the defendant was a guest in the victim's home. During that incident, which is covered in Oxnard Police Department report number 86-27559, the defendant had reportedly obtained $22 as a loan from the victim, leaving the victim with about $200 in his wallet. Despite the $22 loan, the defendant wanted more money from the victim but was refused. He then left the victim's residence and returned about an hour and one-half later. Shortly after his return, the defendant had reportedly talked the victim into going to bed, and had insisted on helping him in the bedroom. The next day, December 17, 1986, when the victim awakened, he checked his pants, which were hanging in the closet, and discovered that his wallet was missing. The missing wallet had contained $200 in cash and the defendant's driver's license, which the victim had taken as

-8-

1   security for the original $22 loan. Later that same day, the victim
2   reported the incident to Officer Ulmer of the Oxnard Police Department,
3   who prepared an initial report indicating the defendant as a primary
4   suspect in that matter. In view of the previous theft report and other
5   corresponding information, namely business papers found on the victim's
6   desk which bore the name of the defendant, investigating officers
7   contacted the defendant at his home on McKinley Street and brought him to
8   the Oxnard Police Department for questioning on the afternoon of December
9   31, 1986.

10   At that time, Detectives Tatum and Garcia told the defendant that
11   they were conducting a homicide investigation on the victim's death and
12   asked him when he had last seen the victim alive. In response, the
13   defendant initially denied any knowledge of the victim's murder, stating
14   that he had last seen the victim about four days ago in regards to the
15   burglary report that the victim had filed on December 17, 1986. The
16   defendant went on to claim that he had no idea who would kill the victim,
17   but advised that the victim had been having problems with a heavy set
18   white man, an ex-marine who resided in the neighborhood and was always
19   harassing him. The defendant also claimed that the victim had previously
20   offered to pay him to take care of the subject who was harassing him.

21   When asked to describe his relationship with the victim, the defendant
22   stated that they were the best of friends and had previously worked
23   together for a number of years. The defendant also denied an allegation
24   that he owed the victim $500, stating that he had already paid the victim
25   back and that the greatest amount owed to the victim on any occasion was
26   about $70. The defendant also stated that he did not believe that the
27   victim was dead, as he had been in contact with a detective earlier that
28   day who was conducting an investigation in regards to the wallet theft

1    case, and was of the opinion that the officer had also talked with the

2    victim that day.

3    During the course of the interview, a number of abrasions were noted

4    on the defendant's left hand and finger area, which the defendant claimed

5    were the result of an injury sustained while playing basketball. He also

6    indicated that he wore a size 10 tennis shoe, but did not own a pair at

7    that time. In regards to narcotics usage, he denied ever having used

8    narcotics or having been arrested for narcotics violations.

9    When asked about his whereabouts on the previous evening, the

10   defendant stated that he had been with his brother, Melvin Webster, and

11   his friend, Crawford McCauley. He claimed that he, McCauley and Webster

12   spent the entire evening watching television and drinking beer up until

13   about 2:00 a.m. the next morning.

14   He claimed that his mother, brother, and McCauley could verify his

15   activities and the time he had arrived home on the following morning.

16   He also indicated that he was a good friend of the victim, who he

17   characterized as being in good shape and very strong. He claimed that

18   they would play boxing against each other on many occasions, and that

19   they would go out together on occasion to solicit females for sex acts at

20   the victim's request. He indicated that the victim was still sexually active

21   and that he had provided the victim with females on prior occasions, but

22   did not consider himself to be a pimp. The defendant was also aware of

23   an incident in which a white male acquaintance of his had orally copulated

24   the victim for an unknown amount of money, and that an altercation had

25   transpired between the acquaintance and the victim involving threats

26   against each other which were not apparently carried out.

27   Following the initial interview, the defendant accompanied Detectives

28   Garcia and Tatum to the Angel Hotel where the officers contacted Crawford

-10-

McCauley and conducted an interview with him.  At that time, McCauley basically verified that he, Melvin Webster and the defendant and been together during the previous evening.  The defendant was then escorted to his own home where the detective spoke with his mother and Melvin Webster.  Webster also told the officer that he, McCauley and the defendant had been together during the previous evening.  While at the defendant's residence, detectives inspected several tennis shoe soles, none of which matched the prints which were left at the victim's residence.  At that time, the defendant was regarded as a witness and was returned home and not arrested.

Later, Detective Tatum was told that the defendant's fingerprints matched those found on the bathroom window sill at the victim's house. The defendant was then picked up again and returned to the police station where he waived his rights as per Miranda and voluntarily submitted to a polygraph test and a second interview.  During the course of the polygraph test, the defendant confessed to being present at the victim's home, and to inflicting blows with a pair of scissors in self defense. However, he stipulated that he neither intended to kill the victim nor did he say that he thought the victim was dead.

Following his conversation with Detective Donald Boger, the polygraph examiner, the defendant was turned back over to Detectives Tatum and Garcia for further questioning.  During a taped interview at the Oxnard Police Department on December 31, 1986, at about 9:25 p.m., the defendant again waived his rights as per Miranda and advised that he had talked to the victim on the day before in regards to the missing wallet incident, and that during their conversation everything appeared very friendly with no hard feelings between them.  At the victim's request, he later went over to the victim's residence in the company of his brother and

-11-

1  McCauley.  While Webster and McCauley waited for him in a parked car, he

2  approached the victim's house and knocked on the front door for quite

3  some time before he was let into the residence by the victim.  At that

4  point, the victim purportedly started to threaten him about the money that

5  was missing, and demanded, "You either bring me the money or a girl,

6  otherwise we are going to box."  When asked why the victim's television

7  had been moved from its original position, he claimed that he had moved

8  the television in order to use it as a weapon to keep the victim away from

9  him, as the victim was chasing him around the house with a paper stapler.

10  He also claimed that during the chase, he had broken the bathroom window

11  in an attempt to get out of the house.  When told that his fingerprints

12  were from the outside of the window, the defendant changed his story and

13  explained that he usually knocked on the bathroom window when he went

14  to the victim's residence.  He further changed his story stating that he

15  had attempted to exit via the bathroom window because the victim had

16  locked him inside the residence.

17      When asked why he had killed the victim, the defendant stated he

18  had acted in self defense.  He claimed that the victim had initiated the

19  attack by hitting him several times in the face.  Additionally, he claimed

20  that the victim had struck him with the stapler.  He also acknowledged

21  that he had heard his brother knocking on the sliding glass door of the

22  victim's office and yell for him to stop and come out, but he continued to

23  fight with the victim, who refused to stop hitting him.  At about that

24  time, the victim purportedly grabbed a pair of scissors from his desk and

25  started stabbing at the defendant with his right hand, while the

26  defendant, in turn, used his left hand in a defensive motion, attempting to

27  grab the scissors from the victim.  The defendant claimed that during that

28  time he was able to grab the scissors away from the victim after having

-12-

been hit three or four times.  He then started striking the victim back with the scissors, making contact with him three or four times.

During that interview, the defendant also denied that he had taken money from the victim.  He also explained that he had originally lied to detectives about the incident because he was scared.  He claimed that after his altercation with the victim, he had dumped his bloody clothing near K-Mart.  He later changed his story and stated that he had dumped the bloody clothing in the area of Channel Islands Boulevard and Bard Road, and that he had taken his tennis shoes to McCauley's Hotel room and had attempted to wash off the blood.  He denied taking any money or property from the victim's residence, he claimed that the money he had given to McCauley was his personal property.  He also indicated that he had gone with McCauley and his brother to the area of Terrace Avenue after he left the victim's house, and that they had purchased about $100 worth of cocaine on that particular night from some "friends," whose names he could not recall.  However, he stipulated that he had not used any cocaine prior to his altercation with the victim.

At the conclusion of the interview, the defendant was transported to St. John's Hospital where a blood sample was obtained for analysis.  At that time, a physician also examined the defendant for injuries and noted that he had a number of small lacerations on the fingertips of his left hand.  At the conclusion of the examination, the defendant was transported back to the police station where, at approximately 11:30 p.m. on December 31, 1986, he was placed under arrest for a violation of Section 187 of the Penal Code, murder.

An autopsy was performed on January 1, 1987, by Dr. Ronald O'Halloran.  Noted were approximately eight wounds to the chest area, which appeared to be minor, none of them having punctured the victim's

-13-

chest cavity. Further examination of the victim's body revealed approximately 26 to 28 puncture wounds to the face, neck and head area. Many of the wounds to the head penetrated the scalp and appeared to have gouged the victim's skull. A majority of the wounds were concentrated on the victim's right cheek and temple area. No visible defensive wounds were found on the victim's hands. Through examination of internal organs it was learned that the victim had at one time sustained a heart attack, as was evident by scarred heart tissue. Upon completion of the autopsy, Dr. O'Halloran determined that the cause of death was mycardio ischemia due to blood loss from multiple stab wounds. Contributing factors were arterial sclerotic heart disease and coronary thrombosis. Additionally, Dr. O'Halloran noted that all of the wounds had been inflicted while the victim was still living, and that those injuries would cause bleeding but not necessarily cause death by themselves.

It is also noted that on December 31, 1986, at about 5:00 a.m., a man by the name of Richard Knuppel happened to find the victim's wallet on Bryce Canyon Street near "A" Street in Oxnard while he was bicycling to work. The wallet contained no money, but carried identification belonging to the victim. Mr. Knuppel later attempted to contact the victim by phone to return the wallet, but after no one answered he then contacted the police and turned the wallet over to them. By that time, the defendant had already been arrested and taken into custody for the victim's murder. In addition to the discovery of the victim's wallet, police investigators also discovered that the victim had closed out a dormant savings account at his bank on December 29, 1986, and had received an amount in excess of $400 in cash on that date.

DEFENDANT'S STATEMENT:

The defendant was interviewed on May 15 and May 18, 1987, while in custody in Ventura County Jail. He submitted a written statement, in which he describes his previous relationship with the victim, his own activities before, during and after the commission of the instant offense, and how he feels about his own life and pending sentencing. His statement is attached to and made a part of this report. During both interviews the defendant was cooperative and responded to questions in a candid manner. He advised as follows:

The defendant readily acknowledged his wrongdoing and expressed his remorse for his actions, stating that the victim's death weighed heavily on his conscience as he had known the victim both professionally and socially for nearly 11 years, dating back to the time when he worked under the victim's supervision while he was employed in a work-study program at the Naval Construction Batallion Center. During the intervening years he had come to regard the victim as a caring father figure, a close confidant, friend, and benefactor. Over the years he had spent a great deal of time in the company of the victim, often "hanging around" at his house as a frequent guest. The victim regularly helped him with his accounting and tax matters, and on occasion he would reciprocate by doing whatever he could to help out the victim. They had come to be very close friends, and he had been seeing the victim on a daily basis right up until the time of his death.

The defendant felt that he was basically a nonviolent person, and that the instant offense, namely the victim's murder, was completely against his nature. He claimed that he had absolutely nothing against the victim, and is now having a hard time reckoning with his own sense of loss and responsibility. He professed that he had gone to the victim's

-15-

house, at the victim's invitation, on a friendly, social basis, without any intention to steal from or harm the victim. He emphasized that the offense would never have occurred if the victim had not provoked him into an uncontrollable rage by attacking him first, without any apparent provocation.

In regards to the circumstances leading to the victim's death and his arrest, the defendant explained that, on the date of the instant offense, he had run into the victim while he was in a liquor store buying a half pint of tequila for himself while Crawford McCauley was next door cashing a check at the Alpha Beta Market. During that encounter, the victim, who was buying something to drink, asked him in a rather insistent manner if he would be available to join him that evening so that they could go out drinking together. As he was already committed to go out with his half brother, Melvin Webster and McCauley, he turned the victim down on the offer, telling him that he already had plans for the evening, but that he might stop by at his house to visit him if he had an opportunity later. He and the victim then parted company, and he went out to McCauley's car to rejoin his brother and McCauley.

From the parking lot at the Alpha Beta Market on Ventura Road, McCauley drove him and Webster over to Terrace Avenue, where McCauley stopped and procured some rock cocaine. During that period of time, the defendant consumed the half pint of tequila which he had purchased at the liquor store. After McCauley made his cocaine purchase on Terrace Avenue, he rode over to McCauley's hotel room where they "hung out for a while." At that time, McCauley broke up the rock cocaine he had purchased into small packages, which he intended to sell. The defendant denied that he possessed or used any rock cocaine that night, claiming that McCauley lied on the witness stand about that part of the incident

-16-

because McCauley was on a grant of probation for arson and did not want to get into trouble. The defendant adamantly professed that on that evening, he was neither under the influence of any illicit drugs, nor was he intoxicated on the tequila he had consumed. He admitted that the alcohol had affected him by making him feel a bit elated, but stipulated that he was functioning quite well and would have passed a sobriety test if one had been administered to him.

After they spent some time in McCauley's hotel room watching television he left with Webster and McCauley to go out drinking. At about that time, he thought of the victim's earlier invitation and decided to have McCauley take him by the victim's house so he could go in and see what the victim had in mind. When McCauley drove him to the victim's street, they found that parking spaces were scarce, so he exited the vehicle, and told McCauley to find a parking space and wait with Webster until he got back. The defendant then walked up the street a bit and came to the victim's house, where he noticed that the inside lights were on and that radio music was playing from inside. As he was accustomed to doing, the defendant initially began knocking on the sliding glass door at the front of the victim's house, which led into a lounge and office area where the victim did much of his accounting work. After knocking on the glass and calling out the victim's name several times without a response, he then moved over to the front door and began to knock there. At the time he assumed that the victim had fallen to sleep after doing some heavy drinking, so he kept on knocking and calling his name to wake him up. After knocking on the front door for a while, the defendant then moved over to the adjacent bathroom window, where he saw a light on from inside. He then rapped on the glass a few times with his hands, and

-17-

1  accidentally broke the window, sending the glass and a curtain cascading

2  inside the bathroom.

3      At that time, the victim came out of the front door of his house and

4  greeted the defendant by saying, "Hey chingaso," an expression that the

5  victim commonly used to address him by.  He, in turn, apologized to the

6  victim for breaking the window, then they both walked into the house and

7  looked into the bathroom to check out the damage.  The victim told him

8  that he was not worried about it, and they then walked on through the

9  kitchen, where he stopped momentarily to grab a beer from the

10  refrigerator, but there were none available.  He then asked the victim

11  about the beer, and was told that they would go get some later.  They

12  then exited the kitchen together and went into the den where the victim

13  conducted his tax accounting business.

14      Once in the den, the victim, who appeared to be a bit dishevled and

15  slightly intoxicated, stood face to face towards him and started asking him

16  about his ex-girl friend Bessie, whom the victim was infatuated with.  The

17  defendant told the victim that he did not know where she was, but the

18  victim insisted that he call Bessie so that he could have her over to his

19  house.  Although the defendant had brought some of his former girl

20  friends over to the victim's house on previous occasions, he did not feel

21  comfortable about the victim's proposition and tried to get away from the

22  topic, but the victim was persistent, stating, "Hey Chingaso you owe me

23  for what you did."  The defendant claimed that the victim then began to

24  hit him for no apparent reason, throwing punches at his face and cursing

25  him in the process.

26      In response to the victim's aggression, the defendant tried to back

27  up, but the victim kept coming at him.  At about that time, the victim

28  struck him across the arm with a desk stapler, causing the defendant to

-18-

back up further, trip over a table and fall to the floor. While he was still on the floor, the victim grabbed a pair of scissors and started swinging them at him. In turn, the defendant tried to protect himself and disarm the victim, but with each succeeding swing the victim nipped his fingertips with the blade of the scissors. Suddenly, the victim struck him in the forehead with the scissors, which sent him out of control in a rage. Before the defendant knew what he was doing, he had grabbed the victim's hand with the scissors and began stabbing him back. At this point they were both grappling on the floor of the den. The victim's hand was still clutched tight around the scissors, even as the defendant grabbed his arm and stabbed him.

During the ensuing struggle, the defendant found himself trying to open the sliding glass door to get out of the room and away from the victim, but a piece of wood in the door track kept him from doing so. He also tried to back away, but the victim would not let loose of his leg, which he was holding in his tight grip. At about that time he heard Webster calling to him from outside of the sliding glass window. He then kicked and pulled himself free from the victim, who was still struggling and cursing at him, and retreated into the adjacent room where he came across the television set.

Being both scared and outraged by the victim's aggressive behavior, the defendant then decided to take the victim's television as retribution. While the victim thrashed about and cursed at him from the other room, he disconnected the television and moved it to the kitchen. He then changed his mind, left the television on the floor and fled from the residence without further incident. At that time, he had no idea that the victim was seriously wounded or in jeopardy, as the victim was still very belligerent, noisily moving about, yelling and cursing when he left.

-19-

After he exited the victim's house, the defendant came upon Webster, who walked back with him to McCauley's car. When he got into the car, he told McCauley and Webster about the altercation he had with the victim. Without mentioning of the stabbing, he told them them that he had protected himself by repelling an attack by the victim. McCauley then drove them away from the area. While the car was moving, he pitched out some of his bloodied clothing and the victim's wallet, which he had inadvertently picked up during the struggle with the victim. He claimed that the victim's wallet did not contain any money, and that he had not taken anything else from the victim's house. He spent the rest of the night with McCauley and Webster brother, and was later left off at home.

He did not think about the victim until later the next day when the police came to his house and asked to speak to him about a burglary incident. At that time, he had no idea that the victim was dead, and assumed that the police were referring to an earlier incident in which the victim had lost another wallet and had reported it as being a theft. As requested, he went with officers to the Oxnard Police Department, where they apprised him of the true nature of their investigation, namely a homicide. At that point, he realized what had happened. He speculated that his knowledge of the crime must have shown up on his face, as the attitude of the police interrogators towards him immediately shifted. He suddenly changed from being a witness to a suspect, and, after initially denying any wrongdoing, he ultimately confessed to his role in the crime and was arrested accordingly.

In regards to his conviction, sentencing and pending consequences, the defendant advised that he had unintentionally committed the most serious offense possible and would now be paying for his wrongdoing for the rest of his life. The five months he has already spent in jail awaiting

-20-

sentencing have been an extreme hardship upon him, as he had never been previously incarcerated for any period of time. He felt that he was utterly defeated, as he could now do nothing to change his fate and had to face the fact that his life would henceforth be a long and monotonous repetition with no immediate hope for freedom or change. He claimed that he felt very sorry for the victim's family, as he did not hold a grudge against them and hoped that they would find it in their hearts to forgive him. He also regretted that he could not bring the victim back to life, and stated that all he could do on his own behalf was to behave himself as a model inmate and turn his fate over to God.

In regards to his imprisonment, the defendant stated that he would like to be housed in a facility that was not dominated by hardcore, habitual criminals. He further stated that he did not view himself as being a security risk, and that he would prefer to work in a fire camp or a similar work-oriented setting where he could do something productive with his time.

STATEMENTS OF VICTIM'S FAMILY:

Victim Ernie Sanchez, who was a widower, is survived by his two daughters, Caryl Brooks of Oxnard and Denise Lemoux of Camarillo, two sons-in-law, Joseph Brooks and Cliff Lemoux, and seven grandchildren. The daughters and sons-in-laws were interviewed at the Brooks family home in Oxnard on May 14, 1987. They advised as follows:

The victim's entire family has encountered a great deal of difficulty trying to cope with the victim's untimely death, as he had been involved in their lives on a daily basis right up until the time of his passing. For the past 14 years following the death of his wife, up until the time just before his death, the victim had been living in the Brooks household.

-21-

During that time some very strong ties were developed within the family which make his passing particularly difficult.

The victim was characterized as having been a very active man for his age who, despite of a heart condition, kept busy by running his own tax preparation and accounting service from his home. He had been in business for himself for about 30 years, was well respected in the community. Because of the victim's involvement with the tax and business affairs of so many clients, the time of his death, which corresponded with the end of the year, came as a particular hardship to both his clients and family, especially his daughter, Caryl Brooks, who worked with him as a partner in the accounting business. Because of the demands of clients, the family had been denied the benefit of a normal bereavement period. Furthermore, as the victim met his end through homicide, the family was also faced with the unusual burden of having to deal with the victim's residence, which had been torn apart when the police were gathering evidence during the initial investigation.

In regards to the defendant, both of the victim's daughters indicated that they were aware of him through his long term social and professional involvement with their father, which dated back to a time when the defendant worked under the supervision of the victim at the Naval Construction Battalion Center. They reported that the defendant was always hanging around at their father's home, that he would often walk in unannounced, without knocking and take advantage of the victim's hospitality. They indicated that the victim was a "sitting duck," as the defendant knew the entire layout of his home and his behavior patterns. They believed the defendant was responsible for stealing the victim's wallet during the incident that had been reported to police earlier.

-22-

They had also speculated that the defendant had gone to their father's home on the night of his death to steal his television set and his money while he was sleeping. They theorized that their father had been drinking and may have been asleep in his office area when the burglary was initiated, and that he probably woke up abruptly and found that he was being robbed. As the victim knew the defendant, he probably would have confronted him, but not in the unprovoked and aggressive manner that the defendant had claimed.

Although they were glad that the matter did not have to go to trial, the entire family was disappointed that the District Attorney did not push for special circumstances in this matter which would preclude the defendant from ever being released on parole. They felt that the defendant had pled guilty in this matter simply to minimize his own consequences.

They also felt that the judge in the preliminary hearing could have been more responsive, as he seemed to treat the circumstances of the offense with a degree of indifference, as though the taking of a human life was a routine matter. They also felt that the police had done some sloppy investigative work, which might have compromised the case if it had gone to trial, as investigating officers had neglected to Mirandize the defendant at the time of their initial interrogation.

It was the consensus of family opinion that the criminal justice system had erred by displaying more concern for defense and humane treatment of criminals than it did for their victims. The family wished to stipulate that the defendant did not show their father any mercy when he stabbed their father 27 times. They believed the defendant, through his actions, should now be permanently disinfranchised from society with a term of life imprisonment without possibility of parole. Additionally, they indicated

-23-

that they would be present in the Courtroom for the defendant's sentencing. They also intended to try to keep track of the defendant's parole status and use whatever influence they might have to discourage his release on parole.

In addition to statements made by the victim's family during the interview, his daughter Caryl Brooks submitted a letter and two photographs of the victim for incorporation with this report. In her letter, which is addressed to the District Attorney, Mrs. Brooks expresses her disappointment with the prosecution's handling of this matter and with the prospect of the defendant being eligible for parole in 13 or less years. Her letter and pictures of the defendant with his grandchildren are attached to and made a part of this report.

CORRESPONDING VICTIM INFORMATION:

Maryanne Ditzhazy, a Victim-Witness Advocate with the Ventura District Attorney's Office, was contacted during the course of this investigation. She indicated that the victim's family have applied for and received an award of $1,236.72 from the State of California's Victim of Violent Crime fund. That award was given to help cover some of the victim's funeral and internment costs. Ms. Ditzhazy also noted that the victim's daughters, Caryl Brooks and Denise Lemoux, were two very nice, cooperative people who had both suffered from an enormous emotional ordeal in the wake of their father's murder, and were not at all happy with the District Attorney's Office because of the handling of the defendant's prosecution, namely the lack of special circumstances that would have made the defendant ineligible for parole.

RELATED DEFENDANT INFORMATION/INTERESTED PARTIES:

In addition to the written statement made by the defendant, the Public Defender has submitted seven character reference letters on the

-24-

defendant's behalf for the Court's consideration. Those letters, which were written by some of the friends, family and former co-workers of the defendant, generally address the defendant's positive traits, and amenable attitude and contributions to his family and the community. They are attached to and made a part of this report for the Court's review.

Furthermore, the Public Defender also submitted copies of a number of awards and certificates that the defendant had received, copies of the defendant's grade point and attendance records from college, high school, and elementary school, and a two page report from a school psychologist dated May 11, 1985. In that report, which was prepared when the defendant was six years old, the psychometrist's evaluation findings indicate that the defendant had tested as being at a borderline level of retardation, which qualified him as a candidate for a special education class.

In addition to the aforementioned information, Deputy Public Defender Susan Olson also prepared an extensive social history/biography of the defendant, in the form of a five page memorandum. That document, which chiefly regards the defendant's disadvantaged rearing, family problems and involvement in the instant offense, has been carefully reviewed and is also attached to and made a part of this report for the Court's consideration.

TIME IN CUSTODY:

The defendant was arrested on December 31, 1986, by the Oxnard Police Department and was subsequently booked into Ventura County Jail, where he has remained in continuous custody ever since. At the time of the defendant's sentencing hearing on June 3, 1987, he will have been in continuous custody for a total of 154 actual days. A Time in Custody Worksheet is attached for the Court's consideration.

1

FINANCIAL STATUS:

2
3
4
5
6
7
8
9
10

The defendant has been unemployed since late July, 1986, prior to his arrest, he had been living with his unemployed mother and had been in arrears with his Court ordered child support payments. The defendant currently has no income, significant assets or financial holdings to speak of. Thus, if he happened to be granted probation at this time, it would appear that he would not have the ability to pay for the cost of both probation supervision and the presentence investigation. Copies of the defendant's Financial Declaration worksheets are attached for the Court's consideration.

11

EVALUATION:

12
13
14
15

Sentencing Alternatives:  A violation of Section 187 of the Penal Code, first degree murder without special circumstances, is a serious, non-alternative felony, punishable by imprisonment for a term of 25 years to life in state prison (Count 1).

16
17
18
19
20
21
22
23

A violation of Penal Code Section 459, within the meaning of Penal Code Sections 460.1 and 667, first degree burglary, is a serious, non-alternative felony, punishable by imprisonment for a term of two, four or six years in state prison.  Pursuant to Penal Code Section 462(a), the granting of probation for a first degree burglary violation is restricted and shall not be granted unless this is determined to be an unusual case where the interests of justice would be best served with such a grant (Count 2).

24
25
26
27

Whereas Section 462 of the Penal Code merely restricts the granting of probation for the first degree burglary violation in this matter, Section 654 of the Penal Code would appear to preclude imposition of punishment on that count.  Furthermore, there are no statutory provisions limiting or

28

prohibiting the granting of probation for the first degree murder violation outlined in Count 1.

Circumstances in Aggravation (Judicial Rule 421): Although the penalty in Count 1 is the indeterminate 25 years to life sentence, the following factors in aggravation appear to be applicable to the setting of the term in Count 2 and are incorporated to assist the Court in the selection of an appropriate term:

1.  The crime involved great violence, great bodily harm and an extraordinarily high degree of callousness and cruelty as indicated by the numerous wounds that the elderly victim suffered (Rule 421a1).

2.  The defendant used a lethal weapon, namely a pair of scissors, when he committed the crime, which was not charged as an enhancement (Rule 421a2).

3.  The victim was particularly vulnerable as he was a 73 year old man who lived alone and suffered from a heart condition (Rule 421a3).

4.  As the defendant was financially destitute and apparently involved in rock cocaine use, it can easily be speculated that the instant offense, namely the burglary, was somewhat preplanned, premeditated and motivated by the defendant's narcotics usage (Rule 421a8).

5.  As the victim had long been the defendant's friend, confidant and benefactor, it would appear to be very clear that the defendant took advantage of a position of trust when he committed the instant offense (Rule 421a12).

6.  The defendant demonstrated an extraordinarily vicious, cruel and callous degree of violent conduct which indicates a very serious danger to society (Rule 421b2).

7.  The defendant was on a grant of conditional release stemming from a child support order violation when he committed the instant offense (Rule 421b4).

Circumstances in Mitigation (Judicial Rule 423): Although the penalty in Count 1 is an indeterminate 25 years to life sentence, the following factors in mitigation appear to be applicable to Count 2, and are incorporated to assist the Court in selection of an appropriate term:

1.  The defendant had an insignificant prior record of criminal conduct consisting mainly of a few minor traffic matters, and a child support violation (Rule 423b1).

2.  Although the defendant denies that the crime was drug related, it had been reported that he used rock cocaine on the night of the instant offense and, in light of the chemical effects of cocaine use, he may have been suffering from a mental or physical condition that significantly reduced his culpability for the crime. However, this factor is given very little weight as the defendant's drug usage is purely subject to speculation and appears to be very questionable in view of the defendant's continued denial (Rule 423b2).

3.  The defendant pled guilty at an early stage, thus avoiding the necessity for a trial in this matter (Rule 423b3).

Probation Suitability (Judicial Rule 414): The following factors appear to oppose the granting of probation:

1.  In light of the defendant's first degree burglary conviction, the granting of probation is prohibited unless the Court finds that this matter qualifies as an unusual, interest of justice case (Rule 414a).

2.  The defendant's vicious, repeated stabbing of an elderly victim would indicate that he may be a danger to others if he is not imprisoned (Rule 414b).

3.  The defendant committed one of the most serious offenses known to mankind, namely the taking of a human life in a willful and malicious manner (Rule 414c1).

4.  The victim, a very vulnerable 73 year old man with a heart condition, suffered the ultimate loss at the hands of the defendant, namely his life (Rule 414c2).

5.  The defendant used a very formidable, lethal weapon against his victim, namely a pair of scissors (Rule 414c3).

6.  It virtually goes without saying that the defendant inflicted great bodily injury upon his victim when he stabbed him more than a dozen time on the head and upper torso with a pair of scissors (Rule 414c4).

7.  As the defendant knew the victim as a friend, and had been a guest in his home on previous occasions, it would appear that he took advantage of a position of trust and confidence when he committed the instant offense, and it can be easily speculated that Ernie Sanchez would be alive and well today if he had not developed a degree of comradory with the defendant (Rule 414c8).

8.  The defendant has failed to comply with Court ordered child support payment terms as a condition of conditional release (Rule 414d2).

9.  The defendant has been unemployed for nearly one year, does not have any military service to his credit, and is currently financially destitute (Rule 414d5).

10.    Although the defendant denies having a drug or alcohol problem, his freely professed association with rock cocaine users would indicate that a formidable chemical dependency problem may exist or be imminent (Rule 414d6).

The following actors appear to favor the granting of probation:

1.    The defendant has an inconsequential record of misconduct which is neither significant nor frequent (Rule 414d1).

2.    The defendant would appear to be willing to comply with whatever probationary terms the Court may sanction, as he is not looking forward to spending the next few years of his life in prison (Rule 414d3).

3.    There is nothing about the defendant's age, education, health, mental faculties or family background that would necessarily preclude him from successfully completing a grant of probation (Rule 414d4).

4.    Although the defendant has been unemployed for almost one year, he had previously established a long and fairly stable history of employment dating back to when he was a teenager that would indicate that he possesses valuable work habits and viable vocational skills (Rule 414d5).

5.    In all likelihood, imprisonment will have a devastating effect on the defendant, who has never previously suffered any significant degree of incarceration (Rule 414d7).

6.    In all likelihood, a felony record will have a negative impact on the defendant's ability to obtain future employment (Rule 414d8).

7.    The insomnia and loss of appetite that the defendant has been suffering from since his arrest may be an indication that he is, to some degree, as remorseful as he claims to be (Rule 414d9).

Interests of Justice (Judicial Rule 416):  Pursuant to Section 462(a) of the Penal Code, a conviction of a first degree burglary violation precludes the granting of probation except in unusual cases where the Court finds that the interests of justice would be best served through such a grant.

As the defendant used a deadly weapon when the burglary and murder were perpetrated, was not participating in the crime under circumstances of coercion or duress, is neither especially youthful or aged, and was not suffering from psychological problems, it could be easily argued that this is not an unusual interest of justice case (Rule

-29-

416a, b, d, e & f). However, it might be argued this is an unusual, interest of justice case merely because the defendant has never previously been convicted of a felony (Rule 416c.).

Analysis: Although the defendant's criminal background is not considered to be overtly consequential, the extraordinarily vicious and callous nature of the instant offense alone would appear to render him completely unsuitable as a candidate for probationary consideration. Furthermore, the instant offense is clearly not an unusual, interest of justice case and the defendant would therefore appear to be ineligible for probation pursuant to Section 462(a) of the Penal Code. Thus, it would appear that the only matter that needs to be addressed at this time is the setting of the term for the first degree burglary violation outlined in Count 2. Seeing as how the defendant already faces an indeterminate term of 25 years to life for the first degree murder conviction, a question of the burglary term hardly seem important as it appears that it will be stayed or omitted in accordance with Penal Code Section 654. Nevertheless, even though a penalty cannot be imposed on Count 2, it would appear that the aggravated term of six years for the first degree burglary is appropriate in light of the overwhelming factors in aggravation and due to the sheer gravity of the overall offense. It should also be mentioned that the granting of probation would not be recommended under any circumstances in this matter, even if the defendant had not been ineligible pursuant to Judicial Rule 414, as the very nature of this senseless crime totally outweighs any possible factors that might otherwise be used to support or favor the granting of probation.

In conclusion, it is also noted that the defendant has continued to advocate that he was provoked to anger by the victim, and that his actions, although undeniably wrong, can in some way be justified on the

-30-

1  grounds of self defense or unusual provocation. Be that as it may, the
2  defendant's counter claim simply does not carry any weight whatsoever and
3  should be addressed as such, as the compilation of events preceding and
4  proceeding the instant offense, which were testified to under oath in Court
5  and are not subject to the defendant's varied interpretation, would clearly
6  indicate that the defendant, rather than the aged victim, was the true
7  aggressor in this case.

8      Hopefully, the defendant will now reflect upon his own wrongdoing,
9  and all the sorrow he has caused the victim's family, so that his eventual
10  release will not be viewed as a total miscarriage of justice in their eyes.
11  Whether he recognizes it or not, even with the imposition of the
12  indeterminate sentence, the defendant is being granted one more chance at
13  life, which is something that his victim did not have.

14  RECOMMENDATION:

15      It is respectfully recommended that:

16      The defendant be committed to the Department of Corrections for an
17  indeterminate term of 25 years to life.

18      The defendant be ordered to pay a restitution fine in the amount of
19  $10,000 to the State Restitution Fund.

20
21
22
23
24
25
26
27
28

-31-

Respectfully submitted,

*Daniel Hedrick*

Daniel Hedrick
Deputy Probation Officer

THE WITHIN AND FOREGOING REPORT
OF PROBATION OFFICER HAS BEEN
READ AND CONSIDERED BY ME THIS
_____ DAY OF JUNE, 1987.

_____
JUDGE OF THE SUPERIOR COURT

DH:LP67

## SOCIAL FACTORS

| PARENTS | NAME | DOB/AGE | OCCUPATION | ADDRESS |
|---------|------|---------|------------|---------|
| MOTHER: | Johnnie M. Neal | 1930 | Homemaker | 540 W. McKinely Ave., Oxnard, CA. |
| FATHER: | Palmer Ross | Deceased | | |

================================================================

| SIBLINGS | DOB/AGE | SIBLINGS | DOB/AGE |
|----------|---------|----------|---------|
| Chester J. Edmond | 1/2   31 | | |
| Melvin Webster | "   27 | | |
| Evelyn M. Allison | "   42 | | |
| Carolyn M. Freeman | "   41 | | |
| June F. Underwood | "   33 | | |

================================================================

| MARRIAGES | LOCATION | DATE | CURRENT ADDRESS | OUTCOME |
|-----------|----------|------|-----------------|---------|
| None | | | | |

NOT LEGALIZED
    None

================================================================

| CHILDREN | DOB/AGE | SUPPORTED BY | LIVING WITH |
|----------|---------|--------------|-------------|
| Nequayle Ross | 11/27/72 | Jackie Evans | Mother |

================================================================

FAMILY ARREST HISTORY
    Chester J. Edmond - CRC - paroled 1985 - drug offense.

================================================================

SOCIAL SECURITY NUMBER: 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
DRIVER'S LICENSE:       N6168649
RELIGION:               Baptist

NAME  ROSS                    NUMBER D-59353          DATE 7/9/87

INITIAL PSYCHOLOGICAL SCREENING

TESTS ADMINISTERED:          California Achievement Test, Army General
                             Classification Test, Minnesota Multiphasic
                             Personality Inventory, Sentence Completion,
                             Draw-A-Person, Who-Are-You, Personal
                             Information.

INTELLECTUAL
CLASSIFICATION:              Dull Normal


                             Leisla M. Howell, Senior Psychologist
                             Licensed Psychologist No.:  PA 000183



A Battery




ROSS          D-59353              RCC/CIM          jd          7/9/87