Wayne Ross
D-59353 ED-110-L
P.O. Box 689
Soledad, CA 93960-0689
Pro Per

SUPERIOR COURT OF CALIFORNIA

COUNTY OF VENTURA

WAYNE ROSS                          )    Case No._____
                                    )
              Petitioner,           )
                                    )    EXHIBIT'S for PETITIONER'S PETITION
v.                                  )    for WRIT of HABEAS CORPUS.
                                    )
B. Curry, Warden et al.,            )
                                    )
              Respondent.           )

EXHIBIT'S for PETITIONER'S PETITION for WRIT of HABEAS CORPUS.

EXHIBITS ENCLOSED

<u>EXHIBIT</u>

A.    Board of Parole Hearings Transcripts, hearing held June 9, 2006.

B.    Change of Plea Minute Order.

C.    Sentence Minute Order.

        Sentence Transcripts.

        Abstract of Judgment.

D.    Staff Recommendation Summary.

E.    Life Prisoner Evaluation Reports.

        2002 report written by Correctional Counselor M.Y. Cross.

        2005 report written by Correctional Counselor H. Staten.

F.    Psychiatric Evaluations for the Board of Parole Hearings.

        1990 by G. Hollingsworth, M.D.

        1996 by Darlene Peddicord, PSY.D

        2002 by Erich Rueschenberg, Ph.D.

        2006 by M. Macomber Ph.D.

G.    Support Letters.

        This includes offers for housing and employment.

11/20/06

# Exhibit
# A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )         CDC Number D-59353
                          )
WAYNE ROSS                )
                          )
_____)

**INMATE COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 9, 2006

3:57 P.M.

PANEL PRESENT:

Mr. Tom Sawyer, Presiding Commissioner
Ms. Suzanne Rothlisberger, Deputy Commissioner

OTHERS PRESENT:

Mr. Wayne Ross, Inmate
Ms. Maryann Tardiff, Attorney for Inmate
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____     No      See Review of Hearing
_____     Yes     Transcript Memorandum

**Stacy Wegner, Peters Shorthand Reporting**

ii

## INDEX

|                                         | PAGE |
|-----------------------------------------|------|
| Proceedings                             | 1    |
| Case Factors                            | 5    |
| Pre-Commitment Factors                  | 21   |
| Post-Commitment Factors                 | 39   |
| Parole Plans                            | 29   |
| Closing Statements                      | 54   |
| Recess                                  | 57   |
| Decision                                | 58   |
| Adjournment                             | 77   |
| Transcriber Certification               | 78   |

--oOo--

1

1    P R O C E E D I N G S

2        **DEPUTY COMMISSIONER ROTHLISBERGER:**   We are

3    on record.

4        **PRESIDING COMMISSIONER SAWYER:**   Okay.   This

5    is a subsequent parole consideration hearing for

6    Wayne Ross, R-O-S-S, CDC number D-59353.

7    Today's date is June the 9th, 2006.   It's 3:57

8    in the afternoon.   We're at the Correctional

9    Training Facility in Soledad.   The date received

10   was 6/18 of 1987 from the county of Ventura,

11   murder in the second degree, case number CR-

12   22128, count number one 187.   The term is 25 to

13   life.   The minimum eligible parole date of 1/21

14   of '03.   This hearing is being tape recorded,

15   and for the purpose of voice identification,

16   each of us is required to state our first and

17   last name, spelling our last name.   And when it

18   comes to you, Mr. Ross, as you'll recall, we

19   also want your CDC number.   Okay.   I'll start

20   and go to my left, Tom Sawyer, S-A-W-Y-E-R,

21   Commissioner.

22       **DEPUTY COMMISSIONER ROTHLISBERGER:**   Suzanne

23   Rothlisberger, R-O-T-H-L-I-S-B-E-R-G-E-R, Deputy

24   Commissioner.

25       **ATTORNEY TARDIFF:**   Maryann Tardiff, T-A-R-

26   D-I-F-F, attorney for Mr. Ross.

27       **INMATE ROSS:**   Wayne Ross, D-59353.

2

1    **PRESIDING COMMISSIONER SAWYER:**   Spell your

2    last name.

3    **INMATE ROSS:**   R-O-S-S.

4    **PRESIDING COMMISSIONER SAWYER:**   Thank you.

5    Okay.   We have two correctional peace officers

6    in the room for security purposes.   The record

7    reflects, Mr. Ross, you signed a BPT 1073, which

8    is a reasonable accommodation notice in request

9    and accordance with the provisions of the

10   American's with Disabilities Act today.   We did

11   not find one in your file.   You have a copy.   I

12   gave the form to your attorney.   Did she discuss

13   that with you?

14   **INMATE ROSS:**   Yes.

15   **PRESIDING COMMISSIONER SAWYER:**   Okay.   And

16   you indicated on that there was no disabilities

17   that affect you that you need for this hearing

18   today?

19   **INMATE ROSS:**   That's correct.

20   **PRESIDING COMMISSIONER SAWYER:**   That's

21   correct.   Okay.   You don't wear glasses?

22   **INMATE ROSS:**   No.

23   **PRESIDING COMMISSIONER SAWYER:**   Okay.   And

24   you can hear me all right?

25   **INMATE ROSS:**   Yes.

26   **PRESIDING COMMISSIONER SAWYER:**   You look

27   real alert.   So she talked to you about your

3

1    accommodation for disabilities. Outline of the

2    hearing procedure as well?

3        **INMATE ROSS:** Yes, sir.

4        **PRESIDING COMMISSIONER SAWYER:** Your rights

5    and the confidential material?

6        **INMATE ROSS:** Right.

7        **PRESIDING COMMISSIONER SAWYER:** Okay.

8    Counsel, would you waive reading those scripts?

9        **ATTORNEY TARDIFF:** I will.

10       **PRESIDING COMMISSIONER SAWYER:** Okay. I

11   will mark that Exhibit One and put it in the

12   package. Okay. Commissioner Rothlisberger, do

13   we have any confidential material?

14       **DEPUTY COMMISSIONER ROTHLISBERGER:** There

15   is but we will not be using it.

16       **PRESIDING COMMISSIONER SAWYER:** I passed

17   the checklist to Ms. Tardiff marked Exhibit Two

18   if you could check that against your documents.

19       **ATTORNEY TARDIFF:** I'm marking the psych

20   report document and board report as well.

21   They're current. I have these. Thank you.

22       **PRESIDING COMMISSIONER SAWYER:** I have -- I

23   didn't -- didn't I have the psych marked on

24   there?

25       **ATTORNEY TARDIFF:** No.

26       **PRESIDING COMMISSIONER SAWYER:** Because I

27   had it in my package.

4

1      **ATTORNEY TARDIFF:**  No.

2      **PRESIDING COMMISSIONER SAWYER:**  That's the

3  psych of 5/5 of '06?

4      **ATTORNEY TARDIFF:**  Yes.

5      **PRESIDING COMMISSIONER SAWYER:**  Okay.

6  Thank you.  Do you have any additional documents

7  to be submitted?

8      **ATTORNEY TARDIFF:**  No.

9      **PRESIDING COMMISSIONER SAWYER:**  Is there

10  anything you want to include in this hearing,

11  Mr. Ross?

12      **INMATE ROSS:**  None other than what I have.

13      **PRESIDING COMMISSIONER SAWYER:**  Okay.

14  Well, then Counsel, is there any preliminary

15  objections?

16      **ATTORNEY TARDIFF:**  There are none.  I just

17  received the District Attorney's letter.  It's

18  very lengthy.  Obviously I've had insufficient

19  amount of time to go over it and prepare for

20  this hearing, so I make a motion that it not be

21  allowed.

22      **PRESIDING COMMISSIONER SAWYER:**  Based on

23  the 10-day rule?

24      **ATTORNEY TARDIFF:**  Yes.

25      **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

26  sustained.

27      **ATTORNEY TARDIFF:**  Thank you.

5

1    **PRESIDING COMMISSIONER SAWYER:**  Will the

2    inmate be speaking with the Panel?

3    **ATTORNEY TARDIFF:**  Yes.

4    **PRESIDING COMMISSIONER SAWYER:**  Would you

5    raise your right hand, sir?  Do you solemnly

6    swear or affirm that the testimony you are about

7    to give at this hearing will be the truth, the

8    whole truth, and nothing but the truth?

9    **INMATE ROSS:**  I do.

10    **PRESIDING COMMISSIONER SAWYER:**  Thank you.

11    Would you do me a favor?

12    **INMATE ROSS:**  Yes, sir.

13    **PRESIDING COMMISSIONER SAWYER:**  Would you

14    relax.  I'm not going to lay hands on you.

15    We're just going to have a hearing here.  Take a

16    deep breath.  We all have to do that from time

17    to time.  Pretend it's a job interview, which it

18    is essentially, the hardest job interview you

19    will ever have.  Okay.  I'm going to be reading

20    -- although we have a November 2005 board

21    report, and it does have some current -- a lot

22    of current information on it, but it refers back

23    -- in the summary of the crime and the

24    prisoner's version it refers back to the

25    November 2002 calendar board report.  I'll be

26    reading from page one, summary of the crime.

27                    On 12/31/1986, that's New Year's

6

```
 1          Eve, right.  At approximately 9:30
 2          -- 09:30 hours businessman Ray
 3          Tejaea, T-E-J-A-E-A, arrived at the
 4          victim, Earnest Sanchez's, S-A-N-C-
 5          H-E-Z, residence to check on tax
 6          documents that the victim had been
 7          preparing on his behalf.  Upon
 8          arrival Tejaea noticed the front
 9          door opened and unlocked and the
10          bathroom window was broken.  Tejaea
11          entered the residence and
12          repeatedly called the victim's name
13          to no avail.  Tejaea observed that
14          the lights were on and saw a
15          television set sitting on the
16          kitchen floor.  Tejaea went through
17          the house and saw the bedroom was
18          empty.  He later entered the lounge
19          office area where the victim
20          normally conducted his tax
21          accounting business.  It was there
22          that he discovered the 73 year-old
23          victim lying on his side fully
24          clothed with -- in an apparently
25          injured condition.  Tejaea
26          immediately retreated from the
27          house and went to the bank and
```

7

1        cashed a check, then went home and
2        called the police, advised them of
3        his client's discovery.  At
4        approximately 11:00 hours Oxnard
5        Police, Fire, and Medical personnel
6        arrived at the victim's residence
7        and located him lying in a pool of
8        blood.  His vital signs were
9        checked, and he was determined to
10       be dead.  During investigation a
11       set of identifiable fingerprints
12       were lifted from the inside seal of
13       the broken bathroom window, which
14       later found matched those
15       fingerprints belonging to Wayne
16       Ross.  Also found in the office
17       lounge area were a pair of scissors
18       embedded in the base board.  The
19       room itself had splatters of blood
20       and the furniture was in disarray
21       as though there had been a
22       struggle.  There were shoe prints
23       in the bloodstains on the kitchen
24       tile floor.  The telephone was
25       found off the receiver with the
26       receiver off the hook dangling on
27       to the floor.  Because Ross was the

8

```
 1              primary suspect in a previous
 2              December 16th, 1986, theft of the
 3              deceased -- of the deceased
 4              victim's wallet, Oxnard Police
 5              investigators contacted him at his
 6              residence and brought him to the
 7              Oxnard Police station for
 8              questioning.  Ross denied
 9              involvement in the murder and
10              instead maintained that he was with
11              his brother Malcolm Webster, W-E-B-
12              S-T-E-R, and Frank Crawford
13              McCauley, M-C-C-A-U-L-E-Y, the
14              evening that the victim had been
15              murdered.  Ross also indicated that
16              the murder victim -- this doesn't
17              make sense.  Ross also indicated
18              that they and the murder victim
19              were good friends and that on
20              occasion, because the victim was
21              still actually active, he would
22              provide him with females.  Also
23              stated that the victim was in good
24              shape and very strong and that they
25              would box with each others.  Police
26              investigators interviewed McCauley
27              and Webster who both confirmed that
```

9

```
 1              the three were together the
 2              previous evening.  While at Ross's
 3              residence investigators checked all
 4              the tennis shoes in an attempt to
 5              match shoe prints found on the
 6              victim's floor.  Police
 7              investigators were left with the
 8              impression that Ross was a witness
 9              and that he was not a suspect.
10              Later investigators were notified
11              that Ross's fingerprints matched
12              those lifted off the window seal.
13              Ross was again brought to the
14              police station and mirandized.
15              Ross waived his right per Miranda
16              and submitted to a polygraph test,
17              and on the second interview Ross
18              subsequently confessed to
19              inflicting injuries on the victim
20              with a pair of scissors in self
21              defense.  He claimed that he did
22              not attempt to kill the victim and
23              that when he left he thought the
24              victim was alive.  On 12/31/86 at
25              approximately 9:25 p.m. Ross was
26              interviewed -- re-interviewed by
27              detectives Tatum and Garcia
```

10

1       regarding the homicide.  Claiming

2       to have killed the victim in self

3       defense, the victim had initiated

4       the attack by striking him in the

5       face several times.  He complained

6       that the victim struck him with a

7       staple gun.  He stated that the

8       victim reported -- reportedly

9       grabbed a pair of scissors off the

10      desk and began stabbing Ross.  Ross

11      claimed to have gotten the scissors

12      away from the victim and started

13      hitting the victim back with the

14      scissors making contact with him

15      three or four times.  Ross told

16      detectives that he lied because he

17      was afraid.  He claimed that he

18      dumped his bloody clothing near K

19      Mart and later changed his story

20      saying that he dumped his clothes

21      in the area of Channel Islands

22      Boulevard and Bard Road and that he

23      had taken his shoes to McCauley's

24      motel room where they tried to wash

25      off the blood.  He also indicated

26      that McCauley and his brother had

27      gone to the area of Torrance Avenue

11

1    and purchased cocaine but did not

2    use any prior to the altercation.

3    At the conclusion of the interview,

4    Ross was transported to St. John's

5    Hospital where a blood sample was

6    drawn.  He was examined -- he was

7    also examined for his injuries.

8    They noted that he had a number of

9    small lacerations on his fingertips

10   of his left hand.  Also placed

11   under arrest for murder.  On

12   January 1st, 1987, Dr. Ronald

13   O'Halloran, O-'-H-A-L-L-O-R-A-N,

14   performed an autopsy on the victim.

15   The victim had approximately eight

16   wounds in his chest area, while

17   none punctured the victim's lungs

18   or the chest cavity.  The victim's

19   body also had approximately 26 to

20   28 puncture wounds in the face,

21   neck, and head area.  Many of the

22   head wounds penetrated the scalp

23   and appeared to have gouged the

24   victim's skull.  The majority of

25   the wounds were concentrated on the

26   victim's right cheek and temple

27   area.  No visible defensive wounds

12

1      were found on the victim's head.

2      Cause of death was determined to be

3      myo cardio ischemia due the blood

4      loss from the multiple stab wounds.

5      Contributing factors was sclerotic

6      heart disease and coronary

7      thrombosis.  Also Dr. O'Halloran

8      noted that all the wounds had been

9      inflicted while the victim was

10      still alive.  The wound caused

11      bleeding but not death itself.

12  Okay.  I have your version here.  Would you

13 like to talk about this, or would you like me to

14 read your version?

15  **INMATE ROSS:**  Yeah, I don't mind talking

16 about it.

17  **PRESIDING COMMISSIONER SAWYER:**  Okay.

18  **INMATE ROSS:**  It was basically, you know,

19 one of those nights where Mr. Sanchez at that

20 time had called me and I went over there.  We

21 had talked and everything about what he wanted

22 to do that night and stuff.  Prior to going over

23 there he asked me to go buy and purchase some

24 more liquor and what have you.  When I got

25 there, we went in.  We was talking and stuff,

26 and he asked me could I find him any womens to

27 be with and all that.  At that time I made

13

1   several phone calls and was unable to contact

2   anybody.  We was sitting there and we was

3   laughing and talking with each other, and he

4   gets angry and he goes -- start telling me well,

5   you need to do this or -- I had prior to that

6   had got a loan from him, and he told if I get

7   these girls for him that he would scratch the

8   loan and what have you.  The thing went on.  He

9   gets into -- I thought at the time that he was

10  just horse playing and stuff.  He called me the

11  N word and he got up, picked up the phone, swung

12  the phone at me and stuff, came around from his

13  desk at that time.  That's when we started

14  boxing.  Still at that time I thought we was

15  just horsing around.  After he called me the N

16  word he grabbed me, we fell to the ground.  I

17  noticed a pair of scissors that was in his

18  hands.  I had the scissors top of my head.  He

19  swung it at me a couple times.  When I finally

20  got him on the bottom I took the pair of

21  scissors and just started, you know, punching at

22  him and stuff.  When I got up to leave he

23  grabbed me on my leg.  I turned around and kind

24  of kicked his arm up and stuff.  I just left

25  there from the premises and went about my other

26  business that night.  That night he was -- when

27  I left he was, you know, calling my name, come

14

1   back, let's do this, let's do that and stuff,

2   but that night I seen, you know -- I have never

3   seen him like that before.  It was just out of

4   his character to be like that and stuff.  So

5   that's when later on I was contacted and

6   notified by the DA -- I mean, excuse me, the

7   police came by, talked to me, took me down to

8   the station, questioned me about the thing.  I

9   more or less sat down and told them what

10  happened.  Come to find out he was dead.  It

11  just, you know, it's something that I didn't

12  intend to do.  There was nothing premeditated

13  and stuff.  We done this on several occasions,

14  and it was nothing out of the order, so this

15  night for some reason I wasn't able to produce.

16  This incident just unfolded, you know, just went

17  worse.  Everything just went haywire.

18      PRESIDING COMMISSIONER SAWYER:  Were you

19  under the influence of anything?

20      INMATE ROSS:  I had been drinking that

21  night.

22      PRESIDING COMMISSIONER SAWYER:  How much?

23      INMATE ROSS:  Prior to going over there I

24  might of had probably three or four beers.

25      PRESIDING COMMISSIONER SAWYER:  And was he

26  drinking?

27      INMATE ROSS:  When I got there he was

15

1    drinking some, I think it was tequila, but prior

2    to going over there he had asked me to go to the

3    store to pick up some more liquor and stuff, so

4    I think it was a couple more six packs.

5        PRESIDING COMMISSIONER SAWYER:    And how old

6    were you at that time?

7        INMATE ROSS:    28.

8        PRESIDING COMMISSIONER SAWYER:    28?

9        INMATE ROSS:    28, right.

10       PRESIDING COMMISSIONER SAWYER:    And you had

11   been laid off your job?

12       INMATE ROSS:    Yeah, I was laid off probably

13   couple a months at that time.

14       PRESIDING COMMISSIONER SAWYER:    So what

15   were you doing for money?

16       INMATE ROSS:    Well, I was drawing

17   unemployment.    I was working odd jobs for Mr.

18   Sanchez at that time, house cleaning, cutting

19   his lawn, on occasion washing his car and stuff

20   like that.

21       PRESIDING COMMISSIONER SAWYER:    How much

22   money did you owe him?

23       INMATE ROSS:    I think it was 50 bucks at

24   that time.    I think it was 50 bucks at that

25   time.

26       PRESIDING COMMISSIONER SAWYER:    What did

27   you need to borrow money for?

·16

1      INMATE ROSS:  Just for, you know, gas and

2   stuff like that.

3      PRESIDING COMMISSIONER SAWYER:  Did you

4   charge him for any of the women that you got

5   him?

6      INMATE ROSS:  No.  Well, actually we had --

7   that was kind of a deal packet, I do this, I

8   don't have to pay him back and stuff like that.

9      PRESIDING COMMISSIONER SAWYER:  That's kind

10   of charging him.

11      INMATE ROSS:  Yeah, I guess you can say

12   that.

13      PRESIDING COMMISSIONER SAWYER:  Were these

14   prostitutes that you were bringing over to him?

15      INMATE ROSS:  No.  I wouldn't say it was

16   prostitutes because I didn't know them as

17   prostitutes.  They was actually working girls as

18   far as, you know, had jobs and stuff.  None of

19   them were prostitutes.

20      PRESIDING COMMISSIONER SAWYER:  Did he pay

21   them?

22      INMATE ROSS:  Yes, on a couple occasions he

23   did.

24      PRESIDING COMMISSIONER SAWYER:  Yeah.  Did

25   he pay you?

26      INMATE ROSS:  No.

27      PRESIDING COMMISSIONER SAWYER:  But he did

17

1    loan you 50 bucks?

2        INMATE ROSS:  Yeah, he did loan me.

3        PRESIDING COMMISSIONER SAWYER:  So you

4    didn't think -- when you left there you thought

5    he was okay?

6        INMATE ROSS:  Yeah.  In fact, when I left,

7    like I said, when I was leaving out he grabbed

8    one of my legs, and I turned around and kicked

9    one of his arms off me and stuff, and he was

10   telling me to come back and let's finish this or

11   let's do this, and I just left.

12       PRESIDING COMMISSIONER SAWYER:  How did he

13   look when you left?

14       INMATE ROSS:  He was --

15       PRESIDING COMMISSIONER SAWYER:  Was he

16   bloody?

17       INMATE ROSS:  No, not when I left, not when

18   I left.

19       PRESIDING COMMISSIONER SAWYER:  Didn't you

20   leave footprints in the kitchen?

21       INMATE ROSS:  Yeah, well, they said that

22   there was footprints in the kitchen and in the

23   bathroom and stuff, but as far as the window and

24   stuff like that goes, I been all through his

25   house and stuff.  There was times where he had

26   me crawl through the window because a couple of

27   times he left his house keys in there and that's

18

1   when I go through the window.

2        PRESIDING COMMISSIONER SAWYER:   Is that why

3   the window was broken in the bathroom?

4        INMATE ROSS:   I can't explain why it was

5   broken that night, but that window had been

6   broken for awhile.   The window done never got

7   fixed or he never took the time or bothered to

8   have it fixed.

9        PRESIDING COMMISSIONER SAWYER:   Okay.

10        INMATE ROSS:   But he had tape over that

11   window, kind of the keep the air from coming

12   out.

13        PRESIDING COMMISSIONER SAWYER:   It was

14   December, wasn't it?

15        INMATE ROSS:   Yes.

16        PRESIDING COMMISSIONER SAWYER:   Now, what

17   about his missing wallet?   Did you have anything

18   to do with that?

19        INMATE ROSS:   Well, you know, I -- I don't

20   know nothing about the missing wallet.   In fact,

21   what I was told that everything was intact when

22   they found him.   The wallet was on him and

23   everything.

24        PRESIDING COMMISSIONER SAWYER:   Well,

25   according to this report there was a -- police

26   were investigating a missing wallet --

27        INMATE ROSS:   Right.

19

1        PRESIDING COMMISSIONER SAWYER:    -- on

2    December the 16th.

3        INMATE ROSS:  They questioned me about it,

4    but I had nothing to do with it.  In fact, I was

5    told that when they found him everything was in

6    fact intact.

7        DEPUTY COMMISSIONER ROTHLISBERGER:  Well,

8    the wallet was missing prior.

9        PRESIDING COMMISSIONER SAWYER:  Yes.

10       DEPUTY COMMISSIONER ROTHLISBERGER:  Yeah.

11   Not at the time of the commitment offense.

12       PRESIDING COMMISSIONER SAWYER:  Right.

13       DEPUTY COMMISSIONER ROTHLISBERGER:  But

14   before that, I believe, is the question, right?

15       PRESIDING COMMISSIONER SAWYER:  Have you

16   seen these photos?

17       INMATE ROSS:  Yes.

18       PRESIDING COMMISSIONER SAWYER:  Is this

19   what he looked like when you left him?  Kind of

20   a mess.  These are blood splatters on the floor?

21       INMATE ROSS:  Right.

22       PRESIDING COMMISSIONER SAWYER:  Is this in

23   his kitchen?

24       INMATE ROSS:  I would assume that was.

25       PRESIDING COMMISSIONER SAWYER:  It's tile.

26   Did he have carpet --

27       ATTORNEY TARDIFF:  There is carpet in the

20

1   other areas.

2       PRESIDING COMMISSIONER SAWYER:   -- in the

3   lounge?

4       INMATE ROSS:   Yes.

5       PRESIDING COMMISSIONER SAWYER:   Lounge,

6   office?

7       INMATE ROSS:   Right.

8       PRESIDING COMMISSIONER SAWYER:   Yeah.

9       ATTORNEY TARDIFF:   You can see the carpet.

10      PRESIDING COMMISSIONER SAWYER:   Yeah, I see

11  it.

12      INMATE ROSS:   Right.

13      PRESIDING COMMISSIONER SAWYER:   Okay.

14  There's blood on the table.

15      INMATE ROSS:   Yeah.

16      PRESIDING COMMISSIONER SAWYER:   And blood

17  on his desk, his paperwork, blood on the wall

18  next to the phone.  Did you ever think about

19  calling the -- an ambulance for him?

20      INMATE ROSS:   As I stated, when I left he

21  was still functioning.  He grabbed my leg.  He

22  was calling my name to come back.  I told him --

23  I said I'm leaving, and I just decided to leave

24  at that point.

25      PRESIDING COMMISSIONER SAWYER:   Had you

26  been doing any dope during this period in your

27  life?

21

1      **INMATE ROSS:**  I had used cocaine and PCP,

2    what have you, but that night in particular I

3    was only drinking.

4      **PRESIDING COMMISSIONER SAWYER:**  Okay.  Now,

5    you don't have any juvenile record, right?

6      **INMATE ROSS:**  No.

7      **PRESIDING COMMISSIONER SAWYER:**  Okay.

8    Arrested by Oxnard PD for 11550, under the

9    influence of a controlled substance, and this

10   was in -- several years before, 10/28 of 1984,

11   and you were put on the diversion program.  On

12   9/30 of 1986 charged with disobeying a court

13   order.  What was -- was that not --

14     **INMATE ROSS:**  They said that was something

15   to do with child support, but at that time my

16   daughter was staying with me, and --

17     **PRESIDING COMMISSIONER SAWYER:**  What

18   happened?

19     **INMATE ROSS:**  With the --

20     **PRESIDING COMMISSIONER SAWYER:**  Disobeying

21   the court order?  Did they put you in jail?

22     **INMATE ROSS:**  I didn't do no jail time.

23     **PRESIDING COMMISSIONER SAWYER:**  Okay.  And

24   then on 1/1 of '87 you were arrested for the

25   present office.  And then the record indicates

26   that on 3/15 of 1988 while incarcerated at

27   Folsom Prison arrested for 4502, prisoner in

22

1    possession of a weapon, and there was no

2    prosecution.  The District Attorney declined to

3    file.  We do notice you have a 115 in there?

4         **INMATE ROSS:**  Yeah, regarding that.

5         **PRESIDING COMMISSIONER SAWYER:**  Yeah.

6         **INMATE ROSS:**  I was at Old Folsom.  I

7    remember being on the backyard playing

8    basketball when they announced my name on the

9    PA.  I came in.  The officer told me that they

10   had discovered something up in the chase.

11        **PRESIDING COMMISSIONER SAWYER:**  Yeah.

12        **INMATE ROSS:**  And the write-up itself the

13   officer explained that whatever it was that he

14   found looked like it's been there for years, but

15   whatever it was it was -- I think he said it

16   appeared to be like a piece of broken antenna

17   that might of been sharpened, made into some

18   type of point, but it was only 3/16th of an

19   inch.

20        **PRESIDING COMMISSIONER SAWYER:**  Long?

21        **INMATE ROSS:**  Right.  That was the whole

22   thing.  And the officer said himself that it

23   seemed like it had been there for years.

24        **PRESIDING COMMISSIONER SAWYER:**  But you got

25   a 115?

26        **INMATE ROSS:**  Yeah.

27        **PRESIDING COMMISSIONER SAWYER:**  Did you

23

1    appeal it?

2        INMATE ROSS:  I appealed it, and also

3    agreed to take a polygraph test for that.  And

4    at that time when I had got off the SHU term I

5    was transferred over to New Folsom.  A guy came

6    up and interviewed me.  I signed some papers,

7    and he said he would be back to administer the

8    polygraph test, and that was the last thing I

9    heard from them.

10        PRESIDING COMMISSIONER SAWYER:  Okay.  You

11    were born in 1958?

12        INMATE ROSS:  Yeah.

13        PRESIDING COMMISSIONER SAWYER:  9/12 of

14    '58?

15        INMATE ROSS:  Right.

16        PRESIDING COMMISSIONER SAWYER:  In Ventura,

17    California, to Palmer Stedson Ross and Johnnie

18    (phonetic) Neal, N-E-A-L.  You're the fifth of

19    six children, two brothers and three sisters?

20        INMATE ROSS:  Right.

21        PRESIDING COMMISSIONER SAWYER:  Attended

22    local schools, dropping out of Oxnard High

23    School during the second semester of his senior

24    year.  Why did you drop out?

25        INMATE ROSS:  I didn't drop out.  What

26    happened was I earned enough credits where I was

27    offered summary jobs.  And I was told at the

24

1   time that my credit was good enough to venture

2   out to the job markets and stuff. I started

3   working for the naval construction base. I had

4   other odd jobs working for Oxnard Community

5   School as the warehouse keeper, and after that I

6   started participating in going to the different

7   trade schools and stuff like that. That was the

8   last of high school that I participated in.

9       **PRESIDING COMMISSIONER SAWYER:** Did you go

10  through graduation?

11      **INMATE ROSS:** No.

12      **PRESIDING COMMISSIONER SAWYER:** Did you get

13  a diploma?

14      **INMATE ROSS:** No diploma.

15      **PRESIDING COMMISSIONER SAWYER:** Why?

16      **INMATE ROSS:** I never completed -- I went

17  as far as the 12th grade, and that was when I

18  started working. I just --

19      **PRESIDING COMMISSIONER SAWYER:** Why did

20  they tell you to leave?

21      **INMATE ROSS:** Well, they said that I was

22  earning enough credits that I can go out and

23  start working and, you know, that's -- I really

24  can't explain why that happened the way it did.

25  But I was told that because of my credits at

26  that time was good enough that I can go out and

27  participate in the job markets and stuff, and I

25

1    just never -- since then I've been working ever

2    since, and I never went back to school.  I tried

3    to go -- well, I did enroll myself in Oxnard

4    College.  I did try to go continue my education

5    in black arts and music appreciation.  That

6    didn't go too well because moving here, moving

7    there.  When I started working for Bitro

8    (phonetic) I enrolled myself in, I forget the

9    name of the company, but because of where I was

10   working at they offered me -- they told me if I

11   could learn something about, I think it was

12   computer accounting, that it would help me move

13   up in the company, but that was -- I was going

14   at night, attending that and working all day.

15   That got a little bit too complex and I couldn't

16   continue that as well.  So after that I just

17   started going to different places looking for

18   employment and stuff.  I went through -- I did -

19   - I went to a lot of companies looking for a job

20   and stuff, but it looked like everywhere I went,

21   based on my resume at the time, they was telling

22   me that I was over-qualified or they would keep

23   my application on file in the event that a job

24   opened up, but I always stayed looking for a

25   job.

26          **PRESIDING COMMISSIONER SAWYER:**  Nobody

27   asked you for a high school diploma?

26

1    **INMATE ROSS:**  No.

2    **PRESIDING COMMISSIONER SAWYER:**  What did

3    you put on your -- did you put down that you had

4    a high school diploma?

5    **INMATE ROSS:**  No.  I put down the grade

6    that I last completed.

7    **PRESIDING COMMISSIONER SAWYER:**  You also --

8    at Oxnard College you also did bowling?

9    **INMATE ROSS:**  Right.  That was one of the

10    extracurricular them classes.

11    **PRESIDING COMMISSIONER SAWYER:**  Did you get

12    the units when you were at Oxnard College?

13    **INMATE ROSS:**  I think it was about I want

14    to say four or five.

15    **PRESIDING COMMISSIONER SAWYER:**  Is that

16    enough to get you out of -- to get your high

17    school diploma?

18    **INMATE ROSS:**  No.

19    **PRESIDING COMMISSIONER SAWYER:**  No?

20    **INMATE ROSS:**  No.

21    **PRESIDING COMMISSIONER SAWYER:**  Okay.  Also

22    welding, went three semesters and then dropped

23    out.  It indicates you drank alcohol moderately

24    on a social basis.  Admitted using marijuana and

25    rock cocaine on a recreational but not regular

26    basis.  Isn't rock cocaine pretty a addictive?

27    **INMATE ROSS:**  Yes, it is.

27

1    **PRESIDING COMMISSIONER SAWYER:**  So is that

2   minimizing the use of rock cocaine to say you

3   used it recreationally?

4    **INMATE ROSS:**  Well, you know, that was just

5   something that I did just, you know, just

6   something to be doing.  I don't want to say that

7   I was using it because of the trouble I was in

8   finding employment and stuff, but I just did it

9   mainly out of, you know, just try it, just try

10   it, you know.

11    **PRESIDING COMMISSIONER SAWYER:**  Okay.  You

12   worked for a microscope electronic assembly

13   plant called Bitro, as you mentioned, where you

14   became acquainted with Mr. Sanchez.  Is that

15   right?

16    **INMATE ROSS:**  Well, that was when I was

17   working for the Balloting Center (phonetic) at

18   Port Hueneme Naval Base.

19    **PRESIDING COMMISSIONER SAWYER:**  Uh-huh.

20    **INMATE ROSS:**  Is where I met him at.

21    **PRESIDING COMMISSIONER SAWYER:**  Oh, and you

22   worked for Bitro too?

23    **INMATE ROSS:**  Right.

24    **PRESIDING COMMISSIONER SAWYER:**  Okay.  And

25   what did you do there?

26    **INMATE ROSS:**  There I was computer data

27   entry, stuff like that.

28

1          **PRESIDING COMMISSIONER SAWYER:**  Punch

2   cards?

3          **INMATE ROSS:**  Right, exactly.

4          **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

5   you know how to type?

6          **INMATE ROSS:**  I don't know how to type, but

7   I can look at the key pad and type fast just

8   based on, you know, looking at what I'm doing

9   and stuff.

10          **PRESIDING COMMISSIONER SAWYER:**  Okay.

11          **INMATE ROSS:**  Yeah, exactly.

12          **PRESIDING COMMISSIONER SAWYER:**  With two

13   fingers?

14          **INMATE ROSS:**  Exactly, right.

15          **PRESIDING COMMISSIONER SAWYER:**  Okay.  How

16   long did you work there, Bitro?

17          **INMATE ROSS:**  I think it was -- I thought I

18   had it on me, but I would say it was

19   approximately three or four years.

20          **PRESIDING COMMISSIONER SAWYER:**  Okay.

21   According to this it was '83 to '86, laid off in

22   '86?

23          **INMATE ROSS:**  Right.

24          **PRESIDING COMMISSIONER SAWYER:**  Why did you

25   get laid off?

26          **INMATE ROSS:**  Just for -- they call it

27   contract.  It was a contract ran out and they

29

1    started laying everybody off.

2        PRESIDING COMMISSIONER SAWYER:   And then it

3    says you began seeking employment, but were

4    successful.  Since you'd worked since high

5    school felt depressed of his unemployment

6    status.  Borrowed money from the victim on more

7    than one occasion.  Is that right?

8        INMATE ROSS:   That's correct.

9        PRESIDING COMMISSIONER SAWYER:   They were

10   friends prior to Ross's lay off and became

11   closer after the lay off incident.  Ross advised

12   that he and the victim periodically got together

13   and drank alcohol together.  On one occasion --

14   and on occasion would get a girl to come over to

15   the victim's residence and provide sexual

16   favors.  On the evening of the homicide Ross

17   stated that the victim was pressuring him for a

18   girl and he was unable to come through for the

19   victim.  We talked about that.  We appreciate

20   you talking about the crime.  Okay.  In your

21   future plans, you plan to parole to your wife's

22   residence, Rosa Ross.  That's in Oxnard?

23       INMATE ROSS:   That's correct.

24       PRESIDING COMMISSIONER SAWYER:   How long

25   have you been married to Rosa?

26       INMATE ROSS:   About 15 years now.

27       PRESIDING COMMISSIONER SAWYER:   15?

1    **INMATE ROSS:**  Yes.

2    **PRESIDING COMMISSIONER SAWYER:**  And how did

3  you meet Rosa?

4    **INMATE ROSS:**  I met her on the streets

5  where she used to work at.  I met her while

6  trying to apply employment there.  At that time

7  she was working for a company that made hard

8  plastic -- heart insertions.  I don't know

9  exactly what that is, but --

10    **PRESIDING COMMISSIONER SAWYER:**  Heart

11  valves?

12    **INMATE ROSS:**  Right.  Little square like

13  type heart valves.

14    **PRESIDING COMMISSIONER SAWYER:**  Uh-huh.

15    **INMATE ROSS:**  In fact, that was one of the

16  jobs where I went to and they told me that they

17  was impressed with my resume but for them to

18  hire me I wouldn't qualify for that position

19  that I was asking for.

20    **PRESIDING COMMISSIONER SAWYER:**  What kind

21  of position was that?

22    **INMATE ROSS:**  Just assembly, whatever, you

23  know, assembly.

24    **PRESIDING COMMISSIONER SAWYER:**  Prisoner

25  has -- as far as employment, prisoner has no

26  firm employment plans at this time; however,

27  indicates that his wife is in the process of

31

1    becoming state certified as a medical

2    interpreter and will be self employed, so she

3    has offered him a position as an office

4    technician.   Prior to incarceration you worked

5    at Bitro Company as a shipping clerk and

6    subsequently demoted to computer operator

7    position and believed that you would be able to

8    obtain employment as a tool machine operator or

9    a shipping clerk having completed vocational

10   machine shop trade.   Okay.   This was November of

11   '05.   Did she get that certification?

12       INMATE ROSS:   No, she's currently underway

13   -- she's still currently in the process.   She

14   has to take several examinations to be an

15   orderly or get -- but she's -- she's juggling

16   between taking care of her parents and trying to

17   find the time to pursue her career and getting

18   that done and stuff.

19       PRESIDING COMMISSIONER SAWYER:   Do you have

20   any children?

21       INMATE ROSS:   I have one daughter.

22       PRESIDING COMMISSIONER SAWYER:   And is Rosa

23   the mother?

24       INMATE ROSS:   No.

25       PRESIDING COMMISSIONER SAWYER:   Who's the

26   mother?

27       INMATE ROSS:   Jackie Evans.

32

1    **PRESIDING COMMISSIONER SAWYER:**  And where –
2  – what's your child doing now?
3    **INMATE ROSS:**  She's staying with her mom in
4  Detroit, and she's currently going to school to
5  be a land lawyer.
6    **PRESIDING COMMISSIONER SAWYER:**  How old is
7  she?
8    **INMATE ROSS:**  She's 20 now.
9    **PRESIDING COMMISSIONER SAWYER:**  So she's in
10  college right now?
11    **INMATE ROSS:**  Yes.
12    **PRESIDING COMMISSIONER SAWYER:**  And so
13  she's not getting in any trouble from the sounds
14  of it?
15    **INMATE ROSS:**  No.  She's doing real well.
16    **PRESIDING COMMISSIONER SAWYER:**  Staying
17  away from drugs?
18    **INMATE ROSS:**  Yes.
19    **PRESIDING COMMISSIONER SAWYER:**  Good.
20  Great.  You correspond with her?
21    **INMATE ROSS:**  Yes.
22    **PRESIDING COMMISSIONER SAWYER:**  Who else do
23  you correspond with?
24    **INMATE ROSS:**  My immediate family, my
25  brothers, my sisters, nephews, nieces.
26    **PRESIDING COMMISSIONER SAWYER:**  Okay.
27  Let's look at your letters in your file.

1   There's one from Jack Underwood, Sacramento,

2   June 30th of 2005.  This is your brother-in-law?

3       INMATE ROSS:  Yes.

4       PRESIDING COMMISSIONER SAWYER:  I've known

5   Wayne over the years.  I entered the family in

6   1974.  He talks about your history, talks about

7   your working, talks about your wife having a

8   positive impact and influence on you, talks

9   about the crime.  Okay.  And he and his wife are

10  both volunteer ministers for the Jehovah's

11  Witnesses, and they visit with you?

12      INMATE ROSS:  Yes.

13      PRESIDING COMMISSIONER SAWYER:  And how

14  they grieve for the Sanchez family and ask for

15  parole for you.  March 7, 2005, from Los Angeles

16  from Carolyn R. Freeman Middlebrook, M-I-D-D-L-

17  E-B-R-O-O-K.  This is your second oldest sister?

18      INMATE ROSS:  Correct.

19      PRESIDING COMMISSIONER SAWYER:  She's kept

20  up with you and through your wife.  Done a lot

21  of time for the mistake he made.  He's reliable,

22  diligent, willing to help out where he can, can

23  be counted on, asset to the community.  Your

24  sister is a widow?

25      INMATE ROSS:  Yes.

26      PRESIDING COMMISSIONER SAWYER:  And she's

27  willing to assist Wayne and his wife Rosa and

34

1   willing to provide housing for them. I assume

2   your wife has got a house?

3       INMATE ROSS:  Yes.

4       PRESIDING COMMISSIONER SAWYER:  Or

5   apartment?

6       INMATE ROSS:  No, she's staying with her

7   parents.

8       PRESIDING COMMISSIONER SAWYER:  She lives

9   with her parents?

10      INMATE ROSS:  Right.

11      PRESIDING COMMISSIONER SAWYER:  And how old

12  is your wife?

13      INMATE ROSS:  She is 34.

14      PRESIDING COMMISSIONER SAWYER:  And then we

15  have a letter from 2005/2/26, from Larry D.

16  Foster, F-O-S-T-E-R.  A friend of yours through

17  the years.  He feels that you've learned from

18  your mistakes and you'll be a productive member

19  of society.  How do you know him?

20      INMATE ROSS:  I met him through the family.

21  My older sister knew him, works for the same

22  company up in San Diego.

23      PRESIDING COMMISSIONER SAWYER:  Okay.

24  Okay.  This is from your -- is this a niece

25  Deliaha?

26      INMATE ROSS:  Yeah, Deliaha Martin.

27      PRESIDING COMMISSIONER SAWYER:  Deliaha is

35

1   spelled, D-E-L-I-A-H-A, Martin, M-A-R-T-I-N.

2   And she talks about you serving more than 15

3   years in prison, ready to go back to society,

4   role model in our community.  He's a very good

5   uncle.  Does she visit with you?

6       INMATE ROSS:  Yes.

7       PRESIDING COMMISSIONER SAWYER:  And where

8   does she live?

9       INMATE ROSS:  San Diego.

10      PRESIDING COMMISSIONER SAWYER:  Family is

11  here to support him to transition back in the

12  community, and she says you're a good man,

13  respectable, honest human being.  You will get a

14  job and able to work in our community.  How old

15  is she?

16      INMATE ROSS:  I believe she's -- she's

17  about 35.

18      PRESIDING COMMISSIONER SAWYER:  Oh.  Then

19  we've got a letter of 2/24 of '05 from Evelyn L.

20  Allison, A-L-L-I-S-O-N.  Talks in here about

21  coming home, fast learner.  I've worked with

22  him, supportive.  He and his wife have a place

23  to go.  He's a fun loving person, and he's an

24  asset to the community.  And who is Evelyn

25  Allison?

26      INMATE ROSS:  That's my oldest sister.

27      PRESIDING COMMISSIONER SAWYER:  That's your

36

1    oldest sister.  That's right.  She starts off by

2    saying my brother.  Okay.  Then I have a letter

3    from Rosa from February 4th, 2005.  Very good

4    man.  She's known you for 21 years.  Five years

5    before you got into this mess.  Wants to be law-

6    abiding, support from me and my family, willing

7    to help him in anything.  We plan on having our

8    business of interpreting.  I will go

9    appointments.  My husband with handle the

10   office, setting up appointments, collecting

11   payments, general office work.  I will help him

12   -- Wayne find a job if he decides to work doing

13   something else.  I can tell you we are looking

14   forward to having Wayne home, especially me.  I

15   would like to spend some time with my husband.

16   For any reason God calls me before I'm ready to

17   go due to my heart condition.  She have a heart

18   condition?

19        INMATE ROSS:  Yeah, she's (indiscernible).

20        PRESIDING COMMISSIONER SAWYER:   Yeah.

21        INMATE ROSS:  Yes.

22        PRESIDING COMMISSIONER SAWYER:   Pretty

23   young to have a heart problem?

24        INMATE ROSS:  Yeah.

25        PRESIDING COMMISSIONER SAWYER:  She getting

26   it fixed?

27        INMATE ROSS:  Yeah.  She's going through

37

1    the process of (indiscernible) and taking the

2    medication and what have you.

3         PRESIDING COMMISSIONER SAWYER:  She refers

4    to the crime, I think, here as a very

5    unfortunate accident and says send my husband

6    home to me soon.  So I assume that's the offer

7    of coming to live with you -- with her?

8         INMATE ROSS:  Yes.

9         PRESIDING COMMISSIONER SAWYER:  You'll live

10   with her mother too?

11        INMATE ROSS:  Yeah.

12        PRESIDING COMMISSIONER SAWYER:  Got enough

13   room in the house?

14        INMATE ROSS:  Yeah.  They got a pretty nice

15   size little house.

16        PRESIDING COMMISSIONER SAWYER:  And how

17   many people are there?

18        INMATE ROSS:  With her make it three.

19        PRESIDING COMMISSIONER SAWYER:  Just her

20   mother --

21        INMATE ROSS:  Her mother and her father.

22        PRESIDING COMMISSIONER SAWYER:  And her

23   father?

24        INMATE ROSS:  Right.

25        PRESIDING COMMISSIONER SAWYER:  Okay.

26        INMATE ROSS:  Her father just recently

27   suffered a heart attack and her mother is just

38

 1   up in the age where she's mobility is coming

 2   sort of turning bad.

 3       PRESIDING COMMISSIONER SAWYER:  Yeah.  How

 4   old is she?

 5       INMATE ROSS:  I think she said her mom is

 6   81, if I'm not mistaken.

 7       PRESIDING COMMISSIONER SAWYER:  81, wow.

 8       INMATE ROSS:  Refuses to take any

 9   medications.

10       DEPUTY COMMISSIONER ROTHLISBERGER:

11   Commissioner, I need to turn the tape.

12       PRESIDING COMMISSIONER SAWYER:  Go ahead.

13       DEPUTY COMMISSIONER ROTHLISBERGER:  All

14   right.  We're back on record.

15       PRESIDING COMMISSIONER SAWYER:  I have a

16   letter from December 10th, 2002, from Shadia?

17       INMATE ROSS:  Right.

18       PRESIDING COMMISSIONER SAWYER:  S-H-A-D-I-

19   A, Edmond, E-D-M-O-N-D.  This is your niece?

20       INMATE ROSS:  Correct.

21       PRESIDING COMMISSIONER SAWYER:  And she

22   talks about you being incarcerated since she was

23   around 10 years old.  Obligated to write this

24   letter as having a non-contributive father in

25   the house, and she credits you for playing her

26   father figure for she and her brother, acted as

27   a provider.  When he actually had a job he

39

1  bought my brother and I truly things we needed.

2  I miss the care, the wisdom, the love he

3  provided.  Despite the mistakes he's made he's a

4  good man, hard working, law-abiding citizen if

5  you give him a chance.  He's not the same man he

6  was 17 years ago and no longer do anything to

7  jeopardize the chance to be with his family.

8  And how old is Shadia?

9       **INMATE ROSS:**  Shadia is 32 now.

10      **PRESIDING COMMISSIONER SAWYER:**  Nice

11 encouraging letter.  Any other letters?

12 Anything I might of missed?

13      **INMATE ROSS:**  Those are my letters.

14      **PRESIDING COMMISSIONER SAWYER:**  That's it?

15      **INMATE ROSS:**  Yes.

16      **PRESIDING COMMISSIONER SAWYER:**  Okay.  I

17 will turn it over to Ms. Rothlisberger.

18      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Good

19 afternoon, Mr. Ross.  I'm going to cover in your

20 post-conviction factors, and in doing so I

21 reviewed your Central File, your life prisoner

22 evaluation report prepared for the November 2005

23 hearing, the calendar rather, and that was by

24 correctional counselor one H. Staten, S-T-A-T-E-

25 N, post-conviction progress reports covering the

26 period from your last hearing on November 18th,

27 2002, to the present, and also report prepared

40

1  by the same person, and the psychological

2  evaluation prepared for the May 2006 calendar by

3  Dr. M. Macomber, M-A-C-O-M-B-E-R, Ph.D.  At the

4  time of your last parole consideration hearing

5  on November 18, 2002, you were housed here at

6  CTF, correct?

7      **INMATE ROSS:**  Correct.

8      **DEPUTY COMMISSIONER ROTHLISBERGER:**  And you

9  received a denial.  The Board took action to

10  deny parole for three years.  At that time it

11  was recommended by the Board that you become and

12  remain disciplinary free, you upgrade yourself

13  vocationally and academically, and you

14  participate in self-help programming if

15  available.  The last time you were here your

16  classification score was 15, but that was under

17  the old schedule, and your current

18  classification score now is the minimum

19  mandatory of 19.  Your prior custody level was a

20  Medium-A, and your current custody level is a

21  Medium-A.  I did not find a gang affiliation in

22  your file, and any vocational instruction during

23  this period of review I did not find.  However,

24  you do have some certificates I'm going to go

25  over in just a minute.  Your academic education,

26  I understand you're still working on your GED,

27  correct?

41

1      INMATE ROSS:  That's correct.

2      DEPUTY COMMISSIONER ROTHLISBERGER:  How is

3    that coming?

4      INMATE ROSS:  Slow process, but it's

5    coming.

6      DEPUTY COMMISSIONER ROTHLISBERGER:  Just

7    keep chipping away at it.

8      INMATE ROSS:  Yes, ma'am.

9      DEPUTY COMMISSIONER ROTHLISBERGER:  How

10    often -- are you going to classes now or

11    studying for it now?

12      INMATE ROSS:  Yes, I'm participating in the

13    GED program once a week on Wednesday.

14      DEPUTY COMMISSIONER ROTHLISBERGER:  Okay.

15    And then you're working the rest of the time.

16    We're going to talk about that now.  You

17    currently work in the PIA furniture factory.  Is

18    that correct?

19      INMATE ROSS:  That's correct.

20      DEPUTY COMMISSIONER ROTHLISBERGER:  And

21    you're also certified -- I did find that

22    certificate, and that's from 1994 in the machine

23    shop.  You've had over -- let's see.  Your work

24    report.  You were service factory work raise as

25    a furniture finisher, and I did see that you've

26    gotten some above average work -- your more

27    recent ones are above average work reviews at

42

1    machine shop as a wood furniture factory -- as a

2    finisher.  Boy, that's difficult to say.  That's

3    tough to say.  He's also -- where did I find

4    those?  I did see some certificates on those

5    also.

6        ATTORNEY TARDIFF:  It's in the back of the

7    packet.

8        DEPUTY COMMISSIONER ROTHLISBERGER:  Is that

9    it?

10        ATTORNEY TARDIFF:  Yeah.

11        DEPUTY COMMISSIONER ROTHLISBERGER:  That's

12    where I saw them.

13        ATTORNEY TARDIFF:  He's got five.

14        DEPUTY COMMISSIONER ROTHLISBERGER:  Yeah,

15    there's a total of five certificates, right, the

16    128(b) training certificates?

17        ATTORNEY TARDIFF:  Yes.

18        DEPUTY COMMISSIONER ROTHLISBERGER:  And I

19    wanted to ask you though, what is MSDS?  Do you

20    remember?

21        INMATE ROSS:  MSDS?

22        DEPUTY COMMISSIONER ROTHLISBERGER:  MSDS it

23    says on one of them.  I thought what the heck

24    does that mean.  Let me see.  Well, you've got

25    your finish sander, edge sander, anger

26    management, and then that's right they were

27    those.  I just had them.  Here we go, the

43

1    training certification chronos, oh, back safety,

2    air, eyes and sound equipment, general safety,

3    there's another general one, and oh, right to

4    know it says, MSDS right to know in finishing

5    one and a lock out tag out.  A little too

6    technical for me.

7        **ATTORNEY TARDIFF:**  It might be hazardous.

8        **DEPUTY COMMISSIONER ROTHLISBERGER:**  Sounds

9    like it.

10       **ATTORNEY TARDIFF:**  Hazardous materials.

11       **DEPUTY COMMISSIONER ROTHLISBERGER:**  Sounds

12   it.  Speaking of hazardous material, I see

13   you've also completed the Cal Osha hazardous

14   communication standards.  That was on 4/6/04.

15   And also I found this interesting, although

16   you're not assigned there, on 6/23/03 you

17   received a chrono for willing participation in

18   help with the GED prep tutoring.  Are you still

19   involved in that?

20       **INMATE ROSS:**  No.  That was prior to --

21       **DEPUTY COMMISSIONER ROTHLISBERGER:**  That

22   was prior to you going into the studying?

23       **INMATE ROSS:**  Right.

24       **DEPUTY COMMISSIONER ROTHLISBERGER:**  Okay.

25       **INMATE ROSS:**  I was taking that time to

26   help prep the students to come in to study for

27   the GED while I was taking the course myself.

44

1       **DEPUTY COMMISSIONER ROTHLISBERGER:**  Oh,

2   that's good.  That's good.  So you had some real

3   involvement.  In total I found 28 new chronos

4   since we've last seen you, and including 10 from

5   NA.  It seems like you go very regularly to NA,

6   chronos from 1/6/06, 9/21/05, 6/28/05, 3/15/05,

7   second 9/21/05, actually, that was a second one.

8   You did get two.  6/28/05, 12/22/04, 1/01/04,

9   6/28/04, and 6/7/04.  You had three from AA,

10  12/27/05, 10/6/05 and 3/15/05.  Two from family

11  effective harmony in the home and self-help

12  anger management.  You took the course one in

13  4/2/04 and then again on 3/5/05.  Did you find

14  that useful?

15      **INMATE ROSS:**  Yes, ma'am.

16      **DEPUTY COMMISSIONER ROTHLISBERGER:**  What

17  did you find most useful about it?

18      **INMATE ROSS:**  Just it gave me a lot of

19  insight on different choices I can make,

20  different ways to approach different situations.

21      **DEPUTY COMMISSIONER ROTHLISBERGER:**

22  Different way to react to things?

23      **INMATE ROSS:**  Right.

24      **DEPUTY COMMISSIONER ROTHLISBERGER:**

25  Completed course in cause, prevention, and

26  treatment and management of tuberculosis on

27  1/31/05.  On 12/6/05, a course in cause,

45

1  prevention, treatment, and management of

2  HIV/Aids, the same for hepatitis on 1/13/05.

3  And then -- let me see.  I love this title.  We

4  spoke to a gentleman earlier about this, how to

5  become a father and not get angry.

6      INMATE ROSS:  Right.

7      DEPUTY COMMISSIONER ROTHLISBERGER:  On

8  1/5/05; sexual transmissions -- sexually

9  transmitted diseases, 12/23/04; sexually

10 transmitted infections on 12/23/04; and then, of

11 course, those training certificates.  You've

12 also got some, how many was it, some 20 --

13     PRESIDING COMMISSIONER SAWYER:  27.

14     DEPUTY COMMISSIONER ROTHLISBERGER:  27, is

15 that what it was, certificates from the

16 Emergency Management Institute.

17     ATTORNEY TARDIFF:  I believe he did all of

18 the --

19     DEPUTY COMMISSIONER ROTHLISBERGER:  It

20 looks as though he did all that were available.

21     ATTORNEY TARDIFF:  I don't see many left.

22     DEPUTY COMMISSIONER ROTHLISBERGER:  No.

23 And that's to be commended.  What got you

24 involved in that?

25     INMATE ROSS:  You know, the fact that I

26 like -- again, I'm thinking of the job market

27 and stuff that I can do when I parole.  It's a

46

1   interesting job as far as --

2      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Yeah, I

3   see radiological emergency response, hazardous

4   materials, citizen's orientation, life stock and

5   disaster.  It does, it looks very interesting

6   especially these tormented times outside.  Let's

7   see.  There's been no psychiatric treatment.

8   Your participation in self-help groups, I've

9   gone over that, all your laudatory chronos and

10   general chronos from NA and AA.  In addition,

11   let me see.  Is there anything else I missed on

12   that?  I don't think so.  You have had three

13   disciplinaries 115, 10/24/01, mutual combat.  I

14   believe the Commissioner spoke of that.

15   7/26/00, work stoppage, which you were found

16   guilty; 3/15/88, back at Folsom, dangerous

17   property, possession of an inmate manufactured

18   weapon.  You lost 180 days credit on that.

19   128s, there's been five of those, 128(a)s, 1993,

20   conduct, failure to remove light and windowing

21   covering; 3/17/92, failure to attend assignment;

22   12/7/91, cell conditions; 9/10/90, failure to

23   report to a job assignment.  Same on January

24   5th, 1990.  And 128(b) on 9/24/04, which you

25   refused a lower bunk.  The correctional

26   counselor recommended at your -- recommended you

27   to become and remain disciplinary free, upgrade

 1  educationally by obtaining your GED, participate

 2  in self-help programs and cooperate with the

 3  clinicians in the completion of a clinical

 4  evaluation, and you did get a new clinical

 5  evaluation by Dr. Macomber.  And he states that

 6  -- this was for the May 2006 calendar.  Your

 7  access one is no mental disorder.  Your access

 8  two is no personality disorder.  And your GAF

 9  score is an 80.  Your assessment of

10  dangerousness he said -- let me see.  In talking

11  about the mutual combat, not angry, hostile

12  confrontation.  You've not been involved in

13  riots, assaults, or other acts of violence.  As

14  a result, compared to other inmates potential

15  for dangerous behavior is below average in

16  custody.  Behavior when released to the

17  community is noted that the last psychologist

18  inappropriately used the HCR-20 and the VRAG,

19  which are not appropriate for use with lifers to

20  determine level of dangerousness.  These

21  measures were normed on psychiatric patients and

22  not on life term inmates.  As a result, it

23  produces high risk levels that are not accurate.

24  A more accurate measure is the level of service

25  inventory revised that assesses criminal

26  history, substance abuse use, vocational

27  achieve, social relationships and other factors

48

1    to determine current risk level on parole.  You

2    obtained a score on this assessment of 5.1

3    cumulative frequency for prison inmates, and

4    this means that if 100 men were released on

5    parole he would do better on parole than 94.9 of

6    them.  This is a low, very low risk level, and

7    as a result does not pose any more risk to

8    society than the average citizen in the

9    community.  At this point in his life there are

10   no significant risk factors in this case.  The

11   doctor also states that there are no mental or

12   emotional problems that would interfere with

13   routine release planning.  Does have strong

14   family support, completed vocational machine

15   shop, also required skills that would enable him

16   to obtain employment in the PIA wood furniture

17   factory, developed strong work values, work

18   ethic.  Employment will not be a problem, he

19   states, and you -- because you also get work

20   reports, still working on his GED, and the

21   prognosis for successful adjustment in the

22   community is good.  And I believe that covers

23   it.  Is there anything that I may of missed,

24   Counsel?

25        **ATTORNEY TARDIFF:**  No, I don't think so.

26        **DEPUTY COMMISSIONER ROTHLISBERGER:**  Okay.

27   Commissioner.

49

1      PRESIDING COMMISSIONER SAWYER:  How much of

2  your restitution, your $10,000 restitution is

3  paid off?

4      INMATE ROSS:  Right now I'm down to about

5  8,900 --

6      PRESIDING COMMISSIONER SAWYER:  You paid

7  off 8,900?

8      INMATE ROSS:  Right.

9      PRESIDING COMMISSIONER SAWYER:  Or you have

10  that left to pay?

11      INMATE ROSS:  That's what I have to pay

12  right now.  It was 10,000, and it's -- I think

13  it's down around 8,900.

14      PRESIDING COMMISSIONER SAWYER:  Okay.  Do

15  you have any questions, Ms. Tardiff?

16      ATTORNEY TARDIFF:  Yeah.  I saw -- getting

17  back to the self-help.  There was a chrono dated

18  1/31/05 about reading books, self-help books.

19      INMATE ROSS:  Right.

20      ATTORNEY TARDIFF:  How many of those did

21  you read?

22      INMATE ROSS:  I read several books on

23  different topics such as anger management.  I

24  have them all in there.

25      ATTORNEY TARDIFF:  You have the reports in

26  there too?

27      INMATE ROSS:  Yeah, let me see if I --

50

1        **PRESIDING COMMISSIONER SAWYER:**  Did they

2    give you a chrono on those?

3        **INMATE ROSS:**  Right.

4        **ATTORNEY TARDIFF:**  Yeah.

5        **INMATE ROSS:**  I also did a report with Dr.

6    Gleason.  He wrote a chrono for that as well.

7    Let me see.

8        **DEPUTY COMMISSIONER ROTHLISBERGER:**  What

9    was the date on that again?

10       **ATTORNEY TARDIFF:**  I have 1/31/05.

11       **DEPUTY COMMISSIONER ROTHLISBERGER:**  Here it

12   is.  What I have on 1/31/05 is the tuberculosis.

13       **ATTORNEY TARDIFF:**  Here.  I think we found

14   it.

15       **DEPUTY COMMISSIONER ROTHLISBERGER:**  Did you

16   find it?

17       **ATTORNEY TARDIFF:**  A chrono dated -- it's a

18   pink one.

19       **DEPUTY COMMISSIONER ROTHLISBERGER:**  Okay.

20       **ATTORNEY TARDIFF:**  That's his copy, I

21   guess.

22       **DEPUTY COMMISSIONER ROTHLISBERGER:**  Oh,

23   yeah.  What's the date?

24       **ATTORNEY TARDIFF:**  1/31/05, completed

25   requirements for self-help chrono.  "There are

26   few opportunities at CTF for self-help; however,

27   some inmates are willing to read self-help books

51

1    and write reports on them and learn from each

2    other."

3        **DEPUTY COMMISSIONER ROTHLISBERGER:**  Okay.

4        **ATTORNEY TARDIFF:**  The book title is

5    "Understanding Your Anxiety" by Dr. Bruno.

6        **DEPUTY COMMISSIONER ROTHLISBERGER:**  Mr.

7    Ross, I need you to make sure you get that in

8    your file.  It's not in your C file.

9        **INMATE ROSS:**  Okay.

10       **DEPUTY COMMISSIONER ROTHLISBERGER:**  I want

11   you to get credit for that.

12       **PRESIDING COMMISSIONER SAWYER:**  Is that the

13   only one you did?

14       **INMATE ROSS:**  No.  I did several of them,

15   but --

16       **ATTORNEY TARDIFF:**  Is that one too?  The

17   12-week anger management for Muslims?  He did

18   that 11/19/05.

19       **PRESIDING COMMISSIONER SAWYER:**  How many

20   book reports have you done?

21       **INMATE ROSS:**  Well, what it is you're only

22   allowed to do one.

23       **ATTORNEY TARDIFF:**  For her.

24       **INMATE ROSS:**  For her, for Dr. Gleason,

25   right.

26       **ATTORNEY TARDIFF:**  But did you do more on

27   your own?

52

1      **INMATE ROSS:**  Yes, I took it upon myself to

2   do -- like I did this one righting here.

3      **ATTORNEY TARDIFF:**  Okay.  Well, this is all

4   important stuff for --

5      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Right.

6      **ATTORNEY TARDIFF:**  -- to show --

7      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Oh,

8   counsel, I just another too, 6/23/03.  That was

9   the GED preparation tutoring program.

10      **ATTORNEY TARDIFF:**  Right.

11      **DEPUTY COMMISSIONER ROTHLISBERGER:**  The

12   purpose of this program is to provide small

13   group tutoring for inmates, and also the how to

14   become a father.  We mentioned that before, and

15   not get angry.

16      **ATTORNEY TARDIFF:**  And did you do the

17   Muslims?

18      **DEPUTY COMMISSIONER ROTHLISBERGER:**  Yeah,

19   that's the Muslims.

20      **ATTORNEY TARDIFF:**  Okay.  And then there's

21   a report here entitled caring enough to confront

22   and it was after reading David Augsburger's book

23   "Caring Enough to Confront."  I learned better

24   way to resolve, caring and honest approach for

25   dealing with anger, and how to own my anger and

26   keep my peace.

27      **PRESIDING COMMISSIONER SAWYER:**  So we have

53

1  two books?

2      **ATTORNEY TARDIFF:**  So far, yeah.  All this

3  stuff is important for --

4      **PRESIDING COMMISSIONER SAWYER:**  Right.

5      **ATTORNEY TARDIFF:**  -- it's actually more

6  important than structured self-help because you

7  do it on your own.

8      **INMATE ROSS:**  Yeah.  I tend to have myself

9  to continue reading the books and stuff.  Each

10  time I go to the library on Wednesday to take

11  the GED program I always pick up a book over

12  there and just read it, make personal notes and

13  stuff.

14      **DEPUTY COMMISSIONER ROTHLISBERGER:**

15  Excellent.

16      **PRESIDING COMMISSIONER SAWYER:**  Good.

17      **ATTORNEY TARDIFF:**  That's -- and did you

18  have the work supervisor's report dated 5/1/06?

19  Probably not, that's pretty new.

20      **DEPUTY COMMISSIONER ROTHLISBERGER:**  5/1/06,

21  no, I did not see that.

22      **ATTORNEY TARDIFF:**  He received all ones and

23  twos, exceptional and above average, furniture

24  finisher.

25      **DEPUTY COMMISSIONER ROTHLISBERGER:**  No.

26  The last I had was an above average, not

27  exceptional.

54

1      **ATTORNEY TARDIFF:** And his place status is
2    55 cents, which is pretty high, so he got all
3    ones and twos.

4      **PRESIDING COMMISSIONER SAWYER:** Any other
5    questions, Ms. Tardiff?

6      **ATTORNEY TARDIFF:** No.

7      **PRESIDING COMMISSIONER SAWYER:** Do you have
8    a closing statement?

9      **ATTORNEY TARDIFF:** Thank you. In terms of
10   Mr. Ross's pre-incarceration history, it appears
11   as if he was, even though he did not get his GED
12   or high school diploma, it appears as if he was
13   -- had steady employment and was a hard worker
14   and had a lot of initiative on his own.
15   Apparently getting the GED was not something
16   that was emphasized probably in his family.
17   Since he's been -- and also his criminal history
18   -- I'm looking for my other notes. His criminal
19   history was fairly insignificant. I believe it
20   just involved not paying child support and
21   vehicle violations, so that's also supportive of
22   release. Since he's been incarcerated,
23   especially since his last hearing, he's really
24   done a lot of work to fulfill what the Board has
25   asked him to do, and a lot of that has already
26   been read into the record, but there's a lot of
27   self-help. I believe he's been going to AA/NA

55

```
 1    since '92.  He obviously is finding a lot of
 2    self-help programs here that we see many inmates
 3    coming and saying isn't available, and he's
 4    found it.  The FEMA series, completed that whole
 5    thing.  Inmate peer education.  He's continued
 6    to upgrade vocationally in the PIA furniture.
 7    Received 128(b)s training certificates.  He's
 8    psych eval is supportive of release.  What was
 9    not read into the record was that his judgment
10    was intact.  His insight and self awareness was
11    good.  Because he's been clean and sober for 19
12    years, the psychologist concluded that that is
13    no longer an issue, substance abuse.  Under the
14    crime, he accepts full responsibility, and his
15    remorse appeared sincere and genuine.  Again, no
16    risk factors, strong family ties if he were to
17    be paroled.  He has his vocational machine shop.
18    He's developed strong work ethic, gets good work
19    reports and his prognosis is good for a
20    successful adaptation to the free society.  His
21    '02 psych eval, he had a high GAF score of '75,
22    and that was the testing procedures that Dr.
23    Macomber stated should not be used, but they
24    were not bad.  Under the PCLR, which is a
25    psychopathy checklist, he did not test out to
26    have that psychopathy, I guess, personality.
27    And the other HCR-20 and the VRAG were low to
```

56

1    moderate.  It concluded that he was not

2    criminally oriented, and that psychologist felt

3    that the crime was motivated by material gains

4    and related to substance abuse.  He obviously

5    has strong family support.  He had numerous

6    letters and places for him to live, to help him

7    should he be released.  He has marketable skills

8    in the machine shop and furniture factory.  And

9    if Mr. Ross is not found suitable today, I

10   believe a one-year denial would be quite

11   appropriate since he has remained disciplinary

12   free.  He is trying to get his GED.  He goes

13   once a week, but because he's trying to pay his

14   restitution off, he feels that doing that is

15   more important at this point, but he continues

16   to chip away at the GED and his education.

17   Thank you.

18        **PRESIDING COMMISSIONER SAWYER:**  Thank you.

19   Mr. Ross, can you tell us why you feel you're

20   suitable for parole today?

21        **INMATE ROSS:**  Well, I made major changes in

22   my life as opposed to prior to coming in, and I

23   have a brighter outlook on life itself and

24   realized the importance of being in a free

25   society and what better chances I can have of

26   being productive.  I study now.  I'm reading a

27   lot of self-help books on how to control anger

57

1    and approach situations with a more positive

2    attitude, just basically be able to function

3    based on what I've learned and what I've read.

4    I learned a lot about myself as a person from

5    the books I read and just from generalized my

6    daily life and stuff.  I'm willing to go out and

7    do everything I can to be -- to seek successful

8    work out there.  I would like to continue my

9    education.  I have recently wrote the school

10    that I attended and received a letter that

11    confirmed the courses that's available.  In the

12    event that I was to be granted parole I would

13    suit the criteria for the adult education to

14    continue my education.

15        **PRESIDING COMMISSIONER SAWYER:**  Okay.

16    That's it?

17        **INMATE ROSS:**  Yes.

18        **PRESIDING COMMISSIONER SAWYER:**  Okay.  It's

19    seven minutes past 5:00 and we are going to

20    recess for deliberations.

21                       R E C E S S

22                        --oOo--

23

24

25

26

27

58

1           CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3      DEPUTY COMMISSIONER ROTHLISBERGER:    All

4  right.   We're back on record.

5      PRESIDING COMMISSIONER SAWYER:    The time is

6  18 minutes past 5:00 o'clock in the afternoon.

7  We're back in the matter of Mr. Ross.   Everyone

8  has returned to the room that was previously

9  here.   The Panel reviewed all the information

10  received from the public and relied on the

11  following circumstances in concluding the

12  prisoner is not suitable for parole and would

13  pose an unreasonable risk of danger to society

14  or a threat to public safety if released from

15  prison.   Commitment offense, you have a 73 year-

16  old man who had a considerable fight with the

17  inmate, Mr. Ross, and it appear from the photos

18  that the fight was pretty rough.   And there was

19  a pair of scissors and they were used to stab

20  Mr. Sanchez approximately 24, 25 times.

21  According to the coroner's report, he didn't die

22  of the stab wounds, he died of bleeding to

23  death, and we see that as especially cruel and

24  callous and clearly demonstrates an

25  exceptionally callous disregard for human

26  suffering, in that you left him there and left

27  **WAYNE ROSS D-59353 DECISION PAGE 1 6/9/06**

```
 1   him essentially to die.  The pictures were
 2   pretty telling, in that there was blood left in
 3   a lot of places, probably from the attack
 4   itself.  It looked pretty hideous.  There was
 5   blood on your clothes, there was blood on your
 6   shoes.  You attempted to disguise that.  Of
 7   course, your culpability in this particular
 8   crime was initially lied to police, initially,
 9   and then finally coming around to the truth of
10   the matter.  I still think you have a tendency
11   to minimize a little bit.  We appreciated you
12   talked to us about the crime because some people
13   come in and don't want to talk about the
14   commitment offense, and we just read it and try
15   to figure out what kind of insight they have
16   into the offense.  And I think your insight is
17   pretty good into the offense, whether you --
18   because of your condition that evening
19   (indiscernible).  This is a big deal.  This is a
20   big deal.  You took a 73 year-old man's life
21   with a pair of scissors.  The motive for the
22   crime, as you -- again, we appreciate your
23   candidness in this case.  We talked about using
24   the N word.  He was upset that you couldn't find
25   any girls.  Next time you talk about this crime
26   I want you to look a little deeper into it.
27   WAYNE ROSS D-59353 DECISION PAGE 2 6/9/06
```

60

1    Okay.  We're going to deny you for two years.
2    We see a lot of positive things, no question
3    about it.  You're very positive in the direction
4    that you're going.  You need a little work.  You
5    are looking at a murder first degree here, and
6    I'd like you to think about it when it's quiet,
7    find a quiet place and think about the crime.
8    Think about what you say in terms of the crime,
9    particularly in your closing statement.  You
10   didn't mention it.  You just talked about you
11   and what you wanted to do and get out there and
12   get a job and carry on with your life.  Let's go
13   back to the root of this whole thing.  The root
14   was you were out of control.  You were wandering
15   aimlessly.  If you were a boat, you didn't have
16   a ruder, no direction during this period of time
17   in your life.  We found it interesting, and
18   again in the minimal STKAEUGS of your
19   perspective on things, we found it interesting
20   that you tried to get a job but you were over-
21   qualified without a high school education.  That
22   doesn't -- that doesn't sound right to us.  It
23   just doesn't.  It doesn't sound right to us.
24   Without a GED, without a high school education,
25   people turned you down for jobs, so that -- so
26   you were turning to alcohol and drugs to mask
27   **WAYNE ROSS D-59353 DECISION PAGE 3 6/9/06**

61

 1    your frustrations.  I would say that it was
 2    probably more like you didn't have a high school
 3    education, you didn't have a GED, and they
 4    turned you down for a job as opposed to being
 5    over-qualified.  You didn't have any
 6    qualifications.  You were just fresh out of high
 7    school.  And we still find it troubling to
 8    understand the story about them asking you to
 9    leave high school because you've already got
10    your credits and they never handed you a diploma
11    or sent you a diploma in the mail.  I find that
12    ludicrous.  I never heard a story like that.
13    yeah, most people do have more credits than they
14    need to have, minimal credits in high school, or
15    they get over the minimum amount needed to
16    graduate, but, you know, one of the most
17    important documents in my life at that age, at
18    age 18, was get my hands on that diploma.  It
19    means I did something and I completed something
20    and I've done something with my life.  And it
21    made my parents happy, and it made me happy, and
22    it made my friends happy, and quite frankly that
23    doesn't make a lot of sense to us that you'd
24    just walk away from your high school being told
25    by someone -- was it a counselor, was it a
26    principal, was it a teacher?
27    **WAYNE ROSS D-59353 DECISION PAGE 4 6/9/06**

62

1    **INMATE ROSS:**  It was a counselor.

2    **PRESIDING COMMISSIONER SAWYER:**  Counselor?

3    **INMATE ROSS:**  Yeah.

4    **PRESIDING COMMISSIONER SAWYER:**  Now, quite

5    honestly, and honesty will set you free, okay,

6    you've heard that.  The truth will set you free.

7    **INMATE ROSS:**  Right.

8    **PRESIDING COMMISSIONER SAWYER:**  Okay.  Did

9    they ask you to leave high school?

10    **INMATE ROSS:**  I wasn't exactly told to

11    leave high school, but they told me because I

12    had obtained at that point enough credits that I

13    qualified to get a job.

14    **PRESIDING COMMISSIONER SAWYER:**  Were you a

15    behavior problem?

16    **INMATE ROSS:**  No.  None whatsoever.

17    **PRESIDING COMMISSIONER SAWYER:**  Did they

18    ask other people to do the same thing?

19    **INMATE ROSS:**  Yes.

20    **PRESIDING COMMISSIONER SAWYER:**  Really?

21    **INMATE ROSS:**  Yes.

22    **PRESIDING COMMISSIONER SAWYER:**

23    Unbelievable.  Okay.  I'll move on.  Previous

24    record, did not have any violence or assaultive

25    behavior, but we all know -- we all know,

26    especially sitting on this side of the table,

27    **WAYNE ROSS D-59353 DECISION PAGE 5 6/9/06**

63

1    and I think you know sitting on that side of the

2    table because we know a lot of stuff about human

3    behavior based on our life experiences and

4    people we run into, that drugs and alcohol

5    brings the worst out in you. You go what was I

6    thinking, what did I do because you were under

7    the influence at the time you do something

8    stupid like violence. Okay. So we all know by

9    using drugs, by drink, it has different effects

10   on different people. Some people just go sit in

11   a corner. Some people become lovers. Some

12   people become violent. Some people get loud.

13   Other people get quiet. So it has a different

14   effect on us, and a lot of it -- some of it is a

15   predisposition. You know what that is?

16        INMATE ROSS: Yes.

17        PRESIDING COMMISSIONER SAWYER: You study

18   that in AA?

19        INMATE ROSS: Yes.

20        PRESIDING COMMISSIONER SAWYER: Yeah.

21        INMATE ROSS: Some of it, yeah.

22        PRESIDING COMMISSIONER SAWYER:

23   Predisposition. Some cultures has more an

24   effect. Alcohol has more an effect on a woman

25   than it does a man. Alcohol has a -- if you got

26   a predisposition where you have a family of

27   WAYNE ROSS D-59353 DECISION PAGE 6 6/9/06

64

1    alcoholics, then all of a sudden you're more

2    likely to become an alcoholic. It's just that

3    simple. It's proven statistically. So you turn

4    to violence in this case against a 73 year-old

5    man, Mr. Sanchez, and stabbed him numerous

6    times. It was a rage. Looking at those

7    pictures you had to be enraged. You had to be

8    awfully upset with him, whether it was the

9    alcohol that induced you to that rage or whether

10   it was a personality disorder. According to the

11   psych reports it's not a personality disorder,

12   so let's gets back to the drugs and alcohol.

13   See what I mean? It was just a rage. I can't

14   think of a better word to use. Your

15   institutional behavior has been pretty good.

16   For the period of time, it's about 20 years now?

17        INMATE ROSS:  Yes.

18        PRESIDING COMMISSIONER SAWYER:  Three 115s,

19   pretty good. I'm not going to minimize it, I'll

20   maximize it and say it's very good, your last

21   one being five years ago with mutual combat that

22   you say that you and your cellee were just horse

23   playing. The weapon didn't belong to you up at

24   Folsom. See what I mean?

25        INMATE ROSS:  Right.

26        PRESIDING COMMISSIONER SAWYER:  There's a

27   WAYNE ROSS D-59353 DECISION PAGE 7 6/9/06

65

1    common thread here, Mr. Ross.  That common

2    thread is it's not always my fault.  You kind of

3    step back from taking responsibility for your

4    actions.

5         INMATE ROSS:  Right.

6         PRESIDING COMMISSIONER SAWYER:  You

7    understand what I'm saying?  That's what we're

8    seeing.

9         INMATE ROSS:  Yes.

10        PRESIDING COMMISSIONER SAWYER:  We're doing

11   a little mental autopsy on you here.  That's

12   what we do in hearings.  We try to get as deep

13   as we can in a very short period of time based

14   on a lot of information that's been gathered,

15   and we know more about you than a lot of people

16   do on the outside, as we should, to try to make

17   a correct judgment in the interest of public

18   safety.  So we -- you're not -- you're helping

19   in the GED.  You're assisting people in tutoring

20   for the GED, preparing people for the GED, yet

21   you don't have one yet yourself.  Tell us the

22   real reason why you don't have a GED, not that

23   you're going to pay restitution and you need to

24   work.  The GED is going to be one of your

25   tickets out of here.

26   INMATE ROSS:  As I was telling my counselor

27   WAYNE ROSS D-59353 DECISION PAGE 8 6/9/06

66

1    here, you know, I'm in -- I'm optimistic of

2    obtaining or what have you, but it seems like I

3    do well up to the time it comes to testing, and

4    every time, no matter what, it seems like -- I

5    don't know if it's the thing with the timing or

6    what, but up to that point everything just seems

7    like it falls to pieces, but it hasn't kept me

8    from continuing and trying to --

9        **PRESIDING COMMISSIONER SAWYER:**   How many

10   times have you taken the test?

11       **INMATE ROSS:**   About five.

12       **PRESIDING COMMISSIONER SAWYER:**   Five times.

13   What are the weak spots in the test?

14       **INMATE ROSS:**   I would say probably

15   comprehending and math.

16       **PRESIDING COMMISSIONER SAWYER:**   What was

17   the first one?

18       **INMATE ROSS:**   Comprehending.

19       **PRESIDING COMMISSIONER SAWYER:**

20   Comprehension?

21       **INMATE ROSS:**   Right, comprehension, yeah.

22       **PRESIDING COMMISSIONER SAWYER:**   Okay.   So

23   if you know where your weaknesses are and you

24   plan for it, you're not going to be as --

25       **ATTORNEY TARDIFF:**   Anxious.

26   **PRESIDING COMMISSIONER SAWYER:**   That was

27   **WAYNE ROSS D-59353 DECISION PAGE 9 6/9/06**

67

1      exactly the word I was using.

2      **DEPUTY COMMISSIONER ROTHLISBERGER:**  We tend

3  to study things we like that come to easy to us

4  rather than things that are hard.

5      **INMATE ROSS:**  Right, I understand.

6      **PRESIDING COMMISSIONER SAWYER:**  You're not

7  going to hink (phonetic) up.  I don't know how

8  to spell that for the transcriptionist.  And

9  people do hink up, we all hink up under

10  pressure.  We all hink up under pressure.  I

11  mean, that's normal, but the better you plan,

12  the better you prepare yourself, the less you'll

13  hink up.  And I think we're getting to the

14  bottom of it.  The bottom of it is lack of self

15  confidence on your part.  Would that be fair?

16      **INMATE ROSS:**  Perhaps, yes, I might agree

17  with that.

18      **PRESIDING COMMISSIONER SAWYER:**  So you

19  combat that with better planning and better

20  preparation for the next test, and that requires

21  work.  And Commissioner Rothlisberger was

22  absolutely right, we have a tendency, we all do,

23  it's a natural tendency, to go where we have the

24  most fun.  And a tendency if we don't have to go

25  over here where it's hard and we go over here

26  where it's easy, that's normal.  If you've ever

27  **WAYNE ROSS D-59353 DECISION PAGE 10 6/9/06**

68

1    of been to a time management class -- my wife,

2    I'll give you an example, my wife is a professor

3    at a university, and she's got papers to grade

4    that she doesn't like to do.  She'll come home,

5    she'll put the papers down in her office and

6    start vacuuming the floor because it's -- she

7    likes to do that.  Let's say you've got

8    something -- I can read it like a book, you've

9    got something you don't want to do, and she'll

10   say, how did you know that?  And I said because

11   you're doing trivial things around the house.

12   And if you go to a time management class they'll

13   tell you what you do, the best way to manage

14   your time is to take the hardest project first,

15   get that out of the way and the rest of it then

16   easy.  The rest of it is real easy to do, so you

17   want to think about that a little bit.  That's a

18   true story, isn't it?

19       **DEPUTY COMMISSIONER ROTHLISBERGER:**  Yes,

20   absolutely.

21       **PRESIDING COMMISSIONER SAWYER:**  How are we

22   doing on tape?

23       **DEPUTY COMMISSIONER ROTHLISBERGER:**

24   Probably got another three minutes or four

25   minutes.

26       **PRESIDING COMMISSIONER SAWYER:**  You want to

27   **WAYNE ROSS D-59353 DECISION PAGE 11 6/9/06**

69

1  put a new tape in?

2      **DEPUTY COMMISSIONER ROTHLISBERGER:**   Sure.

3      **PRESIDING COMMISSIONER SAWYER:**   Okay.

4  Trying to give you some guidance here.   Okay.

5  You understand what I'm trying to do here?

6      **INMATE ROSS:**   Yes, sir.

7      **PRESIDING COMMISSIONER SAWYER:**   We're

8  trying to encourage you so that you'll well

9  prepared when you get out of here, and you've

10  had five 128s, the last one, I think, was '93,

11  was it?

12      **DEPUTY COMMISSIONER ROTHLISBERGER:**

13  Correct.

14      **PRESIDING COMMISSIONER SAWYER:**   Correct.

15  Those are just counseling chronos, so you're

16  doing fine in that particular area as well for

17  the time you've been down.   You've not too hard

18  on the institution and the staff.   I mean,

19  you're pretty easy to work with from the looks

20  with, and you've been very pleasant in this

21  hearing, you know, our first impressions are

22  when you walk through that door and you've been

23  -- you appear to be very receptive and you speak

24  well.   Your psychiatric factors are good.   Dr.

25  Macomber indicates in our psych report, that's

26  '06, a month old, that you have a very low risk

27  **WAYNE ROSS D-59353 DECISION PAGE 12 6/9/06**

1   level and as a result did not pose any more risk

2   to society than the average citizen in the

3   community.  I would like to see -- add a caveat

4   to that, provided you're sober, and you're

5   taking good care of that.  Your AA and your NA

6   programming has been very good and must continue

7   to be good.  That's another ticket out of here.

8   That helps us understand that you understand

9   your addiction and you can't ever of use again

10  because if you do, you find yourself in a mess

11  like you got yourself into before.  I always

12  take exception when I read letters, and it's

13  nothing personal to you, but when people write

14  letters and they talk about the mistake, they

15  talk about the accident.  Like in one of your

16  letters there was an accident, the word used was

17  accident.  There's no accident here.  He didn't

18  fall on that scissors 24 times.  You inflicted

19  those wounds and then attempted to cover it up

20  or accept responsibility for it, so there's no

21  accident.  It's not like a car, you know,

22  looking the other way and forget to look at the

23  red light and go through the red light, you

24  know, unless you're under the influence, then

25  it's no accident either.  So we have to face

26  reality that a 73 year-old man was murdered

27  **WAYNE ROSS D-59353 DECISION PAGE 13 6/9/06**

71

1    first degree.  Parole plans, wife who sounds

2    like a saint, Rosa?

3         INMATE ROSS:  Right.

4         PRESIDING COMMISSIONER SAWYER:  Sticking by

5    you and offering, it sounds like she's moving

6    forward with her life and sounds like she's very

7    productive.  She lives with her mother and

8    father.  You never lived with her mother and

9    father.  You've never lived with her either,

10    right?

11         INMATE ROSS:  No.

12         PRESIDING COMMISSIONER SAWYER:  Okay.  We'd

13    like you to think of maybe an alternate plan

14    from one of your siblings or somebody out there,

15    one of your family members.  You have a good

16    package of support letters, don't get me wrong.

17    Your parole plans are adequate, but just barely.

18    If you had a secondary plan in case it doesn't

19    work out, you know, you don't get along with her

20    father, you don't get along with her mother, and

21    I'm not saying that that is true, I'm just

22    saying that --

23         ATTORNEY TARDIFF:  It could happen.

24         PRESIDING COMMISSIONER SAWYER:  Thank you,

25    Counsel.

26         ATTORNEY TARDIFF:  You're welcome.

27    WAYNE ROSS D-59353 DECISION PAGE 14 6/9/06

72

1       **PRESIDING COMMISSIONER SAWYER:**  Well, I'm

2   going to throw one of my sayings, one of my isms

3   on you.  If you want to make God laugh, tell him

4   what you're doing tomorrow.  Okay.  Because we

5   don't know exactly -- we know what we want to do

6   tomorrow, and in this case you want this to

7   work.  We want it to work.  We want you to be

8   very successful when you get a date, but

9   sometimes things just don't work out the way we

10  want them to because we don't have the power.

11  We don't have all the juice.  So try to bolster

12  those parole plans.  You'll have two years to do

13  this, and this is one of the reasons we're

14  giving you two years.  One reason is the crime,

15  clearly, and the other is to strengthen up those

16  parole plans, and the other is to get your GED.

17      **INMATE ROSS:**  Okay.

18      **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

19  keep working in that direction.  We did not have

20  a response -- or a response was not allowed in

21  this hearing because it was a late response from

22  the District Attorney's office in Ventura

23  County, but they did write a six-page letter,

24  and while we didn't give it any weight, it went

25  right in the -- it went away because your

26  counsel objected to it, and she was absolutely

27  **WAYNE ROSS D-59353 DECISION PAGE 15 6/9/06**

73

 1    right.  We followed the rules, so it was not
 2    given any weight at all, but -- we'll leave it
 3    at that.  Okay.  I failed to mention one other
 4    thing that's in your favor in terms of your
 5    employment.  We do think based on your 1994
 6    machine shop assignment to the furniture above
 7    average work to exceptional work reports in the
 8    PIA furniture that you're working in now, you do
 9    have those skills in the machine shop that you
10    can take with you.  You can't ever take those
11    away from you.  Any education that you have, and
12    I think you mentioned that, is they can take
13    everything else away from you, but they can't
14    take your education away from you and that's
15    what helps you get self esteem and that's what
16    helps you challenge the world.  If you know --
17    just like you've planned and you've accomplished
18    things that nobody can ever of take away from
19    you, so the more you get of that, the better off
20    you are, but you do have employable skills.  And
21    don't -- I know your wife is busy, but you have
22    some other family out there, have them ask
23    around or see what you can do to look around the
24    Oxnard Ventura area to see where those skills
25    that you have could be utilized.  You don't have
26    to have a job offer, but there's a factory that
27    **WAYNE ROSS D-59353 DECISION PAGE 16 6/9/06**

74

1   does this, that uses the same tools that I know

2   how to use and the same machines I know how to

3   use and they hire people.  That shows us that

4   you've done your home work in terms of your

5   employment so you hit the ground running, so

6   you're out there just a few days before you're

7   dropping those applications on people that you

8   could realistically work for.  Okay.  Because

9   you know what it's like to be unemployed.  It

10  puts pressure on you, so you want to get that

11  job going as soon as you can.  You put pressure

12  on your wife, you put pressure on her mom and

13  dad, you put pressure on your family.  Even

14  they're there for you, they're there to

15  surrounded you and give you positive strokes,

16  but you know, there comes a day that hey, you

17  going to get a job.  We're tired of feeding you.

18  This is not CDC, you know, because you're going

19  to have health care and things like that are

20  very important, especially if your wife starts

21  her own business, and she's going to have to

22  have health care because you said that she has a

23  heart condition.  That's expensive, especially

24  if she's got a preexisting condition to get that

25  policy to cover her and you and the business.

26  That's a lot of money every month that goes out.

27  **WAYNE ROSS D-59353 DECISION PAGE 17 6/9/06**

75

1    Okay.  I want to commend you for your AA, very

2    important.  I want to commend you for assisting

3    the tutor program in the GED area, your FEMA

4    courses, 27 separate courses, how to become a

5    father and not get angry, the family

6    effectiveness in training and harmony, the anger

7    management 12 week course in '05, your HIV/Aids

8    and TB, your book reports.  Your book reports

9    gives you good insight, and as your attorney was

10   getting a little frustrated you're starting to

11   pull that stuff out, it should of been out on

12   the table long ago.  You're here to perform.

13   What I mean by that is you're here to tell us --

14   you have a very limited time to tell us what

15   you're doing that's positive that we should look

16   at, so we make sure that that stuff is either in

17   your file or you have ready to present to the

18   next Panel.  You understand what I'm saying?  In

19   a separate decision, the Panel finds that it's

20   not reasonable to expect that parole would be

21   granted during the following two years, so given

22   the gravity of this murder, murder one, Mr.

23   Earnest Sanchez, given the fact that you haven't

24   achieved that GED since your last hearing three

25   years ago --

26        **ATTORNEY TARDIFF:**  Three years ago.

27   **WAYNE ROSS D-59353 DECISION PAGE 18 6/9/06**

76

1    **PRESIDING COMMISSIONER SAWYER:**   Three

2    years.

3    **ATTORNEY TARDIFF:**   Yeah.

4    **PRESIDING COMMISSIONER SAWYER:**  That's what

5    I said, didn't I, three.

6    **DEPUTY COMMISSIONER ROTHLISBERGER:**   You

7    said two.

8    **PRESIDING COMMISSIONER SAWYER:**   Three years

9    ago, we feel that you won't -- that it's not

10   reasonable to assume that you would have a

11   parole date in the next two years.  You're going

12   in the right direction.  We don't want to

13   discourage you one bit, but we're going to be

14   realistic here.  So we've given you some things

15   to do, work on those parole plans, bolster those

16   up as well.  Okay.  And keep those good letters

17   coming from your family and any friends you've

18   got out there that will support you.  Of do you

19   have anything you'd like to say, Commissioner?

20   **DEPUTY COMMISSIONER ROTHLISBERGER:**   I just

21   want to wish you all the best of luck.  And also

22   another thing you might want to look into when

23   you go to the library, cheek out some books on

24   meditation.  That will help center yourself when

25   you take your GED.

26   **PRESIDING COMMISSIONER SAWYER:**   Good

27   **WAYNE ROSS D-59353 DECISION PAGE 19 6/9/06**

77

```
 1   suggestion.  Okay.  Continue your self-help,
 2   stay discipline free, earn the positive chronos,
 3   and get a GED.  Okay?
 4       INMATE ROSS:  Okay.
 5       PRESIDING COMMISSIONER SAWYER:  Okay.
 6   Thank you, Mr. Ross.  You've been a real
 7   gentleman.
 8       DEPUTY COMMISSIONER ROTHLISBERGER:  Best of
 9   luck, Mr. Ross.
10       PRESIDING COMMISSIONER SAWYER:  Best of
11   luck to you.  That concludes this hearing.  It's
12   5:44 p.m.
13
14
15
16
17
18
19
20
21
22
23   PAROLE DENIED TWO YEARS
24   THIS DECISION WILL BE FINAL ON: OCT 0 7 2006
25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT
26   DATE, THE DECISION IS MODIFIED.
27   WAYNE ROSS D-59353 DECISION PAGE 20 6/9/06
```

78

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, STACY WEGNER, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 77, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF WAYNE ROSS,

D-59353, ON JUNE 9, 2006, and that the foregoing pages

constitute a true, complete, and accurate

transcription of the aforementioned tape to the best

of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated September 7, 2006, at Sacramento,

California.


STACY WEGNER
TRANSCRIBER
**PETERS SHORTHAND REPORTING**