# Exhibit
# B

SUPERIOR COURT OF CALIFORNIA, COUNTY OF VENTURA

☐ D.A ☑    D. CSL ☐
PO ☑    OTHER:
SO ☐

JUDGE: WILLIAM L. PECK          DATE: 5/5/87          TIME: 8:30    CASE NO: CR 22128
CLERK: MARTHA ESQUIVEL          BAILIFF: ART MILLER          CRT.RPTR: RHONDA CRESSY
DDA: AARON STOVITZ          DEF.CNSL: DPD: SUSAN OLSON          DPO: C. WEIDENHEIMER

TITLE OF CASE:
PEOPLE OF THE STATE OF CALIFORNIA          NATURE OF PROCEEDINGS:
              vs.        Plaintiff          ARRAIGNMENT: CHANGE OF PLEA
    WAYNE STEDSON ROSS

                              Defendant

Information    (✓) Filed    (✓) Served    ( ) Amended

Interpreter _____    ( ) Sworn    ( ) Previously swo:

( ) DDA motion to file ( ) _____ Amended  ( ) Amendment to Information
( ) Granted, ordered filed _____    ( ) Defendant served

(✓) Advised re counsel/reimbursement  (✓) Public Defender appointed  ( ) Confli⟨
( ) Attorney _____    ( ) Appointed    ( ) Retaine⟨
Defendant arraigned  ( ) Withdraws plea NOT GUILTY, Count(s) _____
( ) Withdraws DENIAL
Pleads  (✓) GUILTY  ( ) NOLO CONTENDERE of offense(s) of _Murder_    allegation(s
_First degree, count 1 and burglary, 459 PC, First degree, count_
_Counsel stipulate that the murder is of the first degree._
( ) First Degree    ( ) Second Degree    ( ) Misdemeanor
ADMITS _____

Stipulate factual basis for plea based on  (✓) Preliminary Hearing Transcript
    ( ) Police Report    ( ) Investigator's Report    (✓) Probation Report

Defendant informed rights of withdrawal of plea at time of pronouncement of
judgment/court's right to withdraw its approval of specified judgment. Court
finds defendant represented by capable/experienced counsel; defendant advised of
understands constitutional rights/nature of plea/possible punishment/commitment,
understandingly/voluntarily enters plea, knowingly waives constitutional right t
remain silent, to court/jury trial, to confront witnesses.

( ) Court finds factual basis for plea    ( ) Plea entered pursuant 1192.5 PC
( ) Waives time    (✓) Waives Arbuckle rights    ( ) Waives Harvey rights
Probation hearing/judgment-sentencing set _6-3-87  8:30_, ☒ AM, Courtroom 35
( ) Ordered report Probation Department/keep subsequent appointments
(✓) Ordered to return
( ) Released ( ) Bail ( ) Own Recognizance    (✓) Remanded  (✓) Without bail
✓ _Court reserves finding of a factual basis until the time of_
_sentencing._
_____
_____
_____
_____

RICHARD D. DEAN, County Clerk          By _Martha B⟨_
                                          Deputy County Clerk

CRIMINAL CHANGE OF PLEA MINUTE ORDER

(Rev. 1/83)

DA ☒  D. CSL ☒
PO ☒  OTHER:
SO ☐ _____

MICHAEL D. BRADBURY
District Attorney
800 South Victoria Avenue
Ventura, CA 93009

Telephone (805) 654-2501

Attorney for Plaintiff

# FILED

MAY 05 1987

RICHARD D. DEAN, County Clerk
By *Jarma Fry*
Deputy County Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF VENTURA

THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                        )
                         Plaintiff,     )   COURT NO. *CR 22128*
                                        )
            vs.                         )   FELONY DISPOSITION
                                        )   STATEMENT
*Wayne Stedsen Ross*                    )
                         Defendant.     )
_____)

I.

PLEA

A.    CHANGE OF PLEA

The defendant will plead GUILTY ( X )  NOLO CONTENDERE (   ) to:

*P.C. 187 (first degree murder) and*

*P.C. 459 (1st degree burglary)* and admit _____.

The remaining counts will be dismissed after the defendant is
sentenced.

OTHER CASE DISPOSITIONS:  *none* _____

_____

B.    SUMMARY OF DISTRICT ATTORNEY'S REASON FOR DISMISSAL OR AMENDMENT
      (Deputy District Attorney to initial)

____  The defendant is entering (a plea to the most serious charge, giving)
      (pleas to sufficient counts to give) the court adequate discretion to
      impose an appropriate sentence.

_____  The defendant cannot be (convicted) (sentenced) on the count because i
arises from the same facts as the count(s) to which the defendant has
pleaded.

_____  _____

       _____

       _____

       _____

C.   <u>NOLO CONTENDERE PLEA</u>    (Defendant to initial, if applicable)

_____  I understand that for all purposes, my plea of nolo contendere (no
contest) has the same effect as a guilty plea, constitutes a
conviction, and empowers the Court to sentence me as though I had
pleaded guilty.  It also may be used against me as an admission in a
civil proceeding.

D.   <u>VOLUNTARINESS OF PLEA</u>    (Defendant to initial)

_WR_  I have discussed the facts of the case and all possible defenses
which I might have with my attorney.

_WR_  I am entering this plea freely and voluntarily and not as the result
of any force, pressure, threats or coercion brought against me or
any member of my family; further, no commitments have been made to
me or my attorney other than those appearing on this form.

E.   <u>FACTUAL BASIS FOR PLEA</u>    (Defendant to initial)

_WR_  I agree that the Court may consider the following as proof of the
factual basis for my plea:

   ☒   Preliminary hearing transcript

   [ ]   Police reports

   ☒   Probation report

   [ ]   Welfare investigator's declaration

   [ ]   _____

F.   <u>CONSEQUENCES OF PLEA</u>    (Defendant to initial)

_WR_  My attorney has explained to me the direct and indirect conse-
quences of this plea including the maximum possible sentence.  I
understand that the following consequences could result from my
plea:

_WR_ I could be sentenced to the state prison for a maximum possible term o
__25__ year(s)

____ I could be sentenced to the California Youth Authority for a maximum possible term of ____ year(s).

____ I will be required to register as a sexual offender pursuant to Penal Code § 290.

____ I could be deported, excluded from or denied naturalization if I am not a citizen. (Penal Code § 1016.5.)

____ My driver's license will be suspended or revoked for a period of _____ (§§ 13350, 13351, 13352 of the Vehicle Code).

____ I will not be granted probation, and execution or imposition of sentence will not be suspended (1203.055(c), 1203.06, 1203.65, 1203.066, 1203.07, 1203.075, 1203.08, 1203,085, 1203.09 PC).

____ I will not be granted probation unless the court finds that this is an unusual case where the interests of justice would best be served by granting probation (462, 462.5, 1203(e), 1203.04 PC).

_WR_ After I have served my prison term, I may be subject to a maximum parole period of _life_ ~~years~~ (In re Carabes, 144 Cal. App. 3d 927).

____ I will be required to register as a narcotics offender.

_WR_ I will be ordered to pay a fine of not less than $100 nor more than $10,000 (Gov't. Code § 13967).

_WR_ I may be ordered to pay a restitution fine of $200.00 to $10,000.

G.    WAIVER OF CONSTITUTIONAL RIGHTS    (Defendant to initial)

My attorney has explained to me, and I understand, that this plea will result in my conviction and that I am therefore waiving (giving up) each of the following constitutional rights:

_WR_ 1.  The right to have every charge and allegation against me determined by a jury of 12 persons;

_WR_ 2.  The right to confront and, through my attorney, cross-examine each witness called by the prosecution to prove my guilt;

_WR_ 3.  The right to be represented at all times during a trial by a competent attorney and to have the Court appoint one to represent me at no charge, if I cannot afford one;

_WR_ 4.  The right against self-incrimination which means I would not have to testify at my trial and if I did not, the jury could not consider this as evidence of guilt.

3

II.

A.    DISTRICT ATTORNEY

   THE DISTRICT ATTORNEY'S POSITION ON SENTENCE
   (Deputy District Attorney to initial)

____    Any authorized sentence may be sought.

____    The defendant should be placed on probation and not now be sentenced
        to state prison.  The defendant may, however, at a later time be
        sentenced to state prison if a court finds he has violated a term or
        condition of his/her probation.

____    The defendant will receive credit for time served.

____    _____

        _____

        _____

        _____


SUMMARY OF DISTRICT ATTORNEY'S REASON FOR SENTENCE:
(Deputy District Attorney to initial)

____    The defendant has no prior criminal record.

____    The severity and frequency of the defendant's prior criminal record is
        not serious.

____    The underlying facts of the case are not sufficiently serious to
        require a state prison sentence at this time.

____    _____

        _____

        _____


B.    THE COURT

____    The court makes no commitments; any authorized sentence may be imposed.

        The Court, in this non-Proposition 8 case, over the objection of the
        District Attorney, makes the following statements concerning
        sentencing:   (Judge to initial)

____    The defendant will be placed on probation and not now be sentenced to
        state prison.  If, however, he later violates his probation, he may be
        sent to prison at that time.

____    _____

4

C.  **HARVEY WAIVER**    (Defendant to Initial)

The defendant agrees that all facts and information relating to any and all counts, allegations of prior convictions, and other sentencing enhancement allegations which are dismissed by the Court as part of this disposition may be included in the probation report and considered by the Court in determining sentence.

## III.

### DEFENDANT'S AND DEFENSE ATTORNEY'S POSITION

I have read, discussed with my attorney, and understand the consequences of this plea and waive (give up) the above-mentioned constitutional rights.  I request that the Court accept my new plea.

DATED: _May 1, 1987_    _____
                              (Defendant's signature)

I have explained to the defendant all of his constitutional rights.  I am satisfied he understands them and also understands that by entering this plea he is giving up each of them.  I have discussed the facts of the case and all possible defenses to the charges with the defendant.  I have explained the direct and indirect consequences of this plea to the defendant and am satisfied he understands them.  I am satisfied the defendant is voluntarily and of his own free will seeking to enter this plea.  I request the Court to accept this plea.

DATED: _____    _____
                                 (Defendant's Attorney's Signature)

## IV.

### DISTRICT ATTORNEY'S STATEMENT

With the exception of any commitments made to the defendant by the Court, the District Attorney agrees to the terms of this disposition and requests that the Court accept it and order this statement filed.

                    MICHAEL D. BRADBURY, District Attorney
                    County of Ventura, State of California

DATED: _____    By_____

                    Deputy District Attorney

FINDINGS AND ORDER

The Court finds that:

1.  Defendant and his attorney appeared in open court and the defendant entered his plea(s) and admission(s).

2.  Defendant understands the nature of the charge(s) and the consequences of his plea(s) and admission(s).

3.  Defendant has knowingly, intelligently, and understandingly waived his rights as set forth above.

4.  Defendant's waivers of his rights, and his plea(s) and admission(s), are free and voluntary.

5.  There is a factual basis for the plea.

IT IS ORDERED THAT:

1.  Defendant's plea(s) and admission(s) are accepted.

2.  The clerk file this document and incorporate it in the minutes of this case.

DATED: _____May 5, 1987_____        _____
                                    Judge of the Superior Court

The defendant's plea is accepted conditionally, pursuant to Penal Code section 1192.5, and I have advised the defendant that my approval of this plea is not binding, that at the probation and sentencing hearing I may withdraw my approval, and that if I do so, he may withdraw his plea if he desires to do so.

DATED: _____        _____
                                    Judge of the Superior Court

REV. 5/86

6

# Exhibit
# C

D.A. ☒   D. CSL ☐
PO ☒   OTHER
SO ☒   CAC

SUPERIOR COURT OF CALIFORNIA, COUNTY OF VENTURA

JUDGE: CHARLES R. MCGRATH          DATE JUNE 10, 1987   TIME: 8:30   CASE NO: CR 22128
CLERK: SANDI WRIGHT               BAILIFF: DALE BIRDSONG   CRT. RPTR:   TERI CAIN
DDA: A. STOVITZ                   DEF. CNSL: SUSAN OLSON   DPO: BOB HILL

TITLE OF CASE:
PEOPLE OF THE STATE OF CALIFORNIA          NATURE OF PROCEEDINGS:
              vs.        Plaintiff
                                            STATE PRISON SENTENCE
WAYNE STEDSON ROSS          Defendant

| | |
|---|---|
| Interpreter _____ ( )Stipulated as qualified ( )Sworn ( ) Previously swor | |
| ( ) Public Defender appointed (x) Waives arraignment (x) Indicates no legal cause | |

( x ) Convicted by _plea of guilty, First Degree Murder, 187 PC count 1: First degree burglar_
# 459 PC   count 2.

( x ) Sentenced State Prison on count 1, 25 years to life; Count 2, upper term of 6 years _____ ( ) Declared misdemeanor
     stayed pursuant to 654 PC

( ) Term set of _____ years in state prison if defendant subsequently violates probation
( ) Total fixed term _____ years                    ( ) 1202(b) PC                ( ) 1170 (d) PC
( ) Defendant to be housed at Youth Authority facility pursuant to 1731.5(c) WIC
( ) Imposition of sentence suspended
( ) Probation granted _____ months ( ) Formal     ( ) Execution of sentence suspended
( ) Sentenced to County jail _____              ( ) Conditional   ( ) Attached terms
    ( ) Condition Probation _____ ( ) Execution stayed  ( ) Concurrent  ( ) Consecutive
    ( ) Ordered to voluntarily surrender to Sheriff _____
    ( ) Review set _____ 9 AM, Courtroom 35        ( ) Defendant accepts
( ) Remaining Count(s)/Allegation(s) dismissed/stricken ( )Court waives Work Furlough Criteria
( ) Committed California Youth Authority              ( ) Ordered to return
(x) Credit actual __161__ 4019(b) __80__ State Institution   Total __241__ days  ( ) 1737 WIC
(x) Defendant does not have the financial ability to reimburse County of Ventura/pay for:
( x ) Court appointed counsel  ( ) Probation costs   (x) Pre-sentence Investigation
( ) Defendant has financial ability, ordered to pay for:  Counsel $_____ at $_____ mo.
    ( ) Probation costs $_____ /mo. ( ) Investigation Report $_____ at $_____ mo.
    ( ) 2% Collection Surcharge ( ) through Collections Services beginning
( ) Financial ability hearing ( ) waived ( ) set _____ 9 AM Courtroom 35
( x ) Defendant to pay a restitution fine of $ 10,000  to the State Restitution Fund, 1202.4 PC
    ( ) Restitution fine stayed pending successful completion of probation
( x ) Advised re appeal ( ) Income less than 125% County median ( x) Advised re parole( )Time waived
( ) Probation/Sentencing continued _____
( ) Bench Warrant, bail set $_____ at _____, Courtroom 35 ( ) Ordered present
( ) Bench Warrant recalled/withdrawn _____, issued ( ) Ordered held ( ) No action bail
Company _____
( ) Released ( ) Probation ( ) Bail ( ) Own Recognizance (x) Remanded (x) Without bail
( ) Committed Diagnostic Facility, 90 days, 1203.03 PC, to be automatically returned by
    Sheriff upon notice by Director of Corrections
( ) Criminal proceedings suspended, civil proceedings instituted
( ) Doctor(s) _____
    ( ) 288.1 PC  ( ) 3050/3051 WIC  ( ) Hearing set _____ appointed
( ) Ordered report to/make/keep appointment(s)  ( ) Doctor(s)  _____, 9 AM, Courtroom 35
( ) Original/one copy of plea transcript ordered: Reporter  ( ) Probation Department
(x) Sheriff ordered to transport defendant to  Men's Institution, Chino  Date _____

RICHARD D. DEAN, County Clerk
(Rev. 4-84)                    By: _____
                                      Deputy County Clerk
              CRIMINAL PROBATION/SENTENCE MINUTE ORDER

COPY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF VENTURA


COURTROOM 35                    HON. CHARLES R. McGRATH, JUDGE


THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                       )
                        Plaintiff,     )
                                       )
        vs.                            )    No. CR 22128
                                       )
WAYNE STEDSON ROSS,                    )
                                       )
                        Defendant.     )
                                       )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Wednesday, June 10, 1987


APPEARANCES:

    For the People:              MICHAEL D. BRADBURY
                                 District Attorney
                                 By:  AARON STOVITZ
                                 Deputy District Attorney
                                 800 South Victoria Avenue
                                 Ventura, California  93009


    For the Defendant:          KENNETH I. CLAYMAN
                                 Public Defender
                                 BY:  SUSAN OLSON
                                 Deputy Public Defender
                                 800 South Victoria Avenue
                                 Ventura, California  93009




                                 TERI T. CAIN, CSR 4062
                                 Official Reporter
                                 800 South Victoria Avenue
                                 Ventura, California  93009

1

VENTURA, CALIFORNIA; WEDNESDAY, JUNE 10, 1987

--oo0oo--

MR. INMAN:  No. 16, your Honor.  Wayne Ross.  Mr.
Stovitz for the people.

MS. OLSON:  May Mr. Ross join me at counsel table?

THE COURT:  Yes, that would be fine.

Mr. Ross's case is here for probation and
sentence hearing.  Continued hearing.  The court has read
the probation officer's report and recommendation to the
court in this matter.  I now order the report filed.

I see a memorandum dated today that wasn't
in the file when I went through the file yesterday.  Give
me just a minute.

(Pause.)

Okay.  It's a recomputation of presentence
credits and also a letter from Mrs. Bush.

(Pause.)

Okay.  I've read the letter.  The memorandum
that was attached is ordered filed, also.

Do you wish to be heard now?

MS. OLSON:  Yes, I do, your Honor, just briefly.

MR. STOVITZ:  Counsel is also going to ask the
court for permission to allow the defendant's -- the
victims, Mr. Sanchez's two daughters, to address the
court.  Would you want to us reserve our remarks until
after they speak?

1              MS. OLSON:   Yes.   Thank you.

2              MR. STOVITZ:   Mrs. Brooks?   Caryl?

3              MS. BROOKS:   Your Honor?

4              MR. STOVITZ:   May she stand there, your Honor?

5              THE COURT:   That's fine.

6              MS. BROOKS:   My father was needlessly bludgeoned

7    to death.  The anguish that we have lived with this past

8    six months -- I cannot begin to share his loss -- has

9    meant something different for each member of our close

10   family.

11              I lost a very constant companion, because

12   not only was he a member of our household, he lived with

13   us for 14 years ever since my mother died, but he and I

14   shared a tax business.

15              He vacationed with us.  He attended our

16   children's functions and sports activities almost weekly.

17   He attended mass with us and was a very integral part of

18   our family, our daily lives.

19              It is inconceivable that his killer has

20   ripped away from existence and then tried to destroy his

21   good name and character.  He was loved by many who would

22   attest to this and to all his fine and many charitable

23   qualities.

24              I realize now that his ugly and vicious

25   death is a reality, which will be with us every single

26   waking day of our lives.  This pain I wish on no other

27   man.  Thank you.

28              MR. STOVITZ:   Your Honor, with the court's

1    permission, Denise Lemieux, the other daughter, would

2    like to address the court as well.

3            THE COURT:  Fine.

4            MR. STOVITZ:  Miss Lemieux.

5            MS. LEMIEUX:  Your Honor, almost six months ago my

6    father, Ernest Sanchez, was a victim of a brutal murder.

7    We as a family are also victims.  Someone we loved and

8    admired has been taken from us.

9                    We were robbed of the opportunity to say our

10   good-byes.  God knows, we got no need for good-byes for

11   sometime to come at this time of year when we were

12   rejoicing in the wonderful things of our lives.

13                   We are hurting knowing if my dad had been

14   here last week, his first born grandchild graduated from

15   California university.  His other granddaughter has

16   graduated from San Buenaventure high.

17                   These family occasions are especially

18   difficult.  Not only do we feel a loss since he was so

19   much a part of our family lives and activities, we must

20   live with the horror, cruelty and pain, knowing how much

21   he suffered.  The pain will not lessen until we have an

22   opportunity to put this behind.

23                   Therefore, I ask there be no more delays and

24   the maximum sentence should begin today and carried out

25   as soon as possible.  Thank you.

26           MR. STOVITZ:  We have no other evidence, your

27   Honor.

28           THE COURT:  All right.  I'll hear counsel's

4

1    remarks now.

2         MS. OLSON:  Thank you.  As the court is aware, I'm

3    sure was aware of today, this is very sad case for

4    everyone.  I am totally convinced from everything I know

5    about Mr. Ross and the events of the day in question that

6    he did not set out on that day with the intention of

7    killing anyone, much less Ernie Sanchez, who had been a

8    friend of his for many years.

9              Whether it was because of some drug

10   involvement, whether it was because of fight that ensued

11   after his entry into the house, what happened that

12   evening not only brought a great deal of sadness and

13   grief and pain to the family of Ernie Sanchez, but also

14   brought pain to Mr. Ross's family.

15             They have lost for some time to come the

16   loving son and a loving brother.  Society of course has

17   lost Mr. Ross and his productive life up to age 28, in

18   spite of handicaps and the hardships he suffered as a

19   youth.

20             I don't see any alternative to the sentence

21   that is recommended in the probation report, but I felt

22   that I needed to make some statements as far as Mr. Ross

23   is concerned.

24             I would also like to make the court aware of

25   an incident that happened last week when this matter was

26   continued, that is, a member of Mr. Sanchez's family

27   confronted Mr. Ross's mother in a very abusive way.  She

28   is an ill woman as well and has lost her son for some

1    years to come.  I hope there will not be a recitation of
2    that behavior.  Thank you.
3         THE COURT:  People wish to be heard?
4         MR. STOVITZ:  The only thing I'd like to say, your
5    Honor, this event happened not because the defendant
6    wanted to wish Mr. Sanchez a happy new year; and I only
7    hope that for the next 25 years and for the rest of his
8    life, every time somebody says, "Happy new year to you,
9    Wayne Ross," you'll remember this day that he moved his
10   finger against a person who respected him, who enjoyed
11   his company and thought he was his friend.
12        THE COURT:  There is a legal issue that I suppose
13   counsel are submitting because they didn't mention it to
14   me, and that is the 654 constraint on the burglary
15   charges.
16        MR. STOVITZ:  I believe, your Honor, that that is
17   the essence of the first degree murder, and therefore 654
18   would apply.
19        THE COURT:  Defendant waive formal arraignment for
20   judgment?
21        MS. OLSON:  Yes.  No legal cause.
22        THE COURT:  All right.  The defendant has been
23   convicted of murder in the first degree, and the sentence
24   for that charge, that's 187 of the penal code, is a
25   sentence of 25 years to life.  The court imposes that
26   sentence for that count.
27             The defendant also has been charged with and
28   convicted of a violation of burglary in the first degree,

6

1    459 of the penal code.  The sentence choices for that

2    offense are two years, four years and six years in the

3    state prison.

4            In connection with that charge, the court

5    select the following circumstances as circumstances in

6    aggravation:

7            First, the crime with which it's connected

8    involved great violence great bodily harm, as a matter of

9    fact, death of the victim;

10            A high degree of callousness and cruelty,

11    which are evidenced by the extraordinary number of wounds

12    to the victim;

13            The defendant used a lethal weapon, a pair

14    of scissors, when he committed the crime.  That was not

15    charged as an enhancement;

16            The court finds the victim was vulnerable

17    and he was 73 years of age and lived alone and suffered

18    from a heart condition;

19            The circumstances surrounding the offense

20    indicate that the burglary was planned and premeditated

21    and motivated by the defendant's narcotic usage;

22            The victim had been a long time friend of

23    the defendant, confidant and benefactor, and it would

24    appear that defendant violated a position of trust when

25    he committed the offense;

26            And the circumstances of the offense

27    indicate that the defendant, because of his callousness,

28    cruelty and viciousness, is a serious danger to society;

1           And the court notes the defendant was on a

2    grant of conditional release from the municipal court at

3    the time these offenses were committed.

4           In mitigation, the defendant's prior record

5    is insignificant; mainly, traffic matters and and a child

6    support conviction;

7           Although the defendant denies it, it appears

8    that cocaine abuse was the motivating factor for the

9    crime, which is a circumstance in mitigation;

10          And finally, the defendant entered a plea at

11   a early stage, thus avoiding a trial and the trauma and

12   expense involved in a trial in this matter.

13          Court finds, however, that the circumstances

14   in aggravation outweigh those in mitigation as to the

15   burglary charge and does order the defendant serve the

16   aggravated term of six years in the state prison for 459

17   allegation, which is count 2.

18          Pursuant to 654 of the penal code and

19   because the burglary charge was transactionally related

20   to and connected to, independent of the murder charge,

21   the more serious charge, the court orders the sentence

22   for the burglary charge stayed pending completion of the

23   sentence, indeterminate term of 25 years to life, and

24   will be stayed permanently after the service of that

25   term.

26          The court also orders imposed a restitution

27   fine of $10,000 to the state restitution fund.

28          Mr. Ross, you're entitled to presentence

8

1    credits in this case for time you have served in custody

2    through yesterday.  I have computed that at 161 days

3    actual time, and you have earned an additional 80 days

4    good time, work time.  Total presentence credits amount

5    to 241 days.

6              The court finds that you don't have the

7    ability to reimburse the county for the probation

8    investigation and report nor the cost of your court-

9    appointed counsel.

10             It's my obligation now, Mr. Ross, to advise

11   you of your appeal rights and also your parole rights and

12   responsibilities.  Once you've -- well, if you wish to

13   appeal from either your conviction, which occurred when

14   you entered your plea before Judge Peck approximately six

15   weeks ago, or if you wish to appeal from the sentence

16   that is imposed -- be imposed on you by me today, you

17   must file a written notice of appeal and file it with

18   this court no later than 60 days from today's state

19   stating the grounds.

20             If you do appeal, you have the right to have

21   an attorney represent you at no cost.  If you can't

22   afford to pay for one and if you appeal, you have a right

23   to have a transcript prepared and also at no cost if you

24   can't afford to pay for a transcript.

25             Those are your appeal rights, sir.  Do you

26   understand all that?

27        THE DEFENDANT:  Yes.

28        THE COURT:  Once you've served the sentence the

1   court has imposed, you will be released or could be

2   released on parole subject to the discretion of the

3   parole authorities.

4              If you're granted parole for this offense,

5   parole will be for life.  If you should violate a term or

6   condition of parole, you'd been re-imprisoned for up to

7   one year for any single violation.  Do you understand

8   that?

9        THE DEFENDANT:  Yeah.

10        THE COURT:  Anything further today?

11        MS. OLSON:  No.

12        THE COURT:  Court orders you remanded to the

13   custody of the sheriff for transportation to the

14   Department of Corrections.

15

16

17

18                        --oo0oo--

19

20

21

22

23

24

25

26

27

28

REPORTER'S CERTIFICATE


STATE OF CALIFORNIA   )

COUNTY OF VENTURA      )


      I, TERI T. CAIN, CSR 4062, Official Reporter of the Superior Court of the State of California, for the County of Ventura, do hereby certify that the foregoing pages comprise a full, true and correct transcript of the proceedings had in the above-entitled action on the 10th day of June, 1987.

      Dated at Ventura, California, this 4th day of September, 1990.


_____
TERI T. CAIN, CSR 4062
Official Reporter

# In the Superior Court of the State of California

in and for the County of _____VENTURA_____

## Abstract of Judgment

### Commitment to State Prison

Dept. No. ......35............... Case No. ......CR..22128...

Present:

The People of the State of California

Hon. ......CHARLES R. MCGRATH......
Judge of the Superior Court

vs.

......AARON STOVITZ......
Prosecuting Attorney

WAYNE STEDSON ROSS

SUSAN OLOSN
Counsel for Defendant

Defendant.

This certifies that on the ...10..th.. day of ......June......, 19 .87., judgment of conviction of the above-named defendant was entered as follows:

(1) In Case No. .CR..22128... Count No. ..1...... he was convicted by ....court.........; on his plea of .....guilty.........
(court or jury)

(guilty, not guilty, former conviction or acquittal, once in jeopardy, not guilty by reason of insanity)

of the crime of ......................murder.in.the.first.degree..........................

(designation of crime and degree if any, including fact that it constitutes a second subsequent conviction of same offense if that affects the sentence.)

in violation of ..........187 PC..........

(reference to Code or Statute, including Section and Subsection thereof, if any violated)

with prior felony convictions as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|------|------------------|-------|-------------|
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |

Defendant has been held in jail custody for ...... 161 ........... days as a result of the same criminal act or acts for which he has been convicted.

Defendant ...was not... armed with a deadly weapon at the time of his commission of the offense or a concealed deadly weap-
(was or was not)

on at the time of his arrest within the meaning of Sections 969c and 3024 of the Penal Code.

Defendant ..was..not. armed with a deadly weapon at the time of his commission of the offense within the meaning of Sec-
(was or was not)

(2) Defendant was not adjudged an habitual criminal within the meaning of Subdivision ........ of Section 644 of the Penal
(was or was not)                                                                        (a or b)

Code; and the defendant ......is not an habitual criminal in accordance with Subdivision (c) of that Section.
(is or is not)

(3) IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by imprisonment in
the State Prison of the State of California for the term provided by law, and that he be remanded to the Sheriff of the County
of ...VENTURA............................ and by him delivered to the Director of Corrections of the State of California at ..........

...CHINO...........................................................................................................................................

It is ordered that sentences shall be served in respect to one another as follows (concurrently or consecutively as to each count):

....Count 2, upper term of 6 years  stayed pursuant to 654PC.............................................

........................................................................................................................................

........................................................................................................................... ,

and in respect to any prior incompleted sentence(s) as follows (concurrently or consecutively as to all incomplete sentences
from other jurisdictions):

........................................................................................................................................

(4) To the Sheriff of the County of ............VENTURA............ and to the Director of Corrections at the ......MEN'S.........

...INSTITUTION, CHINO............................................................................................... ,

pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the

custody of the Director of Corrections at ........CHINO..................................................................

California, at your earliest convenience.

Witness my hand and seal of said court

this ......16th............. day of .....June..................... 1987.......................................... ,

....................RICHARD. D. DEAN........................................................... Clerk,

by ..............SANDI WRIGHT..................................................... Deputy

State of California,
                                                } ss.
County of ..........VENTURA. ................

I do hereby certify the foregoing to be a true and correct abstract of judgment duly
made and entered on the minutes of the Superior Court in the above entitled action as
provided by Penal Code Section 1213.

Attest my hand and seal of the said Superior Court this .16. day of .....June............ ,
19..87.

........RICHARD. D. DEAN............................................................................................
County Clerk and Ex-Officio Clerk of the Superior Court of California in and for the County of ...
............VENTURA....... ... .............................

The Honorable ........ CHARLES. R. MCGRATH....................................................... ,

Judge of the Superior Court of the State of California, in and for the County of ........

....VENTURA....................................................

# Exhibit
# D

INSTITUTIONAL STAFF RECOMMENDATION SUMMARY

SOURCES OF REPORT:  Probation officer's report dated 6/3/87, CLETS printout dated 6/25/87, and personal interview on 7/6/87.

CONFIDENTIAL INFORMATION:  None noted as of 7/6/87.

HOLDS/DETAINERS:  None noted as of 7/6/87.

MEDICAL/DENTAL:  Full duty and no camp due to bronchial asthma; dental class #2.

PSYCHIATRIC/PSYCHOLOGICAL:  Referral indicated due to nature of offense.

7/9/87                    Leisla M. Howell, Senior Psychologist

WORK SKILLS:  Subject reports a three year period of employment as a computer operator, and relates a considering length of time as a shipping and receiving clerk.

NARCOTICS/DRUGS/ALCOHOL:  Ross denies illicit drug usage; however, the POR reflects subject's prior usage of cocaine and PCP.

ESCAPE HISTORY:  None noted as of 7/6/87.

ARSON HISTORY:  None noted as of 7/6/87.

SEX RELATED OFFENSES:  None noted as of 7/6/87.

ACADEMIC/VOCATIONAL:  Test scores indicate Ross has a reading and arithmetic average of 4.1, and AGCT equivalent IQ score of 88.

CASEWORK FOLLOW-UP:  Review CII, FBI and any law enforcement data for update of criminal history.

EVALUATION:  Ross is a twenty-eight year old first termer, received from Ventura County and committed to the California Department of Corrections following conviction for Murder First with a total term of twenty-five years to life.  He has a prior criminal history primarily inclusive of vehicle code violations and probation violations.

In interview, subject was cooperative and quite responsive.  He acknowledges partial culpability in the instant offense in that, he claims his actions were stimulated due to defending his well being.  He claims no gang affiliations or enemy concerns in CDC.  Currently, he reports a desire to work and to attain a vocational skills which will assist him on his return to the community.

This inmate impressed as an inadequate, irresponsible, immature, untruthful individual who committed the present offense without considering the seriousness of his behavior or the impact on his actions on the life of

ROSS        D-59353        RCC/CIM        jd        7/9/87

another. He harbors little regard for the laws governing society and at present, he is thought to be poorly motivated toward change. His behavior depicts an inability to accept responsibility and a reluctancy to initiate a positive change to his life.

Since arrival at Reception Center Central, he has remained disciplinary free and appears capable of functioning in a mainline setting. Based on observations and opinions, it is anticipated this individual will not pose a custodial concern for staff in the future.

RE-ENTRY PLANS:  Not applicable.

TRANSFER

CLASSIFICATION SCORE:   104                    CUSTODY LEVEL:   IV

INSTITUTION RECOMMENDATION:  CCI-IV, as an alternate, San Quentin.

REASON FOR OUT OF CLASS RECOMMENDATION:

CORRECTIONAL COUNSELOR:  L. Sostand, CC I, 7/6/87

SUPERVISOR'S RECOMMENDATION:  Folsom.  812 clear.  Full duty, no camp.  First exposure to incarceration.


7-9-87          J. Dovey, CCII              aam          7-10-87

INITIAL PSYCHOLOGICAL SCREENING

TESTS ADMINISTERED:     California Achievement Test, Army General
                        Classification Test, Minnesota Multiphasic
                        Personality Inventory, Sentence Completion,
                        Draw-A-Person, Who-Are-You, Personal
                        Information.

INTELLECTUAL
CLASSIFICATION:         Dull Normal


                        Leisla M. Howell, Senior Psychologist
                        Licensed Psychologist No.:  PA 000183




A Battery




ROSS        D-59353           RCC/CIM          jd        7/9/87

# Exhibit E

# LIFE PRISONER EVALUATION REPORT
## INITIAL PAROLE CONSIDERATION HEARING
### NOVEMBER 2002 CALENDAR

**ROSS, WAYNE**                                           **D59353**

I.  **COMMITMENT FACTORS:**

A.  **Life Crime:** Murder 1st, PC 187, Ventura County case number CR22128. Sentence: 25 years to Life. MEPD: 12/1/03. Victim: Ernest Sanchez, age 73.

1.  **Summary of Crime:** On 12/31/86, at approximately 0930 hrs., businessman Ray Tejada arrived at victim Ernest Sanchez' residence to check on tax documents that the victim had been preparing on his behalf. Upon arrival, Tejada noticed the front door open and unlocked and a bathroom window was broken. Tejada entered the residence and repeatedly called the victim's name to no avail. Tejada observed that the lights were on and saw a television set sitting on the kitchen floor. Tejada went through the house and saw that the bedroom was empty. He later entered the lounge/office area from where the victim normally conducted his tax accounting business. It was there that he discovered the 73-year-old victim lying on his side, fully clothed, in an apparently injured condition. Tejada immediately retreated from the house and went to the bank, cashed a check, then went home and called the police and advised them of his client's discovery. At approximately 1100 hr., Oxnard Police, fire, and emergency medical personnel arrived at the victim's residence and located him lying in a pool of blood. His vital signs were checked and he was determined to be dead. During the investigation, a set of identifiable fingerprints were lifted from the inside sill of the broken bathroom window which were later found to match those fingerprints belonging to Wayne Ross. Also found in the office/lounge area were a pair of scissors imbedded in the baseboard. The room itself had splatters blood and the furniture was in disarray as though there had been a struggle. There were shoe prints in the bloodstains on the kitchen tile flooring. The telephone was found with the receiver off the hook dangling onto the floor. Because Ross was a primary suspect in a previous December 16, 1986, theft of the deceased victim's wallet., Oxnard Police investigators contacted him at his residence and brought him to the Oxnard Police Department for questioning. Ross denied involvement in the murder and instead maintained that he had been with his brother Melvin Webster and friend Crawford McCauley the evening that the victim had

INMATE COPY

been murdered. Ross also indicated that the and the murder victim were good friends and that on occasion, because the victim was still sexually active, he would provide him with females. He also stated that the victim was in good shape and very strong; that they would box with each other. Police investigators interviewed McCauley and Webster who both confirmed that the three were together during the previous evening. While at Ross' residence, investigators checked all his tennis shoes in an attempt to match the shoe prints found on the victim's kitchen floor. Police investigators were left with the impression that Ross was a witness and that he was not a suspect. Later, investigators were notified that Ross' fingerprints matched those lifted off the windowsill. Ross was again brought to the police station and Mirandized. Ross waived his rights per Miranda and submitted to a polygraph test and a second interview. Ross subsequently confessed to inflicting blows on the victim with a pair of scissors in self-defense. He claimed that he did not intend to kill the victim and that when he left, he thought the victim was alive. On 12/31/86 at approximately 9:25 p.m., Ross was re-interviewed by Detectives Tatum and Garcia regarding the homicide. He claimed to have killed the victim in self-defense that the victim had initiated the attack by striking him several times in the face. He also claimed that the victim struck him with the stapler. He stated that the victim purported grabbed a pair of scissors off the desk and began stabbing at Ross. Ross claimed to have gotten the scissors away from the victim, then started hitting the victim back with the scissors, making contact with him three or four times. Ross told detectives that he had lied because he was afraid. He claimed that he dumped his bloody clothing near K-Mart, then later changed his story and stated that he dumped the clothes in the area of Channel Islands Boulevard and Bard Road, and that he had taken his shoes to McCauley's hotel room where he had tried to wash off the blood. He also indicated that they (McCauley and his brother) had gone to the area of Terrace Avenue and purchased cocaine but had not used any prior to the altercation.

At the conclusion of the interview, Ross was transported to St. John's Hospital where a blood sample was drawn. He was also examined for his injuries. It was noted that he had a number of small lacerations on the fingertips of his left hand. He was then placed under arrest for Murder, PC 187. On January 1, 1987, Dr. Ronald O'Halloran performed an autopsy on the victim. The victim had approximately eight wounds to the chest area; none punctured the victim's lungs/chest cavity. The victim's body also had approximately 26 to 28 puncture wounds to the face, neck, and head area. Many of the head wounds penetrated the scalp and appeared to have gouged the victim's skull. A majority of the wounds were concentrated on the victim's right cheek and temple area. No visible defensive wounds were found on the victim's hands. Cause of death was determined to be

myocardioischemia due to blood loss from the multiple stab wounds; that the contributing factors were sclerotic heart disease and coronary thrombosis. Also Dr. O'Halloran noted that all the wounds had been inflicted while the victim was still alive, that the wounds caused bleeding but not death itself. (Source document: POR, pgs. 6-14).

2.    **Prisoner's Version:** Ross was interviewed and made the following statement regarding the crime. He indicated that he and the victim were close, having met while working at Vitro Corporation. Upon being laid off, Ross began seeking employment but was unsuccessful. During this period of time, he periodically did the victim's yardwork. He stated that he began hanging out on the streets and being aimless. Ross stated that he and the victim had become drinking buddies and that on the night of the offense, had been drinking together. Because he had been able to get girls for sexual favors for the victim in the past, Ross claimed that that night the victim was demanding that he do this for him again. He made several phone calls and was unable to convince anyone to come over. It was at that time that Ross claims the victim called him the "n" word. He stated that the victim said to him, "Man, you got to come up with it, nigger." Ross stated that he began fighting him and that "all hell broke loose." Ross stated that he recalled having something in his hand and began hitting him. Ross stated that at one point the victim struck him with a telephone receiver. Ross stated that although he may have appeared not to have any remorse, he did have remorse; that in his heart he is remorseful. Ross seemed to have difficulty at times articulating his feelings but wanted this writer to know that he felt terrible for what he did. He also stated that when he left, he had no idea that the victim was going to die.

B.    **Aggravating/Mitigating Circumstances:**

1.    **Aggravating Factors:**

a.    Victim was particularly vulnerable due to his age (73 years old) and poor health (heart condition).

b.    Inmate had a position of trust with the victim as a longtime friend.

c.    Inmate had opportunity to cease but continued with the crime.

d.    Murder was senseless and served no purpose in completing the crime.

e.    Use of weapon (scissors).

     **f.** Nature of crime exhibited viciousness, cruelty, or callousness as evidenced by the 26 to 28 stab wounds suffered by the victim.

    **2.** **Mitigating Factors:** Minimal arrest history.

## II. PRECONVICTION FACTORS:

**A.** **Juvenile Record:** None noted.

**B.** **Adult Convictions:** On 10/28/84, Ross was arrested by Oxnard Police for H & S 11550(B) Under the Influence of Controlled Substance. On 10/31/84, he was referred to drug diversion per PC 1000.

On 9/30/86, he was charged with PC 166.4 Disobey Court Order/Process.

On 1/1/87, he was arrested by Oxnard Police Department for PC 187 Murder, and PC 459 Burglary First Degree.

On 6/18/87 he was sentenced to 25 years to Life for his Murder conviction.

On 3/15/88, while incarcerated at Folsom State Prison, he was arrested for PC 4502 Prisoner in Possession of a Weapon. On 3/24/88, the District Attorney declined to file.

**C.** **Personal Factors:** Ross was born on 9/12/58 in Ventura, California, to Palmer Stedson Ross and Johnny Neal. He was the fifth of six children, two brothers and three sisters.

He attended local schools, dropping out of Oxnard High School during his second semester of his senior year. He later enrolled in Oxnard College where he completed Bowling, Black Experience of Fine Arts, and Welding. He attended three semesters, then dropped out.

According to the POR, the inmate indicated that he drank alcohol moderately and on a social basis. He admitted to using marijuana and rock cocaine on a recreational but not regular basis.

Ross stated that prior to the commitment offense, he worked for a microscopic electronic assembly plant called Vitro Corporation. It was there that Ross became acquainted with the victim. He indicated that they became the best of friends. Ross stated that he began working at Vitro in late 1983 and was subsequently laid off in 1986. He began seeking employment but was unsuccessful. Because he had worked since high school, Ross felt very depressed about his unemployment

status. He borrowed money from the victim on more than one occasion. They were friends prior to Ross' lay off and became closer after the lay off incident. Ross advised that he and the victim periodically got together and drank alcohol together. He stated that on occasion, he would "get" a girl to come over to the victim's residence to provide sexual favors. On the evening of the homicide, Ross stated that the victim was pressuring him for "a girl" and that he was unable to come through for the victim.

### III. POSTCONVICTION FACTORS:

A. **Special Accommodations/Disability:** None.

B. **Custody History:** Since Ross' Documentation Hearing in June 1999, he remained housed at CMC-East. On 8/18/99, he was transferred to CTF II after being referred to CSR for transfer review. He was housed at CTF Central Facility where he remains to date in the general population.

C. **Work, Education, Vocation, Therapy & Self-Help Activities:** Ross was assigned to PIA Shirt Factory per CDC 262 and per CDC 128G's dated 6/29/99 and 7/7/99. No work supervisor's reports were found in the Central File. He was assigned to F-Wing Porter at CTF Central Facility. He was unassigned on 8/12/00 A1A to A2B due to receiving a serious CDC 115. He has been unassigned since. While incarcerated at CMC East, he participated in Narcotics Anonymous on a regular basis per CDC 128B dated 3/4/99. There are no CDC 128B's indicating any further participation in self-help groups. There is a laudatory chrono dated 7/1/02 authored by D. Crowther, Academic Teacher (GED) for Ross' continued participation in the daily distribution and monitoring of student materials in the GED program. He is praised about his voluntary assistance in this program.

D. **Disciplinary History:** Ross received a serious CDC 115 for Participating in a Work Stoppage on 7/26/00 and on 10/24/01 for Mutual Combat without Serious Injury. Relative to the Work Stoppage CDC 115, Ross was given a direct order to assist with the feeding of F-Wing during a lock down. Ross refused to exit his cell. The Mutual Combat CDC 115 involved Ross and his cell partner Inmate Walker getting involved in a fistfight.

### IV. FUTURE PLANS:

A. **Residence:** In the event the inmate is given a release date, Ross plans to reside with either his sister June (and husband Jack) Underwood at 7734 Lamancha Way, Sacramento, CA 95823; phone number (916) 399-5782. He advised that

they own a personal business doing janitorial services and that he would be able to work for them. His other option is to reside with his sister Evelyn Allison at 10207 Weston Hill Drive, San Diego, CA; phone number (619) 578-8799.

**B.**     **Employment:** Ross believes that he would be able to obtain employment as a shipping clerk or in machine shop trade, having completed Vocational Machine Shop trade.

## V.     USINS STATUS: N/A

## VI.    SUMMARY:

**A.**     Considering the commitment offense, prior record and prison adjustment, this writer believes that the prisoner would pose an unpredictable degree of threat to the public if released at this time. Ross has had difficulties remaining disciplinary free. Although he has parole plans, he also needs to develop a stronger employment base.

**B.**     Prior to release the prisoner could benefit from upgrading vocationally, becoming and remaining disciplinary free, and participating in self-help groups such as AA.

**C.**     This Board Report is based upon a one and half-hour interview with the inmate, a thorough review of the Central File, and incidental contact with the inmate.

**D.**     Ross was afforded an opportunity to examine his Central File on 8/23/02. He declined the Olson Review per CDC 128B dated 8/23/02.

**E.**     No accommodation for the purposes of effective communication was required per the Armstrong Remedial Plan (ARP).

_____
M.Y. Cross
Correctional Counselor I


_____
L. Gibbs
Correctional Counselor II(A)


_____
I. Guerra
Facility Captain


_____
D.S. Levorse
Classification and Parole Representative

BOARD OF PRISON TERMS                                          STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 3/99 to 6/00 | | | **PLACEMENT:** Remained housed at CMC-E in the general population. On 8/18/99 he was transferred to CTF II and housed at Central Facility.<br>**CUSTODY:**  Medium A custody is appropriate at both CMC-E and CTF Soledad.<br>**CLASSIFICATION SCORE:**  Classification score adjusted to 13 on 6/29/99 at Annual Review.  Referred to CSR for TX review, RX CTF II/FSP II.<br>**ACADEMIC:**  None.<br>**WORK:**  Assigned to PIA Shirt Factory per CDC 262 and per CDC 128G's dated 6/29/99 and 7/7/99, no work supervisor reports were located iln the Central File.<br>**VOCATION:** None.<br>**GROUP ACTIVITIES:**  Per CDC 128B chrono dated 3/4/99, Ross attended and was active member of Narcotics Anonymous.<br>**PSYCH TREATMENT:**  None noted.<br>**PRISON BEHAVIOR:**  Ross did not incur any CDC 115's this period or CDC 128A chronos. |

CCTI(A)    4    M. Y. Cross          DATE  9/23/02

ROSS, WAYNE          D59353          CTF          NOV/2002

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 6/00 to 6/01 | | | **PLACEMENT:** Remained housed at CTF Soledad Central Facility.<br>**CUSTODY:** Medium A custody remained appropriate.<br>**CLASSIFICATION SCORE:** Classification score was adjusted to 15 reflecting one disciplinary free period and one period of full time job assignment.<br>**ACADEMIC:** None noted.<br>**WORK:** Ross was assigned to F-Wing Porter and was unassigned on 8/2/00, A1A to A2B due to a serious CDC 115.<br>**VOCATION:** None noted.<br>**GROUP ACTIVITIES:** None noted.<br>**PSYCH TREATMENT:** None noted.<br>**PRISON BEHAVIOR:** Received a serious CDC 115 for Participating in Work Stoppage. He was found guilty of a Division F and assessed 30 days LOC. |

ORDER:

☐ BPT date advanced by          months.          ☐ BPT date affirmed without change.
☐ PBR date advanced by          months.          ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

ROSS, WAYNE                    D59353                    CTF                    NOV/2002

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                              Page _2_

BOARD OF PRISON TERMS                                                                                                          STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
| YEAR | BPT | PBR | REASONS |
|---|---|---|---|
| 6/01 to 8/02 | | | **PLACEMENT**:  Remained at CTF Central Facility in general population.<br>**CUSTODY**:  Medium A remained appropriate.<br>**CLASSIFICATION SCORE**:  Classification score adjusted to 15 at his Annual Review on 7/11/02-one period of no serious CDC 115.<br>**ACADEMIC**:  None noted.<br>**WORK**:  None noted.<br>**VOCATION**: None noted.<br>**GROUP ACTIVITIES**:  None noted.<br>**PSYCH TREATMENT**:  Nonen noted.<br>**PRISON BEHAVIOR**:  Ross received another serious CDC 115 on 10/24/01 for Mutual Combat with Inmate Walker without Serious Injury.  Ross was found guilty and assessed 61 days LOC. |

ORDER:

☐  BPT date advanced by          months.                     ☐   BPT date affirmed without change.
☐  PBR date advanced by          months.                     ☐   PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐  Previously imposed  conditions affirmed.
☐  Add or modify

☐  Schedule for Progress Hearing on appropriate institutional calendar

ROSS, WAYNE                    D59353                         CTF                              NOV/2002


BOARD OF PRISON TERMS                                                                                                          STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                              Page _3_

**LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
NOVEMBER 2005 CALENDAR**

**ROSS, WAYNE STEDSON**                                                    **D59353**

I.    **COMMITMENT FACTORS:**

A.    **Life Crime:**  All relevant documents from the previous hearings including the transcripts, have been considered and that information appears valid, and the writer has no further information to add.

1.    **Summary of Crime:** Remains the same as stated in the previous hearings.

2.    **Prisoner's Version:** Remains the same as stated in the previous hearings.

3.    **Aggravating/Mitigating Circumstances:**

a.    **Aggravating Factors:**
- ❖ Victim was particularly vulnerable due to his age (73 years old) and in poor health (heart condition).
- ❖ The inmate had a special relationship of confidence and trust with the victim as a long time friend.
- ❖ During the commission of the crime, the prisoner had a clear opportunity to cease but instead continued.
- ❖ The prisoner used a lethal weapon, a pair of scissors, when he committed the crime
- ❖ The prisoner was on a grant of conditional release stemming from a child support order violation when he committed the instant offense.

b.    **Mitigating Factors:**
- ❖ The prisoner's prior record is insignificant, mainly, traffic matters and a child support conviction.

B.    **Multiple Crime(s):** N/A.

1.    **Summary of Crime:** N/A.

**Inmate Copy**

Sent to Inmate on _12/02/05_

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
NOVEMBER 2005 CALENDAR

    2.   **Prisoner's Version:** N/A.

**II.**   **PRECONVICTION FACTORS:**

    A.   **Juvenile Record:** Documents from the previous hearings have been considered and that information remains valid.

    B.   **Adult Convictions and Arrests:** Documents from the previous hearings have been considered and that information remains valid.

    C.   **Personal Factors:** Documents from the previous hearings have been considered and that information remains valid.

**III.**   **POSTCONVICTION FACTORS:**

    A.   **Special Programming/Accommodations:** None.

    B.   **Custody History:** Received at RCC-CIM on 6/18/87 for initial processing. Placed at Folsom State Prison on 7/13/87 under Close A Custody for Level IV placement in the general population. On 3/22/88, the prisoner appeared before ICC due to receiving a CDC 115 for Possession of an Inmate Manufactured Weapon. His custody was established at Max A and based on the pending CDC 115 for a MERD offense he would be retained at Ad Seg status pending adjudication of the disciplinary. On 5/10/88, ICC elected to set a SHU term of 10 months, due to the guilty finding by the disciplinary disposition and the prisoner was assessed 190 days loss of behavioral credits for Possession of an inmate Manufactured Weapon. On 10/6/88, ICC elected to release the prisoner to the general population effective 10/30/88 as the result of a 10 month SHU term that was scheduled to expire on 10/30/88. On 11/8/88, UCC elected to establish Close A custody, remove the prisoner from orientation status and placed him on the support services waiting list. Committee made note that the prisoner's 10 month SHU term expired on 10/30/88. He was assigned to the education program on 8/10/89 and received satisfactory grades. However, per a 128E- Education Progress Report dated 9/28/90, the prisoner had difficulty in retaining what he had learned and received unsatisfactory grades in cooperation, dependability and initiative. On 10/11/90, per 128G committee was in receipt of a 128B-1 dated 10/9/90, from the academic instructor requesting that the prisoner be removed from his job assignment in education due to the inappropriateness of the program. Committee noted that the prisoner was not a disciplinary problem, however, he plateaued academically and the program was no longer appropriate for him. Therefore committee elected to remove the prisoner from his assignment in education and placed him on the support services waiting list. On 3/27/92, UCC

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
NOVEMBER 2005 CALENDAR

elected to refer to CSR, recommend a transfer to California State Prison Calipatria-Level IV, due to a major population realignment at Folsom. On 4/2/92, the CSR endorsed the prisoner for CSP-Calipatria Level IV. On 4/13/92, the prisoner was received at CSP-Calipatria for housing and subsequently received his initial classification on 4/22/92. His custody was established at Medium A and placed on the support services and vocational waiting lists and released to the general population. The prisoner's work and vocational experience consisted of : vocational auto machine shop program. He earned satisfactory grades per CDC 128E dated 9/15/92. He subsequently was awarded a certificate of completion on 9/30/94 per CDC 128E (Vocational Machine Shop). Other job and or education experience: ABB-III per CDC 128E dated 12/31/91 and earned satisfactory grades; trash dock worker-sweep road ways per CDC 101 dated 3/24/95 and earned satisfactory work grades. Per a 128G dated 3/17/94, the prisoner appeared before committee for program review due to receiving a CDC 115 dated 2/16/94 for work stoppage. The CDC 115 was dismissed. On 9/20/94, UCC elected to refer to the CSR with a placement of RJD- III with an alternate of LAC-III. UCC on 10/18/94, realized that the prisoner was erroneously classified as a Level II and elected to rescind the 128G dated 9/20/94 and re-refer the prisoner's case to the CSR with a recommendation of LAC IV with an alternate of CCI-IV. This action was a result of a miscalculation of the classification score of 51. On 11/15/94, the prisoner appeared before UCC for program review due to the completion of the vocation auto machine shop program due to receiving a certificate of completion. Committee elected to remove him from the assignment and reassigned and placed him on the support services waiting list. On 7/5/95, the prisoner appeared before UCC for annual review. Committee elected to refer to the CSR recommending a transfer to CMC-E-III with an alternate of RJD-III or ISP-III in order to facilitate visiting with family in the Los Angeles County area per the inmate's request. On 7/19/95, the CSR endorsed the prisoner for ISP-III. The prisoner was subsequently received at Ironwood State Prison on 8/4/95 and received his initial classification on 8/8/95. Committee elected to establish custody at Medium A, place on the support services and computer refurbishing waiting list and release to the general population. He was subsequently assigned to the vocational yard crew on 8/17/95 per 128G dated 8/15/95. He subsequently earned satisfactory to above average work grades according to his work supervisor's reports. On 12/19/95, per CDC 128G, the prisoner appeared before UCC for program review requesting to be placed on the ABB-II waiting list so that he may obtain a GED. On 8/20/96 during UCC per 128G, the prisoner's case was referred to the CSR with a recommendation to transfer to CMC-E-III per the inmate's request to facilitate family visits, with an alternate to retain at ISP III. He was assigned to the Vocational Work Crew and received satisfactory work supervisor's reports. On 9/5/96, per 128G the CSR endorsed the prisoner for ISP III. On 8/12/97, the prisoner's case was referred to the CSR with a recommendation of CMC-E III with an alternate of RJD III in order to facilitate family visits. Per 128G dated 9/11/97, the CSR endorsed the prisoner for CMC-E III. He was subsequently

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
NOVEMBER 2005 CALENDAR

transferred to CMC-B on 10/15/97 and received his Initial Classification on 10/29/97 per I28G. Committee elected to establish Medium A custody, place on support services waiting list and released to the general population. Per CDC 128E dated 1/7/98, the prisoner was enrolled into the academic ABE II and III on 12/3/97. He received satisfactory work grades. On 7/8/98 per I28G UCC elected to refer to the CSR recommending to retain the prisoner at CMC-B due to his lifer status as an override with an alternate transfer to CTF II. On 7/20/98 per I28G, the CSR elected to retain the prisoner at CMC B III. On 8/4/98 the prisoner appeared before the committee for program review requesting to be retained CMC-B Level III as an override to be closer to his family who resides in Ventura County with an alternate of CTF II. On 8/18/98 per I28G the CSR endorsed the prisoner for CMC-B III due to administrative placement: violence/life prisoner status. On 7/7/99, the prisoner appeared before his annual classification per I28G. Committee elected to refer to the CSR with a recommendation to transfer to CTF II or FSP-II per the inmate's request. During committee, the inmate requested to be retain at CMC-W as a Level II override. He also requested to be retain at CMC-E or transfer to CTF II to remain close to his family in Ventura County. On 7/26/99, the CSR endorsed the prisoner for CTF II per I28G. He was subsequently received at CTF Central Facility on 8/18/99 as a non-adverse transfer. He received his initial classification on 8/27/99 and committee elected to release him to the general population and place on support services and textiles waiting lists and establish Medium A custody. On 8/3/00, per I28G the prisoner appeared before UCC for annual classification. Committee notes a CDC 115 dated 7/26/00 for participating in a work stoppage and in addition committee was in receipt of a 128B dated 8/12/00, requesting that the prisoner be unassigned from his position and refer to committee for program realignment. Committee elected to drop the prisoner from his porter position effective 8/12/00 and be placed on the support services waiting list and change work group privilege group to A2B effective 8/12/00, per I28G the prisoner's case was reviewed in absentia per his request for an Annual Review. Committee elected to continue present program "unassigned" and place the prisoner on the textiles waiting list per I28G dated 7/31/01. On 7/11/02, the prisoner appeared before his Annual Classification per I28G. In absentia, committee's actions was to continue present program and remove the inmate from the Textiles Waiting List. On 11/6/03 per I28G the prisoner's request committee elected to conduct annual classification in absentia. Committee elected to place him on East Dorm Waiting List and continued present program. The prisoner's work history consisted of wing porter where he received satisfactory work grades. He subsequently was reassigned to the Prison Industry Authority Wood Furniture Factory in the Finishing Department on 4/6/04. The work supervisor reports satisfactory to above average work grades. His supervisor's comments were:" Ross appears to have good habits and seems to have a good attitude. He continues to learn job duties and performs adequately. He continues to learn the various finishing techniques required in the finishing shop." During this review period the prisoner enrolled in the Federal Emergency Management Agency Institute (Independent)

Correspondence Study Course). He received 27 certificates of the Emergency
Management Institute Professional Development Series which is a commitment to
standards of excellence in emergency management. However, the prisoner's
Central File did not reflect any vocationally upgrading experience during this
review period.

C.     **Therapy and Self-Help Activities:** Received a laudatory 128B chrono dated
7/1/02 for volunteering as an assistant with the education GED preparation
tutorial program at CTF Central Facility. On 4/19/03, per 128B the prisoner
successfully completed a series of lectures entitled: "How to Become a Father,
and not get Angry" sponsored by the CTF's Muslim Development Center.

Volunteered assistance with the education department at CTF per 128B dated
6/23/03. Completed Dr. Thomas Gordon's, "Family Effectiveness Training and
Harmony in the Home Self Help Program", per 128B dated 4/24/04. Per 128B
dated 12/23/04, the prisoner successfully completed a course in the cause,
prevention, treatment and management of sexually transmitted infections; and
128B dated 1/13/05 completed a course in the cause, prevention, treatment and
management of Hepatitis; 128B dated 12/22/04 attended meetings with the
Narcotics Anonymous group meetings for the fourth quarter year of 2004; 128B
dated 1/26/05 for successfully completing a course in the cause, prevention,
treatment and management of HIV and Aids; 128B dated 1/31/05 successfully
completing a course in the cause, prevention, treatment and management of
Tuberculosis; 128B dated 10/1/04 attending Narcotics Anonymous meetings for
the third quarter year 2004; 128B dated 3/5/05 for completing Dr. Thomas
Gordon's, "Family Effectiveness Training and Harmony in the Home Self Help
Anger Management Program"; 128B dated 3/15/05 for participation in Narcotics
Anonymous Group meetings during the first quarter year of 2005; 128B dated
1/31/05 for completing the requirement for a self help chrono exercise by reading
self help books and writing reports on what he has learned from each book read.

D.     **Disciplinary History:**

CDC 115s

| 10/24/01 | CTF | 3005(c) | Mutual Combat. Disposition: Guilty: Assessed 61 days Forfeiture of Credits. |
| 07/26/00 | CTF | 3041 | Work Stoppage. Disposition: Guilty: Assessed 30 days Forfeiture of Credits. |
| 03/15/88 | FOL | 3006(a) | Dangerous Property, Possession of an Inmate Manufactured Weapon: Disposition: Guilty: Assessed 180 days Loss of |

Behavorial Credits.

### CDC 128As

| | |
|---|---|
| 05/13/93 | Conduct, Failure to Remove Light and Window Covering. |
| 03/17/92 | Failure to attend Assignment. |
| 01/27/91 | Cell Conditions. |
| 09/10/90 | Failure to Report to Job Assignment. |
| 01/05/90 | Failure to Report to Job Assignment. |

### CDC 128Bs

| | |
|---|---|
| 09/24/04 | Refuse Lower Bunk. |

E.    **Other:** On 11/18/02, the prisoner was seen by the Board of Prison Terms for his Initial Parole Consideration Hearing. The Board's decision was to deny parole for (3) years, and recommend that the prisoner remain disciplinary free, upgrade vocationally and educationally and participate in self help programs. The Board also requested that the prisoner cooperate with the clinicians in the completion of a clinical psychological evaluation.

## IV.    FUTURE PLANS:

A.    **Residence:** The prisoner's residence plans have changed. Ross plans to parole to his wife's residence (Rosa Ross), at 1854 Haazya Oxnard, California 93030, Telephone: (805) 485-9774.

B.    **Employment:** The prisoner has no firm employment plans at this time. However he indicates that his wife is in the process of becoming state certified as a medical interpreter and will be self employed. She has offered him a position as an office technician. Ross, prior to incarceration, worked at the Vitro Corporation as a shipping clerk and was subsequently promoted to a computer operator position. The prisoner believes that he would be able to obtain employment as a tool machine operator or shipping clerk, having completed a vocational machine shop trade.

C.    **Assessment:** Parole plans have been reviewed and discussed with Ross. He has family support and a future offer of employment in his wife's future business as a

office technician. However, it appears that the prisoner did not offer any solid
employment offers from employers in the county of his last residency or make any
contacts with any support groups in order to help him enter back into society as a
productive citizen. See attached letters in the miscellaneous section of the Central
File regarding family support.

## V.    USINS STATUS: N/A.

## VI.    SUMMARY:

A.    Prior to release the prisoner could benefit from:

1.    Become and remain disciplinary free.
2.    Upgrade educationally by obtaining a GED.
3.    Participate in self help programs.
4.    Cooperate with the clinicians in the completion of a clinical
evaluation.

B.    This report is based upon an interview with the prisoner on 8/2/05, lasting
approximately 1.5 hours and a complete review of the Central File lasting 4 hours.

C.    The prisoner was afforded an opportunity to examine his Central File on 8/2/05
per CDC 128B, which is located in the general chrono section of the Central File.

D.    No accommodation was required per the Armstrong vs. Davis BPT Parole
Proceedings Remedial Plan (ARP) for effective communication.

_____     9-26-06
H. Staten                           Date
Correctional Counselor I


_____     10/24/05
R. Leach                            Date
Correctional Counselor II


_____ F.C.(A)  11/30/05
R. Pope                              Date
Facility Captain


_____ C.P.R.  12-1-05
D. S. Levorse                       Date
Classification and Parole Representative


ROSS, WAYNE            D59353              CTF-SOLEDAD          **NOV/2005**

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 8/02 to 6/17/03 | | | **PLACEMENT**: Remained at the Correctional Training Facility II and housed in the general population. **CUSTODY**: Medium A. **VOC. TRAINING**: None indicated during this review period. **ACADEMICS**: None indicated during this review period. **WORK RECORD**: None indicated during this review period. **GROUP ACTIVITIES**: Received a 128B dated 7/1/02 for volunteering and assisting with students in the CTF Education GED Preparation Tutoring Program. Received a 128B dated 9/4/02 on the completion of the Anger Management Course. He subsequently successfully completed a series of lectures entitled: "How to become a Father and not get Angry", sponsored by CTF's Muslim Development Center per 128B dated 4/19/03. **PSYCH. TREATMENT**: None indicated during this review period. **PRISON BEHAVIOR**: None indicated during this review period. **OTHER**: On 11/18/02, the prisoner appeared before the Board of Prison Terms for his Initial Parole Consideration Hearing. The Board's decision was to deny parole for 3 years, and recommend that the prisoner: 1) Remain disciplinary free; 2) Upgrade vocationally and educationally, and 3) Participate in self help and therapy programs. The Board also requested that the prisoner cooperate in the completion of a new psychological evaluation report. |

CORRECTIONAL COUNSELOR'S SIGNATURE                        DATE *10-2/05*

ROSS             D59353             CTF-SOLEDAD           NOV/2005

BOARD OF PRISON TERMS                                                         STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| STCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6/18/03 to 6/17/04 | | | **PLACEMENT:** CTF II and housed in the general population. <br> **CUSTODY:** Medium A. <br> **VOC. TRAINING:** None indicated during this review period. <br> **ACADEMICS:** Enrolled in the Federal Emergency Management Agency Institute (Independent Correspondence Study Course).  He received 20 certificates of achievement in retrofitting flood prone residential structures, developing in managing volunteers, hazardous materials for medical personnel, decision making and problem solving,  radiological emergency management, animals in disaster, awareness and preparation, animals in disaster, community planning, building for earthquakes of tomorrow, introduction to litigation, emergency planning, basic incident command system, hazardous materials, A citizens orientation, radiological emergency response, effective communication, mitigation for homeowners, special considerations for FEMA PA Projects, exercise design, live stock in disaster, principles of emergency management and emergency program manager And orientation to the position. <br> **WORK RECORD:** Assigned to the PIA Wood Furniture Factory on 4/6/04 per his Work Supervisor's Reports (CDC 101 dated 5/1/04).  He earned satisfactory work grades as a furniture finisher.  He received 128B dated 4/6/04 for training on CAL and OSHA Hazardous Communication standard, "Right to Know"; and additional training included safe handling and dispoable of hazardous and waste. He received 128Bs certificate chronos dated 4/6/04 on the instruction on the proper operation and safety procedures of the general safety equipment, back safety, air & eyes and sound equipment, materia data sheet training ("Right to Know") and lockout/tagout procedures. <br> **GROUP ACTIVITIES:** Volunteered and assisted students in the Education Department GED Preparation Tutoring Program at CTF per 128B dated 6/23/03.  He completed Dr. Thomas Gordon's, "Family Effectiveness Training and Harmony in the Home" self help program per 128B dated 4/2/04. <br> **PSYCH. TREATMENT:** None indicated during this review period. <br> **PRISON BEHAVIOR:** None indicated during this review period. <br> **OTHER:** N/A. |

**ORDER:**

☐  BPT date advanced by ___ months.                    ☐  BPT date affirmed without change.
☐  PBR date advanced by ___ months.                    ☐  PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐  Previously imposed  conditions affirmed.
☐  Add or modify

☐  Schedule for Progress Hearing on appropriate institutional calendar

| ROSS | D59353 | CTF-SOLEDAD | NOV/2005 |
|---|---|---|---|

BOARD OF PRISON TERMS                                                         STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                              Page _2_

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 6/18/04 to 6/17/05 | | | **PLACEMENT**: CTF II and housed in the general population.<br>**CUSTODY**: Medium A.<br>**VOC. TRAINING**:  None indicated during this review period.<br>**ACADEMICS**: Enrolled in the Federal Emergency Management Agency Institute/Independent Correspondence Study Course.  He received 7 certificates of achievement in role of voluntary agency emergency management, role of emergency operation center in community prepareness, response and recovery, emergency preparedness, USA, Department of Home Land Security, introduction to residental coastal construction, a citizen's guide to disaster assistance, Department of Home Land Security leadership and influence, and Department of Home Land Security and orientation to community disaster exercises.  He received a certificate of achievement dated 10/21/04 to reaffirm through completion of the emergency management institute professional development series a commitment to standards of excellence in emergency management.<br>**WORK RECORD**:  Assigned to the PIA Wood Furniture Factory per his Work Supervisor's Reports (CDC 101's) dated 7/1/04, 10/1/04, and 2/1/05.  He earned satisfactory to above average work grades.  His supervisor's comments were:  Ross continues to learn the job duties and performs adequately.<br>**GROUP ACTIVITIES**:  Participated in Narcotics Anonymous meetings for the third and fourth quarter year of 2004 per 128Bs dated 10/1/04 and 12/22/04.  Per CDC 128B dated 6/28/04 indicates participation in Alcoholics Anonymous meetings on 6/7/04.  Received a certification of completion in Anger Management course dated 12/3/04.  Per 128B dated 12/23/04 participated in peer education course in the cause, prevention and management of sexual transmitted infections.  Received a 128B dated 1/5/05 for participation in the Father's Anger Management Course.  Completed a course in the cause, prevention, treatment and management of Hepatitis per 128B dated 1/13/05; completed a course in the cause, prevention, treatment and management of HIV/Aids per 128B dated 1/26/05; and the completion of a course in the cause, prevention, treatment and management of Tuberculosis per 128B dated 1/31/05.  Completed Dr. Thomas Gordon's Family Effectiveness Training and Harmony in the Home self help anger management program per 128B dated 3/5/05.  Participation in Narcotics Anonymous meetings during their first quarter year 2005.  Completed the requirement for self help chrono exercise by reading self help books and writing reports on what he has learned per 128C dated 1/31/05.<br>**PSYCH. TREATMENT**:  None indicated during this review.<br>**PRISON BEHAVIOR**:  None noted , however received a CDC 128B chrono dated 9/24/04 for refusing to move to a lower bunk.<br>**OTHER**: N/A. |

ORDER:

☐  BPT date advanced by     months.      ☐   BPT date affirmed without change.
☐  PBR date advanced by     months.      ☐   PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐  Previously imposed  conditions affirmed.
☐  Add or modify

☐  Schedule for Progress Hearing on appropriate institutional calendar

| ROSS | D59353 | CTF-SOLEDAD | NOV/2005 |
|---|---|---|---|

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6/18/05 to 7/31/05 (Present) | | | **PLACEMENT**:  CTF II and housed in the general population. **CUSTODY**:  Medium A. **VOC. TRAINING**:  None during this review period. **ACADEMICS**:  None during this review period. **WORK RECORD**:  Assigned to PIA Wood Furniture Factory as a finisher per CDC 101 dated 10/1/04 and earned above average work grades.  His supervisor's comments were: Ross is still learning the various finishing techniques required in the shop. **GROUP ACTIVITIES**:  Per 128B dated 6/28/05 participation in Narcotics Anonymous meetings for the second quarter year (April, May, June) year 2005. **PSYCH. TREATMENT**:  None noted during this review period. **PRISON BEHAVIOR**:  None noted during this review period. **OTHER**:  On 8/2/05, in preparation for the scheduled Board of Prison Terms Life Prisoner Hearing, Ross was given the opportunity to review his Central File per the Olson decision. |

**ORDER:**

☐ BPT date advanced by _____ months.
☐ PBR date advanced by _____ months.

☐ BPT date affirmed without change.
☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed  conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

| ROSS | D59353 | CTF-SOLEDAD | NOV/2005 |
|---|---|---|---|

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA

# Exhibit
# F

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
DOCUMENTATION HEARING
JUNE, 1990 CALENDAR
NEW FOLSOM

ROSS, D-59353

This report is for the first documentation hearing on Wayne Stedson Ross,
now age thirty-one, who was committed from Ventura County on June 18, 1987
for First Degree Murder with a sentence of twenty-five years to life.
There was a negotiated plea where he acknowledged responsibility for
killing the victim and was not charged with special circumstances. There
is no juvenile record included in the central file and he denied that there
was one. There likewise is essentially a limited arrest record as an
adult. Since being incarcerated there has been only one disciplinary but
it was of a serious nature and involved possession of a weapon. He stated
that he completed a ten month SHU term for this offense. At the present
time he is attending school.

He was born and spent all of his life in Ventura County, dropping out of
school there during the twelfth grade. There later was some attendance at
college. He has never been in military service. He was married for the
first time approximately three months ago to a Mexican female that he had
known prior to prison and there are currently family visits. Any psychi-
atric history was denied as was most substance abuse. He described the
occasional abuse of alcohol but quite limited cocaine use. All other
illegal substances were said to have never even been experimented with.

He was interviewed on May 31, 1990 in the medical clinic of "C" Facility
where he came on time and with a cooperative attitude. There was not
thought to be any significant psychiatric disorder present though he seemed
to experience difficulties with simple intellectual tests. Behaviorly he
seems to have become more conforming since his one infraction occurred.

There seems to have been differing versions of how the homicide occurred
and at this time he stated that he was not intoxicated though there had
been some drinking. It was strongly denied that he was involved with
cocaine use at the time the victim was killed. This person was a long time
friend and an older person that he reportedly looked up to. Apparently he
had just prior to his death been robbed and this may have been the motiva-
tion at the time that he was killed. It was presented as being somewhat in
the nature of self-defense. It was also stated that the victim was still
thought to be alive when he exited the premises. According to the records
a heart condition may have contributed to his death following the multiple
stabbings. Remorse was expressed for the victim.

DIAGNOSIS: Adult antisocial behavior, V71.01.

CONCLUSIONS: There are conflicting versions of the homicide and drugs may
have been a contributory factor. There are no psychiatric recommendations
at this time other than complete abstinence.

G. Hollingsworth, M. D.
Chief Psychiatrist (A)

ROSS, D-59353            NEW FOLSOM            5-31-90            GH:sz

IRONWOOD STATE PRISON
BLYTHE, CALIFORNIA

## PSYCHOLOGICAL EVALUATION
## BOARD OF PRISON TERMS

**INMATE:** ROSS, WAYNE
**CDC #:** D59353
**DOB:** 09/12/58
**DATE:** 05/03/96

This is the second report to the Board of Prison Terms regarding this 37-year-old married, Black male who is serving 25 years to Life for First Degree Murder.

### HISTORY:

Approximately one hour was spent interviewing the inmate and reviewing his C-file and medical chart. There is no history of mental health treatment prior to or during incarceration. This inmate has received one 115 for possession of an inmate manufactured weapon in March of 1988. The inmate is currently working on the vocational yard crew. Since incarceration, the inmate has completed an auto machine shop course at Calipatria and is presently enrolled in the AA/NA course. The inmate states that he doesn't need this because he never really had a drug or alcohol problem. Records however, show that the inmate was drinking at the time he committed the crime and that he has also used cocaine and PCP. The inmate has been married since 1989 and he is visited regularly by his wife. He also receives visits from his mother, three sisters and two brothers. His father is deceased. The inmate states that he has no previous criminal history. His C-file shows however, that he was arrested in 1977 for attempted burglary, in 1984 for being under the influence, in 1986 for failure to pay child support.

The inmate has eleven years of formal education and earned a certificate in Microscope Electronic Assembly before his incarceration.

Regarding his crime, the inmate states "We were drinking...was the best of friends...he went on a frenzy and got aggressive first...died of heart attack during the struggle. Heart flooded with alcohol and he died. I hate the fact that it happened. I think about it every day...close friend." The inmate never actually does express remorse. The inmate states that if he were paroled, he would complete some more education and obtain some more vocational training.

### MENTAL STATUS:

The inmate is oriented to person, place and time. His mood is euthymic. Affect is within normal limits. There is no evidence of thought disorder. The inmate denies hallucinations and delusions. He denies suicidal/homicidal ideation. Memory is intact. Intelligence appears to be low average to average. Sleep and appetite are normal. Judgment and insight are poor.

**Page one of two**

**IMPRESSION:**

Axis I:      305.00  Alcohol abuse in institutional remission

Axis II:     V71.09  No diagnosis

Axis III:    None.

Axis IV:     Three

Axis V:      Global assessment of functioning 80

**RECOMMENDATIONS:**

There are no psychiatric recommendations for this inmate.  It is however, recommended that he receive vocational training and continue with his AA and NA.

Darlene Peddicord, Psy.D
Clinical Psychologist

d:   05/03/96
t:   05/06/96  mk

PSYCHOLOGICAL EVALUATION                                I/M:  ROSS, WAYNE
IRONWOOD STATE PRISON          DR.PEDDICORD             CDC #D59353

MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
NOVEMBER 2002 CALENDAR
LIFER PROGRAM UNIT
CALIFORNIA TRAINING FACILITY AT SOLEDAD

## PSYCHOSOCIAL ASSESSMENT

**IDENTIFYING INFORMATION:** Mr. Wayne Ross, CDC# D-59353, is a 44-year-old, married, African American first-termer committed from Ventura County. He is serving a 25-year-to-life sentence for 1st Degree Murder. The index offense occurred on 12-30-86, and Mr. Ross entered into CDC at Chino on 6-18-87. He arrived at Soledad on 8-18-99. He is a United States citizen.

Informed consent, including the limits of confidentiality, was provided. Mr. Ross appeared to comprehend both the nature and purpose for the present evaluation, and he agreed to participate in the interview. Mr. Ross does not appear to have a mental disability or condition that would qualify under the Americans with Disabilities Act, and it was my conclusion that it was not necessary to provide auxiliary aids or assistance to achieve effective communication. The interview was conducted on 9-9-02, lasting approximately one and one-half hours. Both the Central file and Unit Health Record were reviewed.

**DEVELOPMENTAL HISTORY:** Mr. Ross was born in Ventura, CA. His developmental history appears to be unremarkable. There were no indications of prenatal and perinatal concerns, or birth defects. There were no signs of developmental abnormalities. He seems to have attained developmental milestones at the appropriate times and in the expected sequence. There were no indications of a history for hyperactivity or attention-deficit, but he informed the examiner that he has had persistent learning difficulties. He denied any experience of childhood abuse. His childhood medical history seems unremarkable.

He started to manifest some adjustment difficulties in adolescence, but there is no documented juvenile crime history. He recalled one occasion when he was cited for allowing another individual to use his driver's license.

**EDUCATION:** Mr. Ross attended elementary school in the Oxnard area. He claimed that he received C and D grades, and there were no major disciplinary problems. He graduated from Haydock Junior High with B and C grades. The record indicates that throughout his years of schooling, Mr. Ross was in special education classes due to learning problems. In the 4th grade his mother was dissatisfied with his progress in public school and she transferred him to Our Lady of Guadalupe School. He worked on weekends recycling newspapers to help pay for the tuition. He was detained one year at Our Lady of Guadalupe and in the 6th grade he was transferred back to public school

related to his special education needs. He started attending the 9th grade at Oxnard High School in 1973, two weeks before his 16th birthday. In high school his grades were almost exclusively D's and F's. In the summer session after the 10th grade he received academic credits for working part-time at the Port Hueneme Naval Base. Despite his academic problems, he remained in school until the middle of the 12th grade. After leaving high school, he enrolled at Oxnard College. Although he attended for three semesters at Oxnard College, he withdrew from most of his classes. His record indicates that he made two other attempts to further his education. In 1983, he completed a program at the Center for Employment Training. In 1985 he entered into a microcomputer accounting program at Waterson College, but he dropped out when he realized that this program was too difficult.

According to the Institutional Staff Recommendation Summary Report, when he entered into prison his grade placement level was measured at 4.1. Mr. Ross enrolled in the Adult Basic Education Program at CMC. His TABE test from 11-7-97 reflects a 6.1 grade placement level. On 3-2-98, he tested at the 6.8 level and on 1-4-99, his grade level was estimated at 7.8. A chrono dated 7-1-02 documents that he is currently in the GED Prep Tutoring Program.

**FAMILY HISTORY:** Mr. Ross was born in Ventura County General Hospital. His father, Palmer Stedsen Ross, was a Baptist minister who visited the Oxnard congregation where Mr. Ross' mother, Johnny Neal, was a member. They had a brief relationship that produced Mr. Ross. He recalled meeting his father on only one occasion when he was 4. His father died before he came to prison. Mr. Ross is the 6th of 7 children born to Ms. Neal. He had 3 older sisters, one older brother and one younger brother. The record indicates that his mother supported her family with low paying jobs and occasional public assistance. She had some financial support from her parents. Her parents also helped with child rearing. His older brother died from seizure disorder, perhaps complicated by alcohol use. His younger brother is diagnosed with schizophrenia and receives SSI. His mother died in 1999 at the age of 72 from a heart attack.

Currently, Mr. Ross has contact with his sisters June, Evelyn and Carolyn, and his brothers, Chester and Melvin.

**PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:** Mr. Ross identified himself as exclusively heterosexual. He estimated that he reached puberty at age 14, and he became sexually active at age 15. He denied any interest in non-normative sexual behaviors or fantasies, and there are no reported sex crimes. He estimated that he has had sexual relations with 18 different partners, 10 or 12 of which were casual encounters. He acknowledged having sex with prostitutes, but he denied any history for sexually transmitted diseases.

**MARITAL/RELATIONSHIP HISTORY:** Mr. Ross has been married to Rosa Marie Martin (38) since 12-9-89. He reported that they met at the Wagon Wheel Bowl in 1984. Rosa lives in San Diego and she works for a podiatrist. He had a previous live-in relationship with his girlfriend, Laurie, which lasted more than a year. He had another

relationship with Jacquelyn Evans that produced a daughter, Nequayle Ross. His daughter is now 21 and she plans to become a lawyer. She is currently working for the Kodak Company.

**MILITARY HISTORY:** There is no record of military service.

**EMPLOYMENT/INCOME HISTORY:** Mr. Ross was 28 when the index offense occurred. His employment experience in the community dates back to 1975 when he worked for the Naval Construction Battalion Center through the Youth Opportunity Program. He held this position until 1978, when he went to work for the Western Tech Association for two years, in maintenance and as a shipping clerk. He then held various jobs until 1983, when he was hired as a shipping clerk for the Vitro Corporation. He received training and was promoted to a computer operator position. He was laid off in 1986 when the company lost a government contract. He was unemployed and submitting job applications when the index offense occurred.

Mr. Ross participated in the Adult Basic Education Program at CMC. He received certification in vocational machine shop and has acquired some other work skills in various job assignments. He is presently assigned as a Wing Porter, and his work supervisor's report indicated satisfactory ratings for job performance. He has been volunteering at the Library in the GED Pre-Study Program.

**SUBSTANCE ABUSE HISTORY:** Mr. Ross has a significant substance abuse history. According to the Ventura County Probation Officer's Report (POR) dated 6-7-87, he drank moderate amounts of alcohol on a social basis. He previously reported that he used marijuana and rock cocaine on a recreational basis. In the present interview, he informed the examiner that he was under the influence of marijuana on one occasion and did not try this substance again because it made him feel paranoid. His substance use also included a stint with PCP and he reported that he was placed in a drug diversion program for about one month to deal with his PCP use. He estimated that he had more than four drinks before the index offense, but he had not used illicit drugs. Information in the POR suggests that Mr. Ross could have also used rock cocaine.

Mr. Ross stated that he started attending NA meetings in 1992. He is not currently participating in any 12-Step programming.

**MENTAL HEALTH AND MEDICAL HISTORY:** Mr. Ross does not have a mental health history, either in prison or the community. He has been maintained in the General Population (GP), without mental health services. He denied any history for suicidal concerns, serious head injury, seizure disorder or other neurological conditions. As mentioned above, he has a history for a learning disorder.

Mr. Ross does not seem to have any major medical problems. He screened positive for TB exposure and he was treated with medication. He takes Zantac for mild gastrointestinal problems, and Tylenol and Elavil for migraine headaches. In the past, he

had cortisone injections to decrease inflammation in his left knee and heel. His record shows a history for bronchial asthma.

**PLANS IF GRANTED RELEASE:** Mr. Ross reported that if he were released from prison, he would reside with either his wife or sister in San Diego. He claimed that he has family support for obtaining employment, and he expects to work in the computer field. He expressed his intention to attend 12-Step groups in the community.

At present, his prognosis for community living is guarded.

## CLINICAL ASSESSMENT

**CURRENT MENTAL STATUS/TREATMENT NEEDS:** Mr. Ross arrived for the interview promptly and he was appropriately groomed and dressed. He had short hair and a mustache. His demeanor was talkative and outgoing. He was alert and well oriented in the three spheres. His speech was somewhat slow, and his responses were mostly simple. His mood was euthymic and affect was broad and appropriate. He did not endorse any primary symptoms of depression or hypomania. His thinking was well integrated and purposeful. There were no indications of paranoid ideation. Memory and concentration were intact. Judgment was moderately impaired and insight was only partial. He denied any thoughts or intentions of harm to self or others.

## DIAGNOSTIC IMPRESSION:

| | |
|---|---|
| Axis I: | 304.8  Polysubstance Dependence, in Full Remission in a Controlled Setting |
| | V71.01 Adult Antisocial Behavior |
| Axis II: | V71.09 No Diagnosis on Axis II |
| Axis III: | Migraine headaches |
| | Asthma |
| | TB exposure, treated with INH |
| Axis IV: | Incarceration |
| Axis V: | GAF=75 |

Currently, Mr. Ross does not seem to have a mental disorder and he is not in need of mental health services.

**CRIMINAL HISTORY/REVIEW OF LIFE CRIME:** As illustrated above, Mr. Ross started to manifest some adjustment difficulties during adolescence. There is no documented juvenile crime history. As an adult, he was placed on probation for being behind in his child support payments. In 1987 his probation was revoked for non-payment of child support.

The index offense is described in detail in the POR. Briefly stated, Mr. Ross, his brother Melvin, and a male companion drove around town cashing checks and purchasing rock cocaine. After Mr. Ross and his brother allegedly used cocaine, Mr. Ross asked to be driven to the home of the 73-year-old victim, Mr. Sanchez. Mr. Ross had known the victim for 11 years from when he worked at the naval base, and he performed various odd jobs for him, including tax preparation. After entering into the victim's residence, he left about 20 to 30 minutes later, and told his brother and companion he had "taken care of business." The trio then purchased additional cocaine. Mr. Ross threw some of his clothing from the car and later washed what appeared to be bloodstains from his tennis shoes. A business client later discovered Mr. Sanchez in his home. The lights were on and there were signs of a struggle. The victim was deceased and lying in a pool of blood. After initially denying any involvement in the crime, Mr. Ross admitted being in a physical altercation with the victim. He claimed that the victim became angry with him and attacked him with a pair of scissors. Mr. Ross then allegedly stabbed the victim with the scissors and left. The autopsy revealed 26 to 28 puncture wounds to the victim's face, neck and head, none of which were lethal. The cause of death was determined to be a combination of a heart attack and hemorrhaging. Mr. Ross had superficial wounds to his hands.

In the present interview, Mr. Ross claimed that when he went to visit the victim, Mr. Sanchez had been drinking and he demanded that Mr. Ross "get him a girl." Mr. Ross told the examiner that he and the victim "started play fighting, but then it got more serious." He claimed that after they fought, the victim was still alive and it was not until the following day that he heard about his death. He expressed remorse for the victim's death and he asserted that he should have left the victim's residence before their conflict became physical.

**RISK FOR FUTURE VIOLENCE:** The current research literature indicates that an empirically based approach is the most reliable and valid method for assessing risk for future violence. In the present evaluation, three separate psychological instruments were used to help estimate this individual's risk for future violence in the community. The information for scoring these instruments was obtained from both the clinical interview and the available records. These three measures are widely used and are supported by years of research. They have been cross-validated with various forensic populations, including United States males in correctional settings. However, the following results need to be regarded with some level of caution since some individuals may possess idiographic differences that could limit the applicability of these instruments. The evaluator has taken these above factors into consideration in determining how much weight to give each of the three measures, and in formulating an overall estimate for risk for future violence in the community. Estimates of risk for violence will be stated categorically—low, moderate, or high.

On the Hare Scale (PCL-R), a measure of static risk factors associated with risk for violence, Mr. Ross scored within the low range of severity. This score indicates that although Mr. Ross does not seem to have a prominent antisocial background, he does not fit the clinical picture of a psychopathic personality. Therefore, psychopathy is not a

significant risk factor. Since this categorical score is based on static risk factors, this result in not likely to change substantially over time.

On the History Clinical Risk-20 (HCR-20), which also includes dynamic risk factors, Mr. Ross scored within the low-to-moderate range of severity. As mentioned above, he started to manifest adjustment problems in adolescence which continued into adulthood. These problems included substance use, occasional unemployment and relationship difficulties.

On the Violence Risk Appraisal Guide (VRAG), an actuarial method, Mr. Ross scored within the low-to-moderate range.

**CONCLUSION:** Overall, Mr. Ross appears to fall into a category that represents a low-to-moderate risk for violence in the community. This estimate for future violence is based on multiple determinants, including but not limited to, the clinical interview, background information, level of institutional adjustment and programming, and risk assessment procedures. As mentioned earlier, prior to the index offense he did not have a criminal orientation, but he there was instability in different areas of his life. The index offense appears to have been motivated by material gain and related to substance use. Mr. Ross continues to contend that he did not kill the victim intentionally and that his death was accidental.

Mr. Ross has manifested some occasional adjustment problems in prison. His limited level of academic functioning has restricted his programming. Hopefully, he will be able to obtain his GED in the near future and then extend his vocational training. Given his history and the possible role of substance use in the offense, it is recommended that he resume his participation in 12-Step groups.


_Erich Rueschenberg_

_____
Erich Rueschenberg, Ph.D.
Forensic Psychologist
Lifer Program/Forensic Services Unit
Health Care Services Division
California Department of Corrections

September 16, 2002
Date

**MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON HEARINGS
June, 2006 Lifer Calendar**


**CORRECTIONAL TRAINING FACILITY SOLEDAD
MAY, 2006**


| | |
|---|---|
| **NAME:** | **ROSS, WAYNE** |
| **CDC#:** | **D-59353** |
| **DOB:** | **9/12/58** |
| **OFFENSE:** | **PC 187 MURDER, FIRST DEGREE** |
| **DATE OF OFFENSE:** | **12/30/86** |
| **SENTENCE:** | **25 YEARS TO LIFE** |
| **MEPD:** | **12/1/03** |
| **EVALUATION DATE:** | **5/5/06** |


I.    **IDENTIFYING INFORMATION:**

Mr. Wayne Ross is a 47 year old, first term, married male from Ventura County. He is a Christian. He has served 19 years in custody.

**SOURCES OF INFORMATION:**

This evaluation is based upon a single 90 minute interview, plus review of the central and medical files.

The psychological evaluation by Dr. Reuschenberg, Forensic Psychologist at CMC-East, dated 9/16/02, has a complete Psychosocial Assessment. This information was reviewed with the inmate. Because it is still current and valid, it will not be repeated at this time.

ROSS, WAYNE
D-59353
5/5/06
PAGE 2

## CLINICAL ASSESSMENT

XII.  **CURRENT MENTAL STATUS/TREATMENT NEEDS**

Mr. Ross related during the interview in a serious, sober, open and cooperative manner. His mental status was within normal limits. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. His affect was appropriate. There was no evidence of anxiety or of depression. His eye contact was good. Intellectually, he appears to be functioning in the low average ranges. His memory was intact. His judgment was intact. His insight and self-awareness were good.

Mr. Ross has a history of cocaine and PCP use. He also has a history of alcohol use. He was intoxicated on alcohol at the time of the commitment offense. He now has developed very strong values against use of alcohol and drugs. He continues to attend Narcotics Anonymous. He stated that alcohol and drugs can lead to no good. He stated that his use of alcohol contributed to his use of bad decisions and poor choices. He stated that even though alcohol and drugs are available, where he is living in the dormitory, he consistently says that he is not interested. He stated that he no longer has any urges or desires for alcohol or drugs, because he knows how destructive they can be.

Due to the fact that he has 19 years in custody, without any indication of any use of drugs or alcohol, this currently is not a problem in his life.

He is still working on his GED. He also is working in the PIA Wood Furniture Factory. As a result of this employment, he has developed skills in making wood furniture that has resulted in him being employable in this trade on the streets. He also was certified in Vocational Machine Shop.

## CURRENT DIAGNOSTIC IMPRESSION

Axis I:      No mental disorder
Axis II:     No personality disorder
Axis III:    Migraine headaches and asthma
Axis IV:     Life term incarceration
Axis V:      Current GAF: 80

ROSS, WAYNE
D-59353
5/5/06
PAGE 3

## XIII.   REVIEW OF LIFE CRIME

Mr. Ross accepts full responsibility for this offense. He accepts the written
description of this offense. The victim was an older man, whom he had known
for 11 years, and he saw him on a regular basis. He stated that he had no intent of
hurting the victim, when he arrived there. He became involved in a verbal
argument with the victim, who demanded payment of a loan. This argument
escalated into a physical confrontation. He stated that the victim became angry
with him and attacked him with a pair of scissors. At that point, Mr. Ross gained
control of the scissors, and then stabbed the victim several times. The cause of
death was a heart attack and loss of blood.

Mr. Ross stated that he is very sorry for what he did. He repeated that he was
very wrong. He stated that he made several wrong decisions. He stated that he
could have handled it very differently. He has learned now to handle difficult
situations in a responsible, non-violent manner. He indicated that he feels very
badly for the victim's family. He is working on a written statement that he would
like to read to the victim's family, expressing his feelings of sorrow and remorse
at the loss of their loved one. He would like to give this to the family, if the
opportunity should arise. His feelings of remorse appear to be sincere and
genuine.

## XIV.   ASSESSMENT OF DANGEROUSNESS

A.   In considering potential for dangerous behavior in the institution, Mr. Ross
did receive a disciplinary for possession of a weapon at Folsom, in 1988.
This weapon was found hidden in an air conditioning vent, and apparently
had been there for years. He had no knowledge of it, and he offered to
take a polygraph test to prove his innocence. He received another
disciplinary for mutual combat on 10/24/01. In this situation he was
involved in horse play with his cellie. This was not an angry, hostile
confrontation. He has not been involved in riots, assaults on others, or
other violence. As a result, compared to other inmates, potential for
dangerous behavior is below average.

B.   In considering potential for dangerous behavior when released to the
community, it is noted that the last psychologist inappropriately used the
HCR-20 and the V-RAG, which are not appropriate for use with lifers to
determine level of dangerousness. These measures were normed on
psychiatric patients and not on life term inmates. As a result, it produces
high risk levels that are not accurate. A more accurate measure is the

ROSS, WAYNE
D-59353
5/5/06
PAGE 4

Level of Service Inventory-Revised that assesses criminal history, substance abuse use, vocational achievement, social relationships and other factors to determine current risk level on parole. He obtained a score on this assessment of 5.1 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better on parole than 94.9 of them. This is a very low risk level. As a result, he does not pose any more risk to society than the average citizen in the community.

C. At this point in his life, there are no significant risk factors in this case.

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with routine release planning. He does have strong family support in the community. He has completed Vocational Machine Shop, and he also has acquired skills that would enable him to obtain employment in the PIA Wood Furniture Factory. He has developed strong work values and work ethics. Employment will not be a problem in this case. He gets good work reports. He is still working on his GED. The prognosis for successful adjustment in the community is good.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:    5/5/06
T:    5/8/06

Ross            D-59353            CTF-Soledad            5/5/06

# Exhibit G

Wayne Rass
Copy D59355

Feb 4 2005

To whom it may Concern:

Hello my name is Rosa Rass, I'm Wayne Rass's wife. I'm writing to you to tell you about my husband. My husband is a very good man. You may know about my husband because of his record. I know my husband for 21 years, Five years before he got into this mess. My husband would give the shirt off his back if that was the only thing he had to do to who ever needed it. My husband is going to be a Law abiding citizen. My husband is very remorseful about what happened. I believe he has paid his dues to society and is more than ready to come home. Wayne has a lot of support from me, his family, my family. We are willing to help him in every thing. We plan on having our own business of Interpreting. I will go to the appt's appointments my husband will handle the office setting up appointments, collecting payments General office work and or help Wayne find a job if he decides to work doing something else. I can tell you we all are looking forward to having Wayne home especially me. I would like to spend some time with my husband if for any reason God calls me before I'm ready to go due to my heart condition. My husband like I said is very remorseful for what happened. It was a very unfortunate accident! I thank you for your time I hope I got my point across and hopefully you'll send my husband home to me soon.

Sincerely,
Rosa Rass

October 02, 2002

To whom it may concern:

This letter is in regards to Mr. Wayne S. Ross, he is my husband. Wayne has been my
husband going on thirteen years this coming December. I have known Wayne for over eighteen
years. What happened to Wayne is a very sad and awful incident being in the wrong
place at the wrong time and with the wrong persons. Wayne is not a bad person, he is a
giving helping man and would not think of harming anyone intentionally. Wayne as I
have said before will give the shirt off his back to a stranger if he needed it, he would
help anyone who asked him or if he saw someone needing help with out thinking twice. I
believe in my husband Wayne and have stood by him all this time and will stand by him
until God calls me to him. I am working on starting our own business as a State Certified
Medical Interpreter and when my husband comes home he will help me with answering
phones, setting up appointments, sending invoices, receiving payments, in general taking
over the office and he has the support and help from his family and mine, (sisters brothers
nieces and nephews too)if needing work or housing or any type of support. In general if I
didn't believe in my husband Wayne Ross I would not have married Wayne S. Ross or
stood by him in any way shape or form. In general our family believes in Wayne being a
productive and law abiding citizen, as Wayne S. Ross has paid his dues to society. You
might have had doubts about Mr. Ross but that might be because you only know about
Mr. Ross I know him and I strongly believe in him. I hope I have made my point across
clearly of the intent of this letter, to show you that Wayne S. Ross has a family that cares
and loves him and will be there for him in the time of need, I know I can only speak for
myself but in a way I am speaking for all of the family and I know one day by the grace
of God Wayne will be back with us. I have more to say but I would need a book to say it,
I hope or I should say I know you will take this into consideration in reviewing my
husband's case and sending my husband home to me.

Thank you for your time in reading my letter.

Sincerely,

*Rosa M. Ross*

Rosa M. Ross

March 7, 2005

1020 West 70th Street
Los Angeles, CA 90044

RE: Wayne S. Ross

To Whom It May Concern:

My name is Carolyn R. Freeman Middlebrook, and I am Wayne second oldest sister and I have known him all of his life.

I've keep up on Wayne progress these last few years through his wife Rosa because up until now I have not been able to travel to see him.

Wayne has had a lot of quite time to reflect on the mistake he made. Despite his mistake, he is a good person, and has shown interest in improving himself by working and taking classes.

He is a conscientious person, and I believe he is willing to learn all that he can to help better himself for when he is released from prison.

I know he is reliable, and diligent, willing to help out whenever he can. He can be counted on, as he was, so helpful to our mother while he was still home.

I think Wayne will prove to be a valuable asset to any community when released and given a chance to succeed.

I am a widow currently living alone. I own my home, and have lived here for thirty-seven years.

I am willing to assist Wayne, and his wife Rosa, and willing to provide housing for them.

My telephone is area code (323) 778-5298.

Respectfully,

*Carolyn R. Freeman Middlebrook*
Ms. Carolyn R. Freeman Middlebrook

1020 West 70th Street
Los Angeles, CA 90044

October 27, 2002

RE: Wayne S. Ross

Board of Prison Terms
1515 K Street, Suite 600
Sacramento, CA 95814





To Whom It May Concern:

My name is Carolyn R. Freeman Middlebrook and I am Wayne's second oldest sister. I have known him all of his life. He is a personable young man.

I've kept in contact with Wayne through the years. I've noted that he has developed a mature attitude regarding life in general.

He is a responsible, conscientious person, and I find him to be friendly, reliable, and diligent. Wayne is an extremely knowledge individual who can be counted on. He is sensible, sensitive, and was very helpful to our mother after we left home to start new lives. He is a unique blend of natural ability, directness, common sense, congeniality, and sincerity. He is family oriented, and willing to except responsibilities. These attributes are important to any community we live in. Without reservation, or qualification in my opinion, I think Wayne will prove to be a valuable asset to any community when given a chance to succeed.

Despite Wayne's mistakes, He is a good person. He has shown interest in improving his work skills by taking classes in machine shop, as well as janitorial work. I feel that this will enhance his work employment options.

According to the job market in the Los Angeles area, I feel reasonably certain that Wayne will be able to get his feet back on the ground again and start a productive life for himself and his wife Rosa Ross.

I currently live alone and have owned my home for the last thirty- four years, and I am willing to assist Wayne and his wife, and willing to provide housing for them. My address is 1020 West 70th Street, Los Angeles, CA 90044. The telephone number is (323) 778-5298.

Respectfully,

Carolyn R. Freeman Middlebrook

crm:

cc:    Mr. Esparaz
       Mr. Wayne S. Ross

02/24/05

To Whom It May Concern:

My brother has server more than 15 years and its time for him to come home to us. Please send him home to us. He's sorry for what he has done and he wishes that it never happen, he is a very good man before and after the fact.

He will be able to come home with family that loves him very much. He will be an asset to the community. He can work at anything, he is a fast learner.

I will work with him and support him; I will see that he and his wife have a place to go to. My brother is a find man and he needs to be able to prove that he can work with the community and with co-works when he has a job. He is a fun loving person, and he will be an assess to the community. Thank you,


Evelyn L Allison

To Whom It May Concern:

My name is Evelyn L Allison I am <u>Wayne S Ross</u> sister. I have know Wayne all my life I took care of him when he was a baby I am his older sister. I know Wayne made a mistake and he knows that he made a mistake. He was very young and he has learned from that mistake. With God and his family and friends help he can and will be an asset to his community. My family will provide housing until he and his wife are able to go out on their own. We all will be there for him. Please let him come home to us. Thank you.

Here is the address: 10207 Westonhill Dr
San Diego CA 92126
Phone: 858-578-8799

Evelyn L. Allison

10-16-02



RECEIVED
NOV
BOARD OF PRISON TERMS

02/26/05

To:      To Whom It May Concern
From:    Larry D. Foster
Subject: Support letter for Wayne S. Ross D59353

It is an honor and privilege to write this support letter on behalf of Mr. Ross. As a friend of Mr. Ross for approximately 3 years, I have noticed a significant change in his demeanor, for the positive. I feel that Mr. Ross will be a notable asset to the community as well as society as a whole upon his release. As we all go through life, we all make mistakes, that's how we learn. The Bible tells us "He that is without sin may cast the first stone." Mr. Ross I feel has learned from his mistake and is ready to return as a productive member to society. Mr. Ross will have a significant support group comprised of family and friends awaiting him upon his release.

Larry D Foster

To:      To whom it may concern
From:    Larry D. Foster
Subject: Support letter for Wayne S. Ross  D59353

    It is an honor and privilege to write this support letter on behalf of Mr. Ross. As a friend of Mr. Ross for approximately two (2) years, I have noticed a significant change in his demeanor, for the positive. I feel that Mr. Ross will be a notable asset to the community as well as society as a whole upon his release. As we all go through life, we all make mistakes, that's how we learn. The Bible tells us "He that is without sin may cast the first stone." Mr. Ross I feel has learned from his mistake and is ready to return as a productive member to society.  Mr. Ross will have a significant support group comprised of family and friends awaiting him upon his release.

*Larry D. Foster*    10/16/02

2/26/05

To Whom It May Concern:

My name is April Underwood and I am writing you regarding my uncle, Wayne S. Ross. I was informed that he might be up for parole and letters showing that he'll have support may help. I hope so. Because I do support and pray for his release. It's hard to write these letters because the person that you see before you, you will see as a convicted criminal. The person that I am writng to you about has always worked hard, been kind and very generous to me. Did silly magic tricks to make me laugh when I was crying or scared, gave me money for the ice cream truck after mom said No!! In short, my favorite uncle. I love him. It's hard to write these letters because it's hard to reconcile the two impressions, the one I have and the one you will have. The only way it makes sense to me is the knowledge that even good people, honorable men and women, can make terrible mistakes. I am hopeful that he will be released soon because it's sad to think that a horrible mistake that he made in the worst 10 minutes of his life, will obliterate all the good that he'd done *up to* that point, *and* all the good he's capable of in the future. I know a little bit about reform. At present I spend a minimum of 70 hours per month in a volunteer Bible education work. I cringe in shame at the mean, hurtful, hateful person that I used to be. I physically cringe and shudder at the memories. I am so thankful now that what I *was*, was not all that I would *become*. I am grateful that the darkest time in my past, does not represent who I am today. I am hopeful that the support letters you receive, give you a glimpse of the capacity for the good that friends and family have seen demonstrated in my Uncle Wayne. He has, not only the ability, but the will, the *want to*, to become so much more than the worst mistake in his life. I hope you give him that opportunity.

Respectfully Submitted,

April Underwood
1007 Pontiac Lane
Chanhassen, MN 55317

9/27/02

To Whom It May Concern:
RE: Wayne S. Ross D59353
   C + F  F-151

      I received some good news yesterday in the form of 2 letters and a phone call. My Uncle, Wayne Ross, is being granted a hearing to request parole this November. I was then told that we'd be able to write letters that the parole board would see, so I'd like to thank you now for giving me this opportunity.

      My name is April Underwood. I'm 28 yrs old and I have known my Uncle Wayne all of my life. He was there when I was born, we even lived together as a family for a while when I was in grade school. We had uncles, cousins, mother and grandmother all under one roof so I have real memories of him to reference the person he was then to the person he is now. I loved him then because he was always good to us kids. We all agreed, he was our favorite Uncle(still is). I still love him but being an adult now, my perspective has changed. I now also respect my Uncle Wayne. Each conversation I have with him adds and builds on that love and respect because of what we talk about. His plans, goals, what he values now are all quite a bit different now. I like the person he had grown into. I respect his sincerity. When he gives me advice it's from the standpoint of doing what's right in the first place, not making sure you don't get caught later on. This is VERY different than some others, even in our own family. I can honestly say that with all the uncles I have, he is the ONLY one that warrants my time and concern to even WRITE a letter like this. The others wouldn't ask. They know my standards so they figure, 'why bother?' They're right. They shouldn't.

      I'm a bible student so Uncle Wayne asks me lots of questions and we have great conversations. Sometimes it's hard for him to ask a direct question though, almost as if he's afraid of what the answer might be. You can see his mind working on what we read. You can also see that light of understanding come on when he really gets it. The questions he finds hard to ask give evidence of a conscience he's struggling with, probably for quite some time now. I keep reminding him that the person he *was* then is not the person he *is* now. Nor the person he will be going forward and making decisions.

      Something else he struggles with is the fact that he can't be there to support us when we need him. That's why I know when he's released, he won't be going back. It can, and does happen like that. My own father was paroled over 20 yrs ago and hasn't looked back since. He's now a state employee of California. He, too visits Uncle Wayne, shares the bible with him, and shows by living example that it <u>can</u> be done.(I expect you'll receive a letter from my dad, too) My Uncle is a good man, a good man that made a terrible <u>mistake</u>.

      I wish I could explain to you the moral caliber and quality of the people supporting him,(my mother, my father, his wife) and how real and genuine they are. They wouldn't BE there if he weren't a good man, they have too much integrity for that.

      Every one of us would be willing to have him live with us. My parents in Sacramento have a room they would gladly offer up to Uncle Wayne and his wife, Rosa. So do I in fact. They are welcome to it. We look forward to doing whatever we can. I live in Minnesota, Rosa and my parents in different parts of California yet we all talk to each other regularly, <u>at least</u> once a week, sometimes more. We encourage each other. Rosa is currently preparing to take an exam to become a licensed interpreter. The income she'll be able to make will allow her to buy a house. She wants spare bedrooms for family gatherings. This is the environment my Uncle will start the next phase of his rehabilitation in. And that's why it will work.

Thank you for your time and consideration.

Respectfully Submitted,

*April D. Underwood*

April D. Underwood(niece)
8350 Fremont Avenue South
# 302
Bloomington, MN  55420
(952)250-7777

02/25/05

To Whom It May Concern:

My Uncle has served more than 15 years in prison. I feel he has redeemed him self and is ready to be back in society. We are ready for him to come home and be a positive role model in our community. He is sorry for what he has done and he wishes that it never happened. He is a very good Uncle.

My family will support him, and help with his transition back into the community. My Uncle is a good man and needs a chance to prove that he can do the right things and be a kind, respectable, and honest human being. He will get a job, and be able to work in our community.

Thank you for your time.

Deliaha Martin

*Deliaha A. Martin*

October 22, 2002



To Whom It May Concern:

From: Deliaha A Martin

Hi I am Wayne Ross's Niece I have know Wayne all of my life he was a good uncle to me, and I miss him a lot. I believe he will make a good citizen when you release him. He made a mistake which cost him the privileges to be with his mother at the time of her death but Wayne has a good attitude about every thing and with God helps, he will make it out in society. Wayne has a supportive family waiting for him when he comes home.

Sincerely Deliaha Martin

Jack M. Underwood
7734 LaMancha Way
Sacramento CA 95823

June 30, 2005

RE: Wayne S. Ross  D59353
Parole Board Hearing

Dear Members of the Parole Board,

I am writing this letter on behalf of my brother-in-law, Wayne Ross, in regard to his upcoming parole board hearing. I'm more than happy to do this for Wayne because I've come to know him very well over the years. And the reason I can say this is, I married into the family in 1974 and not only had an opportunity to observe Wayne but lived under the same roof till we could afford our own place.

As a young man, Wayne was a standout among many his age and in the community he lived in. Being involved in sports, music and things like this kept him busy in a good way. But that was not what impressed me. What impressed me most is how he respected and cared for his mom, before any of this happened. Always ready to help with the bills, Wayne took it upon himself to work two jobs at one point, not seeking any praise but considering it the right thing to do. His present wife (at the time his girlfriend) Rosa, was there as well exerting a positive influence on Wayne and helping the family as well. No one has shown a more faithful spirit than his loving wife as she continues to do till this day.

I know personally that Wayne was not a trouble maker and not one to get into trouble, at least not until this occurred. No one can minimize the seriousness of the crime, especially Wayne Ross. This was not a robbery, this was not an act of hatred or malice. This was Wayne's friend that he had come to know over a period of time. No one knows all the details except Wayne and God. But one thing I'm sure of is this, that the same man that made that bad choice years ago, is not the same man before you at this time. Life holds no guarantees, but if you want to take a chance on someone, let it be Wayne S. Ross  D59353. He was an honorable young man before this happened and if given the chance he can be again.

My interest is somewhat personal. My wife June and I are volunteer ministers of Jehovah's Witnesses and we're very involved in helping people change their lives by applying Bible principles. This is something Wayne seems to be agreeable to. I would like to think that it's not only because of where he's at that he is considerate of the Bible, because people I talk with daily have a similar response. We visit Wayne as often as we can. With proper guidance even you would be amazed at what he could accomplish (John 14:12). We could certainly use his help in this life saving work.

I can't say I knew Ernie at all, perhaps seeing him a couple of times, but Wayne always spoke of him as a friend. However, I can't imagine anyone wanting their friend to continue to be punished for something that's already causing them pain. While we grieve deeply for the Sanchez family, we respectfully ask that you release Wayne Ross and grant him the chance that he deserves.

Respectfully
Jack M. Underwood
June F. Underwood
Jack/June Underwood

To: Whom It May Concern

Re: Wayne S. Ross, D59353
Soledad State Prison
Parole Hearing Date: Nov. 4, 2002

from: Jack M. Underwood
7734 LaMancha Way
Sacramento CA 95823
(916) 399-5782

October 13, 2002

Dear Board Members,

It is with deep thought and consideration that I write you on behalf of Wayne S. Ross, D59353, an inmate at your facility. My name is Jack Underwood. I am a minister and also a brother-in-law to Wayne. I hope to shed some light on what I know about him that you may find helpful in making your decision.

Wayne married while in prison, however, I knew his future wife Rosa Martin before he got into this trouble. Rosa has a positive influence on Wayne and this can only work to help him be a better person. Her faithfulness is something he can learn from and benefit from.

Another aspect to Wayne is his spiritual side. This is kind of difficult for you to ascertain, due to the fact that this is dealing with his heart and mind. One wise man put it this way,..."God is examining the heart (Proverbs 17:3). Having talked to Wayne about his future and his spirituality, I can see he does have strong desires about living his life the right way, according to God's standards. This is not an easy thing to do, or the Bible would not refer to it as traveling a "narrow road." A narrow road can be a dangerous one if distracted, so there is a need to be alert and focused. Wayne is on the right track.

I have encouraged Wayne to read the Bible, meditate and reflect on scriptures he can apply to his life, even memorizing them. One in particular, Matthew 5:3, which reads in part, "Happy are those conscious of their spiritual need . . ." Quoted from Jesus' Sermon on the Mount.

It is not easy to find good, reliable answers, but when you perceive your limitations, it is good and comforting to know you can find the answers in God's Word, the Bible. It has been my joy and privilege to help Wayne and Rosa

his wife, as well, to look to God's Word for answers. Also to help Wayne see, that to be able to talk to God about anything at anytime is indeed a privilege.

Reflecting on the past, some say time heals all wounds. That may or may not be true. It is true however, that time changes everything. This is certainly the case with Wayne. I've seen it, my wife has seen it, his wife has seen it and hopefully you will too!

Going back to the scene of the crime, reliving it is something that Wayne has to deal with over and over again. Remember, this was not a stranger, or an enemy, but someone Wayne looked upon as a friend. There is no doubt he regrets what he did and always will.

I don't know what criteria you use in making your decision. Hopefully, this information is helpful. We pray for the Sanchez family, and hope the words of John 5:28, 29 will bring them a measure of comfort regarding loved one "sleeping in death", and the future.

In the meantime, we as a family will do all we can to support him and help him make the adjustment upon — release. Our prayers are with you in making your decision. Thank-you!

Respectfully
Jack M. Underwood

Jack M. Underwood (Bro-in-law)
7734 LaMancha Way
Sacramento CA 95823
(916)399-5782

November 17, 2002

To Whom it may concern:

My name is Laura Carbajal, I am Wayne Ross's niece, he is married to my aunt Rosa Ross.

I've known my uncle ever since I was born, he and my aunt would take me every where they went when I was little. What I remember most is that my uncle would always carry me around and play with me and make me laugh. I've kept in touch with him through mail and I have gone to see him I believe a couple of times. I believe my uncle is a law abiding person and will be the day he comes home, I think he has paid his dues to society and deserves to come home I know he is not a bad person I know he will do well once he is home I know he is repent full for what happened sixteen years ago, I know if he could go back to that day he would erase what happened and have gone a different way. What happened to my uncle was just a terrible accident and mistake. I know that my uncle is a good person and a hard worker and he will stay out of trouble from now on. He is looking forward to coming home just like we are and we meaning the family will help him in finding a job and helping him in what ever he needs. I know my aunt is working on being a Certified Medical Interpreter and having my uncle handle the office work while she goes on appointments, with our support I know my uncle will make it.

Thank you for your time

Sincerely,

Laura Carbajal



TO WHOM IT MAY CONCERN

RE: WAYNE S ROSS D59353, Soledad STATE

PAROLE HEARING: NOV ? ...

Regarding THE FAMILY OF EARNIE SANCHEZ...

SISTER OF WAYNE ROSS WHO CAUSED THE DEATH OF YOUR FATHER,
GRANDFATHER, BROTHER, UNCLE ... THERE ARE NO WORDS TO EXPRES.
THAT WILL TOUCH YOUR HEARTS, BUT JUST SO YOU KNOW, WHEN I
THINK OF MY BROTHER, WHAT FLASHES BEFORE ME IS THE LIFE
THAT WAS LOST, MR. EARNIE SANCHEZ. EACH TIME I VISIT MY
BROTHER, IT IS ALWAYS BEFORE ME WHY HE'S THERE. IT
HURTS MY HEART MUCH FOR YOUR FAMILY LOSS. PLEASE... I'M S.
SORRY. I CAN ONLY PRAY FOR THE DAY THAT YOU WILL SEE MR.
SANCHEZ IN THE RESURRECTION OF LIFE. ACTS 24:15


TO THE BOARD:

WHEN A PERSON HAS DONE WRONG TO THE POINT THAT WARRANTS
A PRISON TERM, AND HAS PAID HIS OR HER DEBT TO SOCIETY, THIS
IS ACCORDING MANKIND. UPON WAYNE'S RELEASE THERE IS STILL
A JUDGMENT THAT AWAITS HIM. JEHOVAH GOD. JOHN 5:29 STATES:

THOSE WHO DID GOOD THINGS TO A RESURRECTION OF LIFE,

THOSE WHO DID VILE THINGS TO A RESURRECTION OF JUDGMENT.
PLEASE! WAYNE IS <u>NOT</u> A BAD PERSON. FROM THE VISITS I'VE HAD
WITH WAYNE, I KNOW HE HAS ASKED JEHOVAH GOD FOR FOR-
GIVENESS MANY, MANY TIMES OVER. HE HAS BEEN ATTENTING THE
MEETINGS OF JEHOVAH'S WITNESSES, THIS I KNOW. WITH EACH VISIT,
MY HUSBAND AND I (WHO ARE JEHOVAH'S WITNESSES) TALK IN GREAT
DETAIL REGARDING WEEKLY STUDIES, ALSO MAGAZINES THAT
WAYNE RECEIVE.

WAYNE HAS SPIRITUAL SUPPORT UPON RELEASE, A WONDERFUL

WIFE WHO HAS STOOD BY HIS SIDE. FAMILY MEMBERS WHO WILL BE THERE TO SUPPORT AND HELP WAYNE. MY HUSBAND AND I HAVE OPEN OUR HOME TO WAYNE AND ROSA HIS WIFE. WE & FEEL SACRAMENTO, CA WILL BE A WONDERFUL BEGINNING FOR WAYNE AND ROSA.

I CAN HONESTLY SAY, IF YOU CAN FIND IT IN YOUR HEARTS TO PAROLE WAYNE, THIS PRISON SYSTEM WILL NEVER EVER SEE WAYNE S. ROSS AGAIN.

THANK YOU FOR YOUR CONSIDERATION

June Underwood, SISTER OF WAYNE RO.
7734 LA MANCHA WY.
SAC, CA 95823
(916) 399-5782

Shadina Edmond
7342 Haskell Ave. #305
Van Nuys, CA 91406

December 10, 2002

To Whom It May Concern:

The following letter is in reference to my uncle, Wayne S. Ross, who has been incarcerated since I was
around 10 years old. I, Shadina Edmond, niece of Wayne S. Ross, feel obligated to write this letter because
as a child, having a non-contributive biological father in the house. My uncle, Wayne, was the one who
played the part of an actual father figure for my brother and I. He was the only person in our household
that acted as a provider for me, my brother, my grandmother, and her two sons. He was the only adult that
actually had a job and bought my brother and I the things that we truly needed. I miss the care, the wisdom
and the love that he provided for me.
Despite the mistakes that he has made, my uncle is a good man and would be a hard working and law-
abiding citizen, if given the chance. The years of incarceration have forced a self-reconstruction, and he
has let me know that he has rehabilitated not only himself, but also his state of mind. He is not the same
man that he was seventeen years ago, and would no longer do anything to jeopardize his chance to be with
his family. Everyone in life has made unconscious mistakes and has learned from them. He knows now
that the path that he was on is not the path to take in life. I know that the long journey of being confined
has empowered my uncle to know that there is more to life than sitting in a cell.

Thank you for taking the time to read this letter. I hope that it will encourage you to look deeper into the
man that my uncle is and sincerely consider the chance that he deserves at making a new life for himself.

Sincerely,


Shadina Edmond



*Superior Court of California* 4/9

COUNTY OF VENTURA
Hall of Justice
800 South Victoria Avenue
Ventura, CA 93009

John R. Smiley,
    Presiding Judge
Colleen Toy White,
    Assistant Presiding Judge

**JUDGES**
Brian J. Back
Edward F. Brodie
Frederick H. Bysshe
Charles W. Campbell, Jr.
Bruce A. Clark
James P. Cloninger
Tari L. Cody
Donald D. Coleman
Manuel J. Covarrubias
Herbert Curtis III
John E. Dobroth
Arturo F. Gutierrez
Steven Hintz
Thomas J. Hutchins
Kent M. Kellegrew
Barry B. Klopfer
Barbara A. Lane
William Q. Liebmann
David W. Long
Kevin J. McGee
Patricia M. Murphy
Vincent J. O'Neill, Jr.
Glen M. Reiser
Ken W. Riley
Rebecca S. Riley
Henry J. Walsh

**COMMISSIONERS**
Mark S. Borrell
Ellen Gay Conroy
Douglas W. Daily
Bruce A. Young

MAY 5, 2006

D. S. LEVORSE, C & PR
BOARD OF PAROLE HEARINGS
CTF SOLEDAD
P O BOX 686
SOLEDAD CA 93960

Re: ROSS, WAYNE
CDC No.:    D-59353
Case No.:    CR22128

Dear Sir or Madam:

The trial judge in this case has retired. The Court has no comments to make at the hearing.

Very truly yours,

JOHN R. SMILEY
Presiding Judge

JRS/bl
enc.

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, _____Wayne Ross_____, declare:

I am over 18 years of age and I am party to this action. I am a

resident of CORRECTIONAL TRAINING FACILITY prison, in the County

of Monterrey, State of California. My prison address is:

Wayne Ross_____, CDCR #: D-59353_____
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: ED-110-L_____
SOLEDAD, CA 93960-0689.

On __11/19/2006_____, I served the attached:

Exhibit's for Petitioner's Petition for Writ of Habeas Corpus.

on the parties herein by placing true and correct copies

thereof, enclosed in a sealed envelope (verified by prison

staff), with postage thereon fully paid, in the United States

Mail in a deposit box so provided at the above-named institution

in which I am presently confined. The envelope was addressed as

follows:

Superior Court of California          Attorney General of California
County of Ventura                     P.O. Box 944255
P.O. Box 6489                         Sacramento, CA 94244-2550
Ventura, CA 93006-6489

I declare under penalty of perjury under the laws of the

State of California that the foregoing is true and correct.

Executed on __11/19/2006__.

Wayne Sr Ross
Wayne Ross
Declarant